# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, et al.,

*Plaintiffs/Appellants*,

vs.

PALANTIR TECHNOLOGIES INC., et al.,

*Defendants/Appellees*.

_____

Appeal from a Decision of the United States District Court
for the District of Colorado, Case No. 1:22-cv-02384-GPG-SBP
Honorable Gordon P. Gallagher, U.S. District Judge

## APPELLANTS' APPENDIX
## VOLUME 1 OF 10 – PAGES 1 TO 233

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
JOSEPH D. DALEY
LUKE O. BROOKS
J. MARCO JANOSKI GRAY
ERIKA L. OLIVER
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

*Counsel for Plaintiffs/Appellants*

# INDEX

| Docket Number | Document – Date | Page |
|---|---|---|
| | **VOLUME 1 OF 10 – Pages 1-233** | |
| -- | Civil Docket, *Cupat v. Palantir Technologies Inc. et al*, No. 1:22-cv-02384-GPG-SBP (D. Colo.) | 5 |
| 91 | Transcript of April 24, 2024 Status Conference | 32 |
| 92 | Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws | 47 |
| 92-1 | Appendix 1 to the Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws | 155 |
| 92-2 | Appendix 2 to the Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws | 167 |
| 102 | Defendants' Combined Motion and Brief to Dismiss Plaintiffs' Second Amended Complaint | 172 |
| | **VOLUME 2 OF 10 – Pages 234-459** | |
| 102-1 | Defendants' Appendix – Volume I of III (D.A. 1 to D.A. 635) to Defendants' Combined Motion and Brief to Dismiss Plaintiffs' Second Amended Complaint [partial] | 238 |
| | **VOLUME 3 OF 10 – Pages 460-689** | |
| 102-1 | Defendants' Appendix – Volume I of III (D.A. 1 to D.A. 635) to Defendants' Combined Motion and Brief to Dismiss Plaintiffs' Second Amended Complaint [partial] | 464 |
| | **VOLUME 4 OF 3 – Pages 690-912** | |
| 102-1 | Defendants' Appendix – Volume I of III (D.A. 1 to D.A. 635) to Defendants' Combined Motion and Brief to Dismiss Plaintiffs' Second Amended Complaint [partial] | 694 |

| | | |
|---|---|---|
| **VOLUME 5 OF 10 – Pages 913-1186** | | |
| 102-2 | Defendants' Appendix – Volume II of III (D.A. 636 to D.A. 887) to Defendants' Combined Motion and Brief to Dismiss Plaintiffs' Second Amended Complaint | 917 |
| **VOLUME 6 OF 10 – Pages 1187-1436** | | |
| 102-3 | Defendants' Appendix – Volume III of III (D.A. 888 to D.A. 1529) to Defendants' Combined Motion and Brief to Dismiss Plaintiffs' Second Amended Complaint [partial] | 1191 |
| **VOLUME 7 OF 10 – Pages 1437-1650** | | |
| 102-3 | Defendants' Appendix – Volume III of III (D.A. 888 to D.A. 1529) to Defendants' Combined Motion and Brief to Dismiss Plaintiffs' Second Amended Complaint [partial] | 1441 |
| **VOLUME 8 OF 10 – Pages 1651-1872** | | |
| 102-3 | Defendants' Appendix – Volume III of III (D.A. 888 to D.A. 1529) to Defendants' Combined Motion and Brief to Dismiss Plaintiffs' Second Amended Complaint [partial] | 1655 |
| **VOLUME 9 OF 10 – Pages 1873-2085** | | |
| 103 | Defendants' Request for Judicial Notice and Notice of Documents Incorporated by Reference in Support of Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint | 1877 |
| 107-1 | Appendix in Support of Defendants' Opposition to Plaintiffs' Motion for a Partial Lift of the PSLRA Discovery Stay | 1893 |
| 112 | Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint | 1921 |
| 115 | Defendants' Reply in Support of Their Motion to Dismiss Plaintiffs' Second Amended Complaint Together with Request for Oral Argument | 1981 |
| 115-1 | Defendants' Reply Appendix (R.A. 1 to R.A. 59) in Support of Defendants' Reply in Support of Their Motion | 2013 |

| | to Dismiss Plaintiffs' Second Amended Complaint Together with Request for Oral Argument | |
|---|---|---|
| 118 | Defendants' Response to Plaintiffs' Objection to Materials Submitted with Defendants' Reply in Support of Their Motion to Dismiss Plaintiffs' Second Amended Complaint | 2080 |

### VOLUME 10 OF 10 – Pages 2086-2186

| | | |
|---|---|---|
| 119 | Defendants' Notice of Supplemental Authority | 2090 |
| 120 | Exhibit A to Defendants' Notice of Supplemental Authority | 2094 |
| 122 | Defendants' Notice of Lead Plaintiffs' Attempt to Circumvent the PSLRA's Mandatory Discovery Stay | 2113 |
| 122-1 | Exhibit A to Defendants' Notice of Lead Plaintiffs' Attempt to Circumvent the PSLRA's Mandatory Discovery Stay | 2117 |
| 122-2 | Exhibit B to Defendants' Notice of Lead Plaintiffs' Attempt to Circumvent the PSLRA's Mandatory Discovery Stay | 2121 |
| 122-3 | Exhibit C to Defendants' Notice of Lead Plaintiffs' Attempt to Circumvent the PSLRA's Mandatory Discovery Stay | 2126 |
| 123 | Order | 2143 |
| 124 | Final Judgment | 2181 |
| 125 | Notice of Appeal | 2183 |

# U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:22-cv-02384-GPG-SBP

Cupat v. Palantir Technologies Inc. et al
Assigned to: District Judge Gordon P Gallagher
Referred to: Magistrate Judge Susan Prose
Case in other court: U.S. Court of Appeals, 10th Cir., 25-01178
Cause: 15:78 Securities Exchange Act

Date Filed: 09/15/2022
Date Terminated: 04/04/2025
Jury Demand: Plaintiff
Nature of Suit: 850 Securities, Commodities, Exchange
Jurisdiction: Federal Question

**Plaintiff**

**Minchie Galot Cupat**
*Individually and on Behalf of All Others Similarly Situated*

represented by **Joseph Alexander Hood , II**
Pomerantz LLP
600 Third Avenue
20th Floor
New York, NY 10016
212-661-1100
Email: ahood@pomlaw.com
*ATTORNEY TO BE NOTICED*

**Jeremy Alan Lieberman**
Pomerantz LLP
600 Third Avenue
20th Floor
New York, NY 10016
212-661-1100
Fax: 212-661-8665
Email: jalieberman@pomlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WenHong Hu**

represented by **Kathryn A. Reilly**
Wheeler Trigg O'Donnell LLP
370 17th Street
Suite 4500
Denver, CO 80202-5647
303-244-1800
Fax: 303-244-1879
Email: reilly@wtotrial.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019**

represented by **Erika L. Oliver**
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
619-744-2617

Email: eoliver@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

**J. Marco Janoski Gray**
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
619-231-1058
Fax: 619-231-7423
Email: mjanoski@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

**Luke Orion Brooks**
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
619-231-1058
Fax: 619-231-7423
Email: lukeb@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

V.

<u>**Consol Plaintiff**</u>

**Shujun Liu**
*Individually and on Behalf of All Others*
*Similarly Situated*
*trustee*
Liu Family Trust 2019

represented by **Jeffrey Allen Berens**
Johnson Fistel LLP
2373 Central Park Boulevard
Suite 100
Denver, CO 80238
303-861-1764
Email: jeffb@johnsonfistel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**Palantir Technologies Inc.**

represented by **Anna C. Van de Stouwe**
Holland & Hart LLP
Commercial Litigation/Appellate
555 17th Street
Suite 3200
Denver, CO 80202
303-295-8017
Email: avandestouwe@ftc.gov
*TERMINATED: 08/03/2023*
*ATTORNEY TO BE NOTICED*

**Boris Feldman**
Freshfields US LLP
855 Main Street

Redwood City, CA 94063
650-461-8200
Email: boris.feldman@freshfields.com
*ATTORNEY TO BE NOTICED*

**David Y. Livshiz**
Freshfields US LLP
3 World Trade Center
175 Greenwich Street
51st Floor
New York, NY 10007
212-284-4979
Email: david.livshiz@freshfields.com
*ATTORNEY TO BE NOTICED*

**Holly Stein Sollod**
Holland & Hart LLP
P. O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201-8749
303-295-8085
Fax: 303-295-8261
Email: hsteinsollod@hollandhart.com
*TERMINATED: 04/08/2024*
*ATTORNEY TO BE NOTICED*

**Kimberly J. Willis**
Holland & Hart LLP
P. O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201-8749
303-295-8528
Fax: 303-975-5426
Email: kjwillis@hollandhart.com
*TERMINATED: 04/08/2024*
*ATTORNEY TO BE NOTICED*

**Matthew S. Kahn**
Gibson Dunn & Crutcher LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715
415-393-8212
Email: MKahn@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Michael David Celio**
Gibson Dunn & Crutcher LLP
310 University Avenue
Palo Alto, CA 94301
650-849-5326
Email: MCelio@gibsondunn.com

*ATTORNEY TO BE NOTICED*

**Nathan A. Keever**
Dufford Waldeck Milburn & Krohn, LLP
744 Horizon Court
Suite 300
Grand Junction, CO 81504
970-241-5500
Fax: 970-243-7738
Email: keever@dwmk.com
*TERMINATED: 07/30/2024*

**Nicholas Angelo Caselli**
Freshfields US LLP
3 World Trade Center
175 Greenwich Street
51st Floor
New York, NY 10007
212-277-4000
Email: nicholas.caselli@freshfields.com
*ATTORNEY TO BE NOTICED*

**Sam D. Starritt**
Starritt Legal LLC
222 North 7th Street
Suite A
Grand Junction, CO 81501
970-335-8831
Email: sam@starrittlegal.com
*ATTORNEY TO BE NOTICED*

**Wesley Sze**
Gibson Dunn & Crutcher LLP
310 University Avenue
Palo Alto, CA 94301
650-849-5347
Email: wsze@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Defendant**

Alexander C. Karp                    represented by **Anna C. Van de Stouwe**
(See above for address)
*TERMINATED: 08/03/2023*
*ATTORNEY TO BE NOTICED*

**Boris Feldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Y. Livshiz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Stein Sollod**

(See above for address)
*TERMINATED: 04/08/2024*
*ATTORNEY TO BE NOTICED*

**Kimberly J. Willis**
(See above for address)
*TERMINATED: 04/08/2024*
*ATTORNEY TO BE NOTICED*

**Matthew S. Kahn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael David Celio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan A. Keever**
(See above for address)
*TERMINATED: 07/30/2024*

**Nicholas Angelo Caselli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam D. Starritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wesley Sze**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**David Glazer**                    represented by    **Anna C. Van de Stouwe**
(See above for address)
*TERMINATED: 08/03/2023*
*ATTORNEY TO BE NOTICED*

**Boris Feldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Y. Livshiz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Stein Sollod**
(See above for address)
*TERMINATED: 04/08/2024*
*ATTORNEY TO BE NOTICED*

**Kimberly J. Willis**
(See above for address)

*TERMINATED: 04/08/2024*
*ATTORNEY TO BE NOTICED*

**Matthew S. Kahn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael David Celio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan A. Keever**
(See above for address)
*TERMINATED: 07/30/2024*

**Nicholas Angelo Caselli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam D. Starritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wesley Sze**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Shyam Sankar**                    represented by    **Anna C. Van de Stouwe**
(See above for address)
*TERMINATED: 08/03/2023*
*ATTORNEY TO BE NOTICED*

**Boris Feldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Y. Livshiz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Stein Sollod**
(See above for address)
*TERMINATED: 04/08/2024*
*ATTORNEY TO BE NOTICED*

**Kimberly J. Willis**
(See above for address)
*TERMINATED: 04/08/2024*
*ATTORNEY TO BE NOTICED*

**Matthew S. Kahn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael David Celio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan A. Keever**
(See above for address)
*TERMINATED: 07/30/2024*

**Nicholas Angelo Caselli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam D. Starritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wesley Sze**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Consol Defendant**

**Stephen Cohen**                                    represented by **Boris Feldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Y. Livshiz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew S. Kahn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael David Celio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Angelo Caselli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam D. Starritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wesley Sze**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Consol Defendant**

**Peter Thiel**  represented by  **Boris Feldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Y. Livshiz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew S. Kahn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael David Celio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Angelo Caselli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam D. Starritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wesley Sze**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Consol Defendant**

**William Ho**  represented by  **Boris Feldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Y. Livshiz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Angelo Caselli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam D. Starritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Consol Defendant**

**Kevin Kawasaki**  represented by  **Boris Feldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Y. Livshiz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew S. Kahn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael David Celio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Angelo Caselli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam D. Starritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wesley Sze**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Consol Defendant**

**Alexander Moore**                    represented by   **Boris Feldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Y. Livshiz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew S. Kahn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael David Celio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Angelo Caselli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam D. Starritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wesley Sze**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Consol Defendant**

**Spencer Rascoff**                    represented by   **Boris Feldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Y. Livshiz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew S. Kahn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael David Celio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Angelo Caselli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam D. Starritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wesley Sze**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Consol Defendant**

Alexandra Schiff                    represented by    **Boris Feldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Y. Livshiz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew S. Kahn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael David Celio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Angelo Caselli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam D. Starritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wesley Sze**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**Afa Sjuk tjanstepensionsaktiebolag**

represented by **Naumon Amjed**
Kessler Topaz Meltzer & Check LLP
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
Fax: (610) 667-7056
Email: namjed@ktmc.com
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**Afa Liv tjanstepensionsaktiebolag**

represented by **Naumon Amjed**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**Afa Trygg tjanstepensionsaktiebolag**

represented by **Naumon Amjed**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**Michael Nagar**

represented by **Adam Marc Apton**
Levi & Korsinsky LLP
33 Whitehall Street
27th Floor
New York, NY 10004
212-363-7500
Email: aapton@zlk.com
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**Mohammad Aboobakar**

represented by **Adam Marc Apton**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**New Mexico State Investment Council**

represented by **Rusty Evan Glenn**
Shuman Glenn & Stecker
600 17th Street
Suite 2800 South
Denver, CO 80202
303-861-3003
Fax: 303-536-7849
Email: rusty@shumanlawfirm.com
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**Public Employees Retirement Association
of New Mexico**

represented by **Rusty Evan Glenn**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**Public Employees' Retirement System of
Mississippi**

represented by **Rusty Evan Glenn**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Movant**

**Vitoldas Ciparis**                        represented by **Robert Vincent Prongay**
Glancy Prongay & Murray LLP
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
310-201-9150
Fax: 310-201-9160
Email: rprongay@glancylaw.com
*ATTORNEY TO BE NOTICED*

**Movant**

**Gagik Yepremyan**                        represented by **Robert Vincent Prongay**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**Lilit Yepremyan**                        represented by **Robert Vincent Prongay**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**California Public Employees' Retirement
System**                        represented by **Christopher Ryan Kinnon**
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
619-408-7787
Email: ckinnon@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

**Danielle S. Myers**
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
619-231-1058
Fax: 619-231-7423
Email: dmyers@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

**Darren Jay Robbins**
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
619-231-1058
Email: darrenr@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

**Erika L. Oliver**

(See above for address)
*ATTORNEY TO BE NOTICED*

**J. Marco Janoski Gray**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey Allen Berens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Luke Orion Brooks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah A. Fallon**
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
619-231-1058
Email: sfallon@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

**Movant**

**Atef Zakhary**                    represented by **Jeremy Alan Lieberman**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/15/2022 | 1 | COMPLAINT against David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar (Filing fee $ 402,Receipt Number ACODC-8659939)Attorney Jeremy Alan Lieberman added to party Minchie Galot Cupat(pty:pla), filed by Minchie Galot Cupat. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons - Palantir Technologies Inc., # 3 Proposed Summons - Alexander C. Karp, # 4 Proposed Summons - David Glazer, # 5 Proposed Summons - Shyam Sankar)(Lieberman, Jeremy) (Entered: 09/15/2022) |
| 09/15/2022 | 2 | Case assigned to Judge Charlotte N. Sweeney and drawn to Magistrate Judge S. Kato Crews. Text Only Entry. (jcharl, ) (Entered: 09/15/2022) |
| 09/15/2022 | 3 | SUMMONS issued by Clerk. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Magistrate Judge Consent Form) (jcharl, ) (Entered: 09/15/2022) |
| 09/16/2022 | 4 | ORDER REFERRING CASE to Magistrate Judge S. Kato Crews **non-dispositive matters**. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of Local Civ. R. 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, (4) pursuant to Local Civ. R. 16.6 and at the discretion of the Magistrate Judge, convene such |

| | | |
|---|---|---|
| | | early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned. By Judge Charlotte N. Sweeney on 9/16/2022. Text Only Entry (cnssec.) (Entered: 09/16/2022) |
| 09/22/2022 | 5 | NOTICE of Entry of Appearance by Joseph Alexander Hood, II on behalf of Minchie Galot CupatAttorney Joseph Alexander Hood, II added to party Minchie Galot Cupat(pty:pla) (Hood, Joseph) (Entered: 09/22/2022) |
| 11/14/2022 | 6 | **WITHDRAWN** MOTION to Consolidate Cases , MOTION for Appointment *as Lead Plaintiff*, MOTION to Appoint Counsel by Movants Afa Sjuk tjanstepensionsaktiebolag, Afa Liv tjanstepensionsaktiebolag, Afa Trygg tjanstepensionsaktiebolag. (Attachments: # 1 Proposed Order (PDF Only), # 2 Declaration of Naumon A. Amjed, # 3 Exhibit A - Certification, # 4 Exhibit B - Loss Chart, # 5 Exhibit C - Notice of Pendency, # 6 Exhibit D - Firm Resume)(Amjed, Naumon) Modified on 11/30/2022 motion withdrawn per [#21] Order. (sphil, ). (Entered: 11/14/2022) |
| 11/14/2022 | 7 | **WITHDRAWN** MOTION to Consolidate Cases *, MOTION to Appoint Lead Plaintiff*, MOTION to Appoint Counsel by Movants Michael Nagar, Mohammad Aboobakar. (Attachments: # 1 Declaration of Adam M. Apton, # 2 Exhibit A- PSLRA Certification, # 3 Exhibit B- Loss Chart, # 4 Exhibit C- PSLRA Notice, # 5 Exhibit D- Joint Declaration, # 6 Exhibit E- LK Resume, # 7 Proposed Order (PDF Only))(Apton, Adam) Modified on 11/30/2022 to withdraw motion per [#23] Order. (sphil, ). (Entered: 11/14/2022) |
| 11/14/2022 | 8 | **WITHDRAWN** MOTION to Consolidate Cases , MOTION for Appointment *as Lead Plaintiff*, MOTION to Appoint Counsel by Movants New Mexico State Investment Council, Public Employees Retirement Association of New Mexico, Public Employees' Retirement System of Mississippi. (Attachments: # 1 Exhibit A, NM SIC Certification, # 2 Exhibit B, NM SIC Loss Chart, # 3 Exhibit C, NM PERA Certification, # 4 Exhibit D, NM PERA Loss Chart, # 5 Exhibit E, MS PERS Certification, # 6 Exhibit F, MS PERS Loss Chart, # 7 Exhibit G, Cupat PSLRA Notice, # 8 Exhibit H, Allegheny PSLRA Notice, # 9 Exhibit I, Liu PSLRA Notice, # 10 Exhibit J, Joint Declaration, # 11 Exhibit K, G&E Firm Resume, # 12 Proposed Order (PDF Only))(Glenn, Rusty) Modified on 12/5/2022 to withdraw motion per [#25] Order. (sphil, ). (Entered: 11/14/2022) |
| 11/14/2022 | 9 | **WITHDRAWN** MOTION to Consolidate Cases , MOTION for Appointment *as Lead Plaintiff*, MOTION to Appoint Counsel by Movants Vitoldas Ciparis, Gagik Yepremyan, Lilit Yepremyan. (Attachments: # 1 Exhibit A - PSLRA Notice, # 2 Exhibit B - Certifications of Movants, # 3 Exhibit C - Financial Interest Analysis, # 4 Exhibit D - Movants' Joint Declaration, # 5 Exhibit E - GPM Firm Resume, # 6 Proposed Order (PDF Only))(Prongay, Robert) Modified on 12/6/2022 to withdraw motion per [#32] Order. (sphil, ). (Entered: 11/14/2022) |
| 11/14/2022 | 10 | MOTION to Consolidate Cases *, for Appointment as Lead Plaintiff*, MOTION to Appoint Counsel by Movant California Public Employees' Retirement System. (Attachments: # 1 Proposed Order (PDF Only))(Myers, Danielle) (Entered: 11/14/2022) |
| 11/14/2022 | 11 | **WITHDRAWN** MOTION to Consolidate Cases *Motion Of WenHong Hu For Consolidation Of Related Actions, Appointment As Lead Plaintiff, And Approval Of Selection Of Counsel* by Plaintiff WenHong Hu. (Attachments: # 1 Proposed Order (PDF Only), # 2 Declaration of Kathryn A. Reilly, # 3 Exhibit A to Declaration of Kathryn A. Reilly, # 4 Exhibit B to Declaration of Kathryn A. Reilly, # 5 Exhibit C to Declaration of Kathryn A. Reilly, # 6 Exhibit D to Declaration of Kathryn A. Reilly, # 7 Exhibit E to Declaration of Kathryn A. Reilly)(Reilly, Kathryn) Modified on 12/6/2022 to withdraw motion per [#31] Order. (sphil, ). (Entered: 11/14/2022) |

| 11/14/2022 | 12 | DECLARATION of *Danielle S. Myers* regarding MOTION to Consolidate Cases *, for Appointment as Lead Plaintiff* MOTION to Appoint Counsel 10 by Movant California Public Employees' Retirement System. (Attachments: # 1 Exhibit 1 - PSLRA Notice, # 2 Exhibit 2 - Allegheny Notice, # 3 Exhibit 3 - Liu Notice, # 4 Exhibit 4 - Certification, # 5 Exhibit 5 - Estimate of losses, # 6 Exhibit 6 - Declaration of Matthew Jacobs)(Myers, Danielle) (Entered: 11/14/2022) |
|---|---|---|
| 11/14/2022 | 13 | **WITHDRAWN** MOTION to Consolidate Cases , MOTION for Appointment *as Lead Plaintiff and Lead Counsel* by Movant Atef Zakhary. (Lieberman, Jeremy) Modified on 12/6/2022 to withdraw motion per [#28] Order. (sphil, ). (Entered: 11/14/2022) |
| 11/14/2022 | 14 | DECLARATION of *Jeremy A. Lieberman* regarding MOTION to Consolidate Cases MOTION for Appointment *as Lead Plaintiff and Lead Counsel* 13 by Movant Atef Zakhary. (Attachments: # 1 Exhibit A - Damages Analysis, # 2 Exhibit B - Press Release, # 3 Exhibit C - Certification, # 4 Exhibit D - Movant Declaration, # 5 Exhibit E - Firm Resume, # 6 Proposed Order (PDF Only))(Lieberman, Jeremy) (Entered: 11/15/2022) |
| 11/14/2022 | 15 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 7 MOTION to Consolidate Cases *, MOTION to Appoint Lead Plaintiff* MOTION to Appoint Counsel filed by attorney**Adam M. Apton**. **DO NOT REFILE THE DOCUMENT. Action to take -** counsel must submit a change of contact request through the Manage my Account tab at the PACER website at https://www.pacer.gov/, pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Civil cases).(Text Only Entry) (sphil, ) (Entered: 11/15/2022) |
| 11/17/2022 | 16 | NOTICE of Entry of Appearance by Boris Feldman on behalf of All Defendants Attorney Boris Feldman added to party David Glazer(pty:dft), Attorney Boris Feldman added to party Alexander C. Karp(pty:dft), Attorney Boris Feldman added to party Palantir Technologies Inc.(pty:dft), Attorney Boris Feldman added to party Shyam Sankar (pty:dft) (Feldman, Boris) (Entered: 11/17/2022) |
| 11/17/2022 | 17 | CORPORATE DISCLOSURE STATEMENT. (Feldman, Boris) (Entered: 11/17/2022) |
| 11/17/2022 | 18 | NOTICE of Entry of Appearance by David Y. Livshiz on behalf of All Defendants Attorney David Y. Livshiz added to party David Glazer(pty:dft), Attorney David Y. Livshiz added to party Alexander C. Karp(pty:dft), Attorney David Y. Livshiz added to party Palantir Technologies Inc.(pty:dft), Attorney David Y. Livshiz added to party Shyam Sankar(pty:dft) (Livshiz, David) (Entered: 11/17/2022) |
| 11/21/2022 | 19 | NOTICE of Entry of Appearance by Nicholas Angelo Caselli on behalf of All Defendants Attorney Nicholas Angelo Caselli added to party David Glazer(pty:dft), Attorney Nicholas Angelo Caselli added to party Alexander C. Karp(pty:dft), Attorney Nicholas Angelo Caselli added to party Palantir Technologies Inc.(pty:dft), Attorney Nicholas Angelo Caselli added to party Shyam Sankar(pty:dft) (Caselli, Nicholas) (Entered: 11/21/2022) |
| 11/28/2022 | 20 | NOTICE re 6 MOTION to Consolidate Cases MOTION for Appointment *as Lead Plaintiff* MOTION to Appoint Counsel *Notice of Withdrawal of Motion* by Movants Afa Liv tjanstepensionsaktiebolag, Afa Sjuk tjanstepensionsaktiebolag, Afa Trygg tjanstepensionsaktiebolag (Amjed, Naumon) (Entered: 11/28/2022) |
| 11/29/2022 | 21 | ORDER withdrawing 6 MOTION to Consolidate Cases, MOTION for Appointment as Lead Plaintiff, MOTION to Appoint Counsel by Movants Afa Sjuk tjanstepensionsaktiebolag, Afa Liv tjanstepensionsaktiebolag, Afa Trygg tjanstepensionsaktiebolag. The Motion at ECF No. 6 is withdrawn pursuant to the Notice at ECF No. 20 . By Judge Charlotte N. Sweeney on 11/29/2022. Text Only Entry(cnssec.) (Entered: 11/29/2022) |

| | | |
|---|---|---|
| 11/29/2022 | 22 | NOTICE re 7 MOTION to Consolidate Cases , *MOTION to Appoint Lead Plaintiff* MOTION to Appoint Counsel - *Notice of Withdrawal of Motion* by Movants Mohammad Aboobakar, Michael Nagar (Apton, Adam) (Entered: 11/29/2022) |
| 11/29/2022 | 23 | ORDER withdrawing 7 MOTION to Consolidate Cases, MOTION to Appoint Lead Plaintiff, MOTION to Appoint Counsel by Movants Michael Nagar, Mohammad Aboobakar. The Motion at ECF No. 7 is withdrawn pursuant to the Notice filed at ECF No. 22 . By Judge Charlotte N. Sweeney on 11/29/2022. Text Only Entry(cnssec. ) (Entered: 11/29/2022) |
| 12/02/2022 | 24 | NOTICE re 8 MOTION to Consolidate Cases MOTION for Appointment *as Lead Plaintiff* MOTION to Appoint Counsel *Notice of Non-Opposition to Competing Motions for Appointment as Lead Plaintiff and Approval of Lead Counsel* by Movants New Mexico State Investment Council, Public Employees Retirement Association of New Mexico, Public Employees' Retirement System of Mississippi (Glenn, Rusty) (Entered: 12/02/2022) |
| 12/02/2022 | 25 | ORDER withdrawing 8 MOTION to Consolidate Cases, MOTION for Appointment as Lead Plaintiff, MOTION to Appoint Counsel by Movants New Mexico State Investment Council, Public Employees Retirement Association of New Mexico, Public Employees' Retirement System of Mississippi. The Motion at ECF No. 8 is withdrawn pursuant to the Notice filed at ECF No. 24 . By Judge Charlotte N. Sweeney on 12/2/2022. Text Only Entry(cnssec. ) (Entered: 12/02/2022) |
| 12/02/2022 | 26 | Joint MOTION for Order to *grant Unopposed Motion Regarding Scheduling* by Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Proposed Order (PDF Only))(Feldman, Boris) (Entered: 12/02/2022) |
| 12/05/2022 | 27 | NOTICE re 13 MOTION to Consolidate Cases MOTION for Appointment *as Lead Plaintiff and Lead Counsel Notice of Non-Opposition to Competing Motions for Consolidation, Appointment as Lead Plaintiff, and Approval of Counsel* by Movant Atef Zakhary (Lieberman, Jeremy) (Entered: 12/05/2022) |
| 12/05/2022 | 28 | ORDER withdrawing 13 MOTION to Consolidate Cases, MOTION for Appointment as Lead Plaintiff and Lead Counsel. The Motion at ECF No. 13 is withdrawn pursuant to the Notice filed at ECF No. 27 . By Judge Charlotte N. Sweeney on 12/5/2022. Text Only Entry(cnssec.) (Entered: 12/05/2022) |
| 12/05/2022 | 29 | NOTICE re 11 MOTION to Consolidate Cases *Motion Of WenHong Hu For Consolidation Of Related Actions, Appointment As Lead Plaintiff, And Approval Of Selection Of Counsel (Notice of Non-Opposition of WenHong Hu to Competing Lead Plaintiff Motions)* by Plaintiff WenHong Hu (Reilly, Kathryn) (Entered: 12/05/2022) |
| 12/05/2022 | 30 | NOTICE re 9 MOTION to Consolidate Cases MOTION for Appointment *as Lead Plaintiff* MOTION to Appoint Counsel *[Notice of Withdrawal of Motion]* by Movants Vitoldas Ciparis, Gagik Yepremyan, Lilit Yepremyan (Prongay, Robert) (Entered: 12/05/2022) |
| 12/05/2022 | 31 | ORDER withdrawing 11 MOTION to Consolidate Cases Motion Of WenHong Hu For Consolidation Of Related Actions, Appointment As Lead Plaintiff, And Approval Of Selection Of Counsel. The Motion at ECF No. 11 is withdrawn pursuant to the Notice filed at ECF No. 29 . By Judge Charlotte N. Sweeney on 12/5/2022. Text Only Entry(cnssec.) (Entered: 12/05/2022) |
| 12/05/2022 | 32 | ORDER withdrawing 9 MOTION to Consolidate Cases, MOTION for Appointment as Lead Plaintiff, MOTION to Appoint Counsel. The Motion at ECF No. 9 is withdrawn |

| | | |
|---|---|---|
| | | pursuant to the Notice filed at ECF No. 30 . By Judge Charlotte N. Sweeney on 12/5/2022. Text Only Entry(cnssec.) (Entered: 12/05/2022) |
| 12/05/2022 | 33 | NOTICE re 10 MOTION to Consolidate Cases , *for Appointment as Lead Plaintiff* MOTION to Appoint Counsel *Notice of Unopposed Motion* by Movant California Public Employees' Retirement System (Myers, Danielle) (Entered: 12/05/2022) |
| 12/06/2022 | 34 | ORDER Granting 10 California Public Employees' Retirement System's ("CalPERS") Motion for Consolidation of Related Actions, Appointment as Lead Plaintiff, and Approval of Lead Plaintiffs Selection of Lead Counsel. ORDERED that the Clerk of Court will **reassign** Civil Actions 1:22-cv-02805-SKC and 1:22-cv-02893-PAB-KLM to the undersigned as the Presiding District Judge Charlotte N. Sweeney, and to U.S. Magistrate Judge S. Kato Crews in the referral role. All future filings in these consolidated actions shall be made exclusively in the lead case number **22-cv-02384-CNS-SKC**. by Judge Charlotte N. Sweeney on 12/6/2022.(sphil, ) (Entered: 12/06/2022) |
| 12/06/2022 | 35 | ORDER granting 26 Joint Unopposed Motion Regarding Scheduling. By Judge Charlotte N. Sweeney on 12/6/2022.(cnssec. ) (Entered: 12/06/2022) |
| 12/08/2022 | 36 | NOTICE of Entry of Appearance by Luke Orion Brooks on behalf of California Public Employees' Retirement SystemAttorney Luke Orion Brooks added to party California Public Employees' Retirement System(pty:mov) (Brooks, Luke) (Entered: 12/08/2022) |
| 12/09/2022 | 37 | NOTICE of Entry of Appearance by Jeffrey Allen Berens on behalf of California Public Employees' Retirement SystemAttorney Jeffrey Allen Berens added to party California Public Employees' Retirement System(pty:mov) (Berens, Jeffrey) (Entered: 12/09/2022) |
| 12/09/2022 | 38 | NOTICE of Entry of Appearance by J. Marco Janoski Gray on behalf of California Public Employees' Retirement SystemAttorney J. Marco Janoski Gray added to party California Public Employees' Retirement System(pty:mov) (Janoski Gray, J.) (Entered: 12/09/2022) |
| 12/09/2022 | 39 | NOTICE of Entry of Appearance by Christopher Ryan Kinnon on behalf of California Public Employees' Retirement SystemAttorney Christopher Ryan Kinnon added to party California Public Employees' Retirement System(pty:mov) (Kinnon, Christopher) (Entered: 12/09/2022) |
| 12/09/2022 | 40 | NOTICE of Entry of Appearance by Sarah A. Fallon on behalf of California Public Employees' Retirement SystemAttorney Sarah A. Fallon added to party California Public Employees' Retirement System(pty:mov) (Fallon, Sarah) (Entered: 12/09/2022) |
| 12/09/2022 | 41 | Joint MOTION for Order to *Set Schedule for Consolidated Complaint and Response* by Movant California Public Employees' Retirement System. (Attachments: # 1 Proposed Order (PDF Only))(Berens, Jeffrey) (Entered: 12/09/2022) |
| 12/12/2022 | 42 | ORDER granting 41 Joint Motion for Order to Set Schedule for Consolidated Complaint and Response. 1. Lead Plaintiff shall serve and file a consolidated complaint on or before 2/10/2023. 2. Defendants shall serve and file their response to the consolidated complaint on or before 4/7/2023. 3. If Defendants move to dismiss the consolidated complaint, Lead Plaintiff shall serve and file its brief in opposition to Defendants' motion to dismiss on or before 6/19/2023, and Defendants shall serve and file their reply brief in support of their motion to dismiss on or before 7/19/2023. By Judge Charlotte N. Sweeney on 12/12/2022. Text Only Entry(cnssec.) (Entered: 12/12/2022) |
| 12/13/2022 | 43 | NOTICE of Entry of Appearance by Holly Stein Sollod on behalf of David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam SankarAttorney Holly Stein Sollod added to party David Glazer(pty:dft), Attorney Holly Stein Sollod added to party Alexander C. Karp(pty:dft), Attorney Holly Stein Sollod added to party Palantir |

| | | |
|---|---|---|
| | | Technologies Inc.(pty:dft), Attorney Holly Stein Sollod added to party Shyam Sankar(pty:dft) (Sollod, Holly) (Entered: 12/13/2022) |
| 12/13/2022 | 44 | NOTICE of Entry of Appearance by Darren Jay Robbins on behalf of California Public Employees' Retirement SystemAttorney Darren Jay Robbins added to party California Public Employees' Retirement System(pty:mov) (Robbins, Darren) (Entered: 12/13/2022) |
| 12/19/2022 | 45 | NOTICE of Entry of Appearance by Kimberly J. Willis on behalf of All Defendants Attorney Kimberly J. Willis added to party David Glazer(pty:dft), Attorney Kimberly J. Willis added to party Alexander C. Karp(pty:dft), Attorney Kimberly J. Willis added to party Palantir Technologies Inc.(pty:dft), Attorney Kimberly J. Willis added to party Shyam Sankar(pty:dft) (Willis, Kimberly) (Entered: 12/19/2022) |
| 01/06/2023 | 46 | NOTICE of Entry of Appearance by Erika L. Oliver on behalf of California Public Employees' Retirement SystemAttorney Erika L. Oliver added to party California Public Employees' Retirement System(pty:mov) (Oliver, Erika) (Entered: 01/06/2023) |
| 02/10/2023 | 47 | AMENDED COMPLAINT *Consolidated Class Action Complaint for Violations of the Federal Securities Laws* against Stephen Cohen, David Glazer, Alexander C. Karp, Kevin Kawasaki, Palantir Technologies Inc., Shyam Sankar, Peter Thiel Attorney Luke Orion Brooks added to party Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019(pty:pla), filed by California Public Employees' Retirement System, Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (Attachments: # 1 Appendix 1) (Brooks, Luke) (Entered: 02/10/2023) |
| 02/27/2023 | 48 | MOTION for Order to *Defer Briefing on Defendants' Motion to Dismiss* by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Livshiz, David) (Entered: 02/27/2023) |
| 02/27/2023 | 49 | Unopposed MOTION for Order to *Set Briefing Schedule on Defendants' Motion to Defer Briefing* by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Proposed Order (PDF Only))(Livshiz, David) (Entered: 02/27/2023) |
| 03/01/2023 | 50 | ORDER granting 49 Unopposed Motion for Order to Set Briefing Schedule on Defendants' Motion to Defer Briefing. The Plaintiff's Response to the Defendants' Motion to Defer Briefing (ECF No. 48 ) is due by 3/15/2023. By Judge Charlotte N. Sweeney on 3/1/2023. Text Only Entry(cnssec. ) (Entered: 03/01/2023) |
| 03/08/2023 | 51 | NOTICE of Entry of Appearance by Anna C. Van de Stouwe on behalf of All Defendants Attorney Anna C. Van de Stouwe added to party David Glazer(pty:dft), Attorney Anna C. Van de Stouwe added to party Alexander C. Karp(pty:dft), Attorney Anna C. Van de Stouwe added to party Palantir Technologies Inc.(pty:dft), Attorney Anna C. Van de Stouwe added to party Shyam Sankar(pty:dft) (Van de Stouwe, Anna) (Entered: 03/08/2023) |
| 03/15/2023 | 52 | BRIEF in Opposition to 48 MOTION for Order to *Defer Briefing on Defendants' Motion to Dismiss* filed by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (Attachments: # 1 Declaration of Erika L. Oliver in Support of Plaintiffs' Opposition, # 2 Exhibit 1)(Oliver, Erika) (Entered: 03/15/2023) |
| 03/16/2023 | 53 | REPLY to Response to 48 MOTION for Order to *Defer Briefing on Defendants' Motion to Dismiss* filed by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, |

| | | |
|---|---|---|
| | | Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Feldman, Boris) (Entered: 03/16/2023) |
| 03/21/2023 | 54 | ORDER granting 48 MOTION for Order to Defer Briefing on Defendants' Motion to Dismiss. Defendants' Opposed Motion to Defer Briefing on Defendants' Motion to Dismiss Pending United States Supreme Court's Decision in Slack Technologies v. Pirani (ECF No. 48 ) is GRANTED. The parties shall file a joint motion regarding a proposed briefing schedule within seven days of the United States Supreme Court's issuance of its decision in Slack Technologies v. Pirani. By Judge Charlotte N. Sweeney on 3/21/2023. (cnssec.) (Entered: 03/21/2023) |
| 04/05/2023 | 55 | REASSIGNMENT OF JUDGE. This action is reassigned to Judge Gordon P. Gallagher upon his appointment as United States District Judge. Unless otherwise ordered, the dates and times for all previously scheduled matters will be maintained. Judge Gallagher is located in Courtroom 323 in the Wayne Aspinall Courthouse. His telephone number is (970) 241-8932. All future pleadings should be designated as 22-cv-02384-GPG. (Text only entry) (cmadr, ) (Entered: 04/05/2023) |
| 05/02/2023 | 56 | REASSIGNING MAGISTRATE JUDGE. This action is reassigned to Magistrate Judge Susan Prose upon her appointment. All future pleadings should reference Magistrate Judge Prose at the end of the civil action number (such as 22-cv-02384-GPG-SP). Unless otherwise ordered, the dates and times for all previously scheduled matters will be maintained and will now be handled by Magistrate Judge Prose in Courtroom C-205. Her chambers are located in Room C-254 of the Byron G. Rogers Courthouse. Her telephone number is 303-335-2722. (Text only entry) (rvill, ) (Entered: 05/02/2023) |
| 06/08/2023 | 57 | Joint MOTION for Leave to File Excess Pages *Joint Motion for Page Enlargement and Briefing Schedule for Complaint and Motion to Dismiss* by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (Attachments: # 1 Proposed Order (PDF Only))(Oliver, Erika) (Entered: 06/08/2023) |
| 06/09/2023 | 58 | ORDER granting 57 Motion for Leave to File Excess Pages: The Plaintiffs' Consolidated Amended Complaint, if any, shall be filed by June 29, 2023. That filing shall not exceed the length of the current Amended Complaint (D. 47). Any motion to dismiss shall be filed by August 18, 2023 and shall not exceed 55 pages. Any response to such motion shall be filed by October 13, 2023 and shall not exceed 55 pages. Any reply shall be filed by November 17, 2023 and shall not exceed 25 pages. By District Judge Gordon P Gallagher on 6/9/23. Text Only Entry(msklc2, ) (Entered: 06/09/2023) |
| 06/29/2023 | 59 | AMENDED COMPLAINT *Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws* against Stephen Cohen, David Glazer, Alexander C. Karp, Kevin Kawasaki, Alexander Moore, Palantir Technologies Inc., Spencer Rascoff, Shyam Sankar, Alexandra Schiff, Peter Thiel, filed by Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019, California Public Employees' Retirement System. (Attachments: # 1 Appendix 1)(Brooks, Luke) (Entered: 06/29/2023) |
| 06/29/2023 | 60 | NOTICE of Filing Amended Pleading re 59 Amended Complaint, by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019 (Attachments: # 1 Exhibit A)(Brooks, Luke) (Entered: 06/29/2023) |
| 08/02/2023 | 61 | MOTION to Withdraw as Attorney by Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Proposed Order (PDF Only))(Sollod, Holly) (Entered: 08/02/2023) |
| 08/02/2023 | 62 | MEMORANDUM regarding 61 MOTION to Withdraw as Attorney filed by Palantir Technologies Inc., Shyam Sankar, Alexander C. Karp, David Glazer. Motion referred to |

| | | |
|---|---|---|
| | | Magistrate Judge Susan B. Prose, by District Judge Gordon P Gallagher on 8/2/2023. Text Only Entry (schap, ) (Entered: 08/02/2023) |
| 08/03/2023 | 63 | MINUTE ORDER by Magistrate Judge Susan Prose on 8/3/2023, GRANTING 61 Motion to Withdraw as Attorney. Attorney Anna C. Van de Stouwe terminated. Text Only Entry (splc3) (Entered: 08/03/2023) |
| 08/18/2023 | 64 | NOTICE of Entry of Appearance by Sam D. Starritt on behalf of David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam SankarAttorney Sam D. Starritt added to party David Glazer(pty:dft), Attorney Sam D. Starritt added to party Alexander C. Karp(pty:dft), Attorney Sam D. Starritt added to party Palantir Technologies Inc.(pty:dft), Attorney Sam D. Starritt added to party Shyam Sankar(pty:dft) (Starritt, Sam) (Entered: 08/18/2023) |
| 08/18/2023 | 65 | NOTICE of Entry of Appearance by Nathan A. Keever on behalf of All Defendants Attorney Nathan A. Keever added to party David Glazer(pty:dft), Attorney Nathan A. Keever added to party Alexander C. Karp(pty:dft), Attorney Nathan A. Keever added to party Palantir Technologies Inc.(pty:dft), Attorney Nathan A. Keever added to party Shyam Sankar(pty:dft) (Keever, Nathan) (Entered: 08/18/2023) |
| 08/18/2023 | 66 | NOTICE *(DEFENDANTS REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS MOTION TO DISMISS)* by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar (Livshiz, David) (Entered: 08/19/2023) |
| 08/19/2023 | 67 | MOTION to Dismiss *Plaintiffs' Amended Complaint* by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Livshiz, David) (Entered: 08/19/2023) |
| 08/19/2023 | 68 | DECLARATION of *Nicholas A. Caselli* regarding MOTION to Dismiss *Plaintiffs' Amended Complaint* 67 , Notice (Other), 66 by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50)(Caselli, Nicholas) (Entered: 08/19/2023) |
| 08/22/2023 | 69 | CONSENT to Jurisdiction of Magistrate Judge by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar All parties do not consent.. (Livshiz, David) (Entered: 08/22/2023) |
| 10/13/2023 | 70 | BRIEF in Opposition to 67 MOTION to Dismiss *Plaintiffs' Amended Complaint* filed by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (Attachments: # 1 Appendix 1 - Comparison of Alleged Misstatements)(Brooks, Luke) (Entered: 10/13/2023) |

| | | |
|---|---|---|
| 10/13/2023 | 71 | MOTION to Strike 68 Declaration,,,,, 67 MOTION to Dismiss *Plaintiffs' Amended Complaint*, 66 Notice (Other), by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (Attachments: # 1 Proposed Order (PDF Only))(Janoski Gray, J.) (Entered: 10/13/2023) |
| 10/13/2023 | 72 | RESPONSE to 66 Notice (Other), *Plaintiffs' Response to Defendants' Request for Judicial Notice* by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (Janoski Gray, J.) (Entered: 10/13/2023) |
| 11/03/2023 | 73 | BRIEF in Opposition to 71 MOTION to Strike 68 Declaration,,,,, 67 MOTION to Dismiss *Plaintiffs' Amended Complaint*, 66 Notice (Other), filed by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Livshiz, David) (Entered: 11/03/2023) |
| 11/17/2023 | 74 | REPLY to Response to 67 MOTION to Dismiss *Plaintiffs' Amended Complaint* filed by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Reply Annex A, # 2 Amended Annex E)(Livshiz, David) (Entered: 11/17/2023) |
| 11/17/2023 | 75 | DECLARATION of *Nicholas A. Caselli* regarding Reply to Response to Motion, 74 by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Exhibit 51, # 2 Exhibit 52, # 3 Exhibit 53, # 4 Exhibit 54, # 5 Exhibit 55)(Caselli, Nicholas) (Entered: 11/17/2023) |
| 11/17/2023 | 76 | RESPONSE to 72 Response, *in Further Support of Defendants' Request for Judicial Notice* by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Livshiz, David) (Entered: 11/17/2023) |
| 11/17/2023 | 77 | REPLY to Response to 71 MOTION to Strike 68 Declaration,,,,, 67 MOTION to Dismiss *Plaintiffs' Amended Complaint*, 66 Notice (Other), filed by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (Janoski Gray, J.) (Entered: 11/17/2023) |
| 11/28/2023 | 78 | NOTICE re 71 MOTION to Strike 68 Declaration,,,,, 67 MOTION to Dismiss *Plaintiffs' Amended Complaint*, 66 Notice (Other), , 75 Declaration, 77 Reply to Response to Motion, 74 Reply to Response to Motion, *Plaintiffs' Notice of Additional Materials Subject to Plaintiffs' Motion to Strike* by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019 (Janoski Gray, J.) (Entered: 11/28/2023) |
| 12/01/2023 | 79 | RESPONSE to 78 Notice (Other),, *Defendants' Response to Plaintiffs' Objection Seeking to Strike Additional Documents* by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Livshiz, David) (Entered: 12/01/2023) |
| 02/22/2024 | 80 | NOTICE of Change of Address/Contact Information by David Y. Livshiz (Livshiz, David) (Entered: 02/22/2024) |
| 02/22/2024 | 81 | NOTICE of Change of Address/Contact Information by Nicholas Angelo Caselli (Caselli, Nicholas) (Entered: 02/22/2024) |

| 03/31/2024 | 82 | ORDER granting 67 Motion to Dismiss. The matter is dismissed without prejudice. No later than April 5, 2024, the parties SHALL jointly contact Chambers to set a status conference as set forth in the Order. by District Judge Gordon P Gallagher on 3/31/24. Text Only Entry(Gallagher, Gordon) (Entered: 03/31/2024) |
|---|---|---|
| 03/31/2024 | 83 | ORDER finding as moot 71 Motion to Strike 71 MOTION to Strike 68 Declaration,,,,,, 67 MOTION to Dismiss *Plaintiffs' Amended Complaint*, 66 Notice (Other), . Due to the Order dismissing the Complaint without prejudice, both this pleading and the Request for Judicial Notice (D. 66) are moot. by District Judge Gordon P Gallagher on 3/31/24. Text Only Entry(Gallagher, Gordon) (Entered: 03/31/2024) |
| 04/04/2024 | 84 | ORDER: VTC Status Conference set for 4/24/2024 from 2:00 - 3:00 PM in Room 323 (Grand Junction) before District Judge Gordon P Gallagher. For further assistance with the VTC link or instructions, parties may contact Donald_Clement@cod.uscourts.gov. By District Judge Gordon P Gallagher on April 4, 2024. Text Only Entry (gpglc3, ) (Entered: 04/04/2024) |
| 04/08/2024 | 85 | MOTION to Withdraw as Attorney by Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Proposed Order (PDF Only))(Sollod, Holly) (Entered: 04/08/2024) |
| 04/08/2024 | 86 | MEMORANDUM regarding 85 MOTION to Withdraw as Attorney filed by Palantir Technologies Inc., Shyam Sankar, Alexander C. Karp, David Glazer. Motion referred to Magistrate Judge Susan Prose, by District Judge Gordon P Gallagher on 4/8/2024. Text Only Entry (schap, ) (Entered: 04/08/2024) |
| 04/08/2024 | 87 | MOTION to Withdraw as Attorney by Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Proposed Order (PDF Only))(Willis, Kimberly) (Entered: 04/08/2024) |
| 04/08/2024 | 88 | ORDER by Magistrate Judge Susan Prose on 4/8/2024, granting 85 Motion to Withdraw as Attorney. Attorney Holly Stein Sollod terminated as counsel of record for Defendants, who continue to be represented by Messers. Sterritt and Kever and who shall send a copy of this order to the Defendants. The Clerk's office is requested to remove Ms. Stein Sollod from the notice list. Text Only Entry (sbplc1) (Entered: 04/08/2024) |
| 04/08/2024 | 89 | ORDER by Magistrate Judge Susan Prose on 4/8/2024, granting 87 Motion to Withdraw as Attorney. Attorney Kimberly J. Willis terminated as counsel of record for Defendants, who continue to be represented by Messers. Sterritt and Kever as local counsel (and by several others as lead counsel; the same is true for ECF No. 88, though not noted therein). Continuing counsel for Defendants shall send a copy of this order to the Defendants. The Clerk's office is requested to remove Ms. Willis from the notice list. Text Only Entry (sbplc1) (Entered: 04/08/2024) |
| 04/24/2024 | 90 | MINUTE ENTRY for Status Conference proceeding held before District Judge Gordon P Gallagher on 4/24/2024. That on or before May 24, 2024, the Plaintiffs shall file an amended complaint that is no more than 100 pages and associated briefing. Court Reporter: Erin Valenti. (dclem) (Entered: 04/24/2024) |
| 04/29/2024 | 91 | TRANSCRIPT of status conference held on 4/24/24 before Judge Gallagher. Pages: 1-14. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the |

| | | |
|---|---|---|
| | | Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (evale, ) (Entered: 04/29/2024) |
| 05/24/2024 | 92 | AMENDED COMPLAINT *Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws* against Stephen Cohen, David Glazer, Alexander C. Karp, Kevin Kawasaki, Alexander Moore, Palantir Technologies Inc., Spencer Rascoff, Shyam Sankar, Alexandra Schiff, Peter Thiel, filed by Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019, California Public Employees' Retirement System. (Attachments: # 1 Appendix 1, # 2 Appendix 2)(Brooks, Luke) (Entered: 05/24/2024) |
| 05/24/2024 | 93 | NOTICE of Filing Amended Pleading re 92 Amended Complaint, by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019 (Attachments: # 1 Exhibit A)(Brooks, Luke) (Entered: 05/24/2024) |
| 05/24/2024 | 94 | MOTION to Lift Stay *Plaintiffs' Motion for a Partial Lift of the PSLRA Discovery Stay* by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (Attachments: # 1 Appendix in Support of Plaintiff's Motion for a Partial Lift of the PSLRA Discovery Stay, # 2 Proposed Order (PDF Only))(Brooks, Luke) (Entered: 05/24/2024) |
| 05/24/2024 | 95 | RESTRICTED DOCUMENT - Level 1: *Plaintiffs' Unopposed Motion to Restrict Public Access* by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019.. (Attachments: # 1 Appendix in Support of Plaintiffs' Motion for a Partial Lift of the PSLRA Discovery Stay, # 2 Proposed Order (PDF Only))(Oliver, Erika) (Entered: 05/24/2024) |
| 05/24/2024 | 96 | Plaintiffs' Unopposed Motion to Restrict Public Access by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. [**Public Entry to the 95 Restricted Document**] Text Only Entry. (schap, ) (Entered: 05/28/2024) |
| 05/28/2024 | 97 | MEMORANDUM regarding 96 Plaintiffs' Unopposed Motion to Restrict Public Access filed by California Public Employees' Retirement System, Shujun Liu. Motion referred to Magistrate Judge Susan Prose by District Judge Gordon P Gallagher on 5/28/2024. Text Only Entry (schap, ) (Entered: 05/28/2024) |
| 05/28/2024 | 98 | ORDER by Magistrate Judge Susan Prose on 05/28/2024, granting 96 Unopposed Motion for Leave to Restrict 96 . For the reasons stated in the motions, the court is satisfied that the requirements of Local Rule 7.2 are met. The Restricted Information in the Declaration of Professor Joshua Mitts, Ph.D. shall be and remain restricted at Level One. This ruling, however, does not apply to how such information will be handled in hearings, orders, or trial. Text Only Entry (sbplct2) (Entered: 05/28/2024) |
| 06/05/2024 | 99 | NOTICE of Change of Address/Contact Information by Sam D. Starritt (Starritt, Sam) (Entered: 06/05/2024) |
| 06/07/2024 | 100 | Joint MOTION for Leave to File Excess Pages *Joint Motion for Page Enlargement and Briefing Schedule for Defendants Motion to Dismiss the Second Amended Complaint and Plaintiffs Motion for a Partial Lift of the PSLRA Discovery Stay* by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Proposed Order (PDF Only))(Livshiz, David) (Entered: 06/07/2024) |
| 06/11/2024 | 101 | ORDER granting 100 Joint Motion for Page Enlargement and Briefing Schedule for Defendants' Motion to Dismiss the Second Amended Complaint and Plaintiffs' Motion for |

| | | a Partial Lift of the PSLRA Discovery Stay. By District Judge Gordon P Gallagher on 6/11/2024. (schap, ) (Entered: 06/11/2024) |
|---|---|---|
| 07/25/2024 | 102 | MOTION to Dismiss *Plaintiffs' Second Amended Complaint* by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Appendix Volume I of III, # 2 Appendix Volume II of III, # 3 Appendix Volume III of III)(Livshiz, David) (Entered: 07/25/2024) |
| 07/25/2024 | 103 | NOTICE *of Request for Judicial Notice and Notice of Documents Incorporated by Reference in Support of Defendants' Motion to Dismiss* by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar (Livshiz, David) (Entered: 07/25/2024) |
| 07/25/2024 | 104 | NOTICE of Entry of Appearance by Michael David Celio on behalf of Stephen Cohen, David Glazer, Alexander C. Karp, Kevin Kawasaki, Alexander Moore, Palantir Technologies Inc., Spencer Rascoff, Shyam Sankar, Alexandra Schiff, Peter ThielAttorney Michael David Celio added to party Stephen Cohen(pty:condft), Attorney Michael David Celio added to party David Glazer(pty:dft), Attorney Michael David Celio added to party Alexander C. Karp(pty:dft), Attorney Michael David Celio added to party Kevin Kawasaki(pty:condft), Attorney Michael David Celio added to party Alexander Moore(pty:condft), Attorney Michael David Celio added to party Palantir Technologies Inc.(pty:dft), Attorney Michael David Celio added to party Spencer Rascoff(pty:condft), Attorney Michael David Celio added to party Shyam Sankar(pty:dft), Attorney Michael David Celio added to party Alexandra Schiff(pty:condft), Attorney Michael David Celio added to party Peter Thiel(pty:condft) (Celio, Michael) (Entered: 07/25/2024) |
| 07/25/2024 | 105 | NOTICE of Entry of Appearance by Matthew S. Kahn on behalf of Stephen Cohen, David Glazer, Alexander C. Karp, Kevin Kawasaki, Alexander Moore, Palantir Technologies Inc., Spencer Rascoff, Shyam Sankar, Alexandra Schiff, Peter ThielAttorney Matthew S. Kahn added to party Stephen Cohen(pty:condft), Attorney Matthew S. Kahn added to party David Glazer(pty:dft), Attorney Matthew S. Kahn added to party Alexander C. Karp(pty:dft), Attorney Matthew S. Kahn added to party Kevin Kawasaki(pty:condft), Attorney Matthew S. Kahn added to party Alexander Moore(pty:condft), Attorney Matthew S. Kahn added to party Palantir Technologies Inc.(pty:dft), Attorney Matthew S. Kahn added to party Spencer Rascoff(pty:condft), Attorney Matthew S. Kahn added to party Shyam Sankar(pty:dft), Attorney Matthew S. Kahn added to party Alexandra Schiff(pty:condft), Attorney Matthew S. Kahn added to party Peter Thiel(pty:condft) (Kahn, Matthew) (Entered: 07/25/2024) |
| 07/25/2024 | 106 | NOTICE of Entry of Appearance by Wesley Sze on behalf of Stephen Cohen, David Glazer, Alexander C. Karp, Kevin Kawasaki, Alexander Moore, Palantir Technologies Inc., Spencer Rascoff, Shyam Sankar, Alexandra Schiff, Peter ThielAttorney Wesley Sze added to party Stephen Cohen(pty:condft), Attorney Wesley Sze added to party David Glazer(pty:dft), Attorney Wesley Sze added to party Alexander C. Karp(pty:dft), Attorney Wesley Sze added to party Kevin Kawasaki(pty:condft), Attorney Wesley Sze added to party Alexander Moore(pty:condft), Attorney Wesley Sze added to party Palantir Technologies Inc.(pty:dft), Attorney Wesley Sze added to party Spencer Rascoff(pty:condft), Attorney Wesley Sze added to party Shyam Sankar(pty:dft), Attorney Wesley Sze added to party Alexandra Schiff(pty:dft), Attorney Wesley Sze added to party Peter Thiel(pty:condft) (Sze, Wesley) (Entered: 07/25/2024) |
| 07/25/2024 | 107 | BRIEF in Opposition to 94 MOTION to Lift Stay *Plaintiffs' Motion for a Partial Lift of the PSLRA Discovery Stay* filed by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David |

| | | |
|---|---|---|
| | | Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Appendix in Support of Opposition)(Celio, Michael) (Entered: 07/25/2024) |
| 07/30/2024 | 108 | MOTION to Withdraw as Attorney by Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Keever, Nathan) (Entered: 07/30/2024) |
| 07/30/2024 | 109 | MEMORANDUM regarding 108 MOTION to Withdraw as Attorney filed by Palantir Technologies Inc., Shyam Sankar, Alexander C. Karp, David Glazer. Motion referred to Magistrate Judge Susan Prose by District Judge Gordon P Gallagher on 7/30/2024. Text Only Entry (schap, ) (Entered: 07/30/2024) |
| 07/30/2024 | 110 | ORDER by Magistrate Judge Susan Prose on 07/30/2024, granting 108 Motion to Withdraw as Attorney. Attorney Nathan A. Keever terminated as counsel of record in this case. Remaining counsel of record must provide the client(s) of withdrawing attorney a copy of the motion to withdraw pursuant to D.C.COLO.LAttyR 5. Text Only Entry (sbplct2) (Entered: 07/30/2024) |
| 09/16/2024 | 111 | REPLY to Response to 94 MOTION to Lift Stay *Plaintiffs' Motion for a Partial Lift of the PSLRA Discovery Stay* filed by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (Attachments: # 1 Appendix in Support of Plaintiffs' Motion for a Partial Lift of the PSLRA Discovery Stay - Volume II)(Brooks, Luke) (Entered: 09/16/2024) |
| 09/16/2024 | 112 | RESPONSE to 102 MOTION to Dismiss *Plaintiffs' Second Amended Complaint* filed by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (Brooks, Luke) (Entered: 09/16/2024) |
| 09/16/2024 | 113 | RESPONSE to 103 Notice (Other), *Plaintiffs' Opposition to Defendants' Request for Judicial Notice* by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (Brooks, Luke) (Entered: 09/16/2024) |
| 10/16/2024 | 114 | NOTICE *of Change of Firm Name* by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar (Livshiz, David) (Entered: 10/16/2024) |
| 10/16/2024 | 115 | REPLY to Response to 102 MOTION to Dismiss *Plaintiffs' Second Amended Complaint* filed by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Attachments: # 1 Reply Appendix)(Livshiz, David) (Entered: 10/16/2024) |
| 10/16/2024 | 116 | REPLY to 113 Response, *in Further Support of Defendants' Request for Judicial Notice* by Consol Defendants Stephen Cohen, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Peter Thiel, Defendants David Glazer, Alexander C. Karp, Palantir Technologies Inc., Shyam Sankar. (Livshiz, David) (Entered: 10/16/2024) |
| 10/24/2024 | 117 | OBJECTIONS to 115 Reply to Response to Motion, *Plaintiffs' Objection to Additional Materials Improperly Submitted With Defendants' Reply in Support of Their Motion to Dismiss Plaintiffs' Second Amended Complaint* by Movant California Public Employees' Retirement System, Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (Brooks, Luke) (Entered: 10/24/2024) |
| 11/01/2024 | 118 | RESPONSE to 117 Objections, *RESPONSE TO PLAINTIFFS OBJECTION TO MATERIALS SUBMITTED WITH DEFENDANTS REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS SECOND AMENDED COMPLAINT* by Consol |

| | | |
|---|---|---|
| | | Defendants Stephen Cohen, Peter Thiel, William Ho, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Defendants Palantir Technologies Inc., Alexander C. Karp, David Glazer, Shyam SankarAttorney Sam D. Starritt added to party, Attorney Sam D. Starritt added to party, Attorney Sam D. Starritt added to party, Attorney Sam D. Starritt added to party, Attorney Sam D. Starritt added to party, Attorney Sam D. Starritt added to party, Attorney Sam D. Starritt added to party. (Starritt, Sam) (Entered: 11/01/2024) |
| 02/10/2025 | 119 | NOTICE of Supplemental Authorities by Consol Defendants Stephen Cohen, Peter Thiel, William Ho, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Defendants Palantir Technologies Inc., Alexander C. Karp, David Glazer (Starritt, Sam) (Entered: 02/10/2025) |
| 02/10/2025 | 120 | NOTICE of Supplemental Authorities *Exhibit A - Supplemental Authority* re: 119 Notice of Supplemental Authorities, by Consol Defendants Stephen Cohen, Peter Thiel, William Ho, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Consol Plaintiff Shujun Liu, Defendants Palantir Technologies Inc., Alexander C. Karp, David Glazer (Starritt, Sam) (Entered: 02/10/2025) |
| 02/13/2025 | 121 | RESPONSE to 119 Notice of Supplemental Authorities, by Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019, Movant California Public Employees' Retirement System. (Brooks, Luke) (Entered: 02/13/2025) |
| 04/03/2025 | 122 | NOTICE *of Lead Plaintiffs' Attempt to Circumvent the PSLRA's Mandatory Discovery Stay* by Consol Defendants Stephen Cohen, Peter Thiel, Kevin Kawasaki, Alexander Moore, Spencer Rascoff, Alexandra Schiff, Defendants Palantir Technologies Inc., Alexander C. Karp, David Glazer, Shyam Sankar (Attachments: # 1 Exhibit A - Notice of Appearance, # 2 Exhibit B - Notice of Challenge to Confidential Treatment, # 3 Exhibit C - Motion for Continued Confidential Treatment)(Livshiz, David) (Entered: 04/03/2025) |
| 04/04/2025 | 123 | ORDER denying 94 Motion to Lift Stay and granting 102 Motion to Dismiss by District Judge Gordon P Gallagher on 04/04/2025.(dclem) (Entered: 04/04/2025) |
| 04/04/2025 | 124 | FINAL JUDGMENT in favor of Palantir Technologies Inc., Alexander C. Karp, David Glazer, Shyam Sankar against Minchie Galot Cupat, Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019, WenHong Hu. Entered by the Clerk on 04/04/2025. (dclem) (Entered: 04/04/2025) |
| 05/02/2025 | 125 | NOTICE OF APPEAL as to 124 Judgment, by Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019, Movant California Public Employees' Retirement System (Filing fee $ 605, Receipt Number ACODC-10316011) (Brooks, Luke) (Entered: 05/02/2025) |
| 05/05/2025 | 126 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 125 Notice of Appeal, filed by California Public Employees' Retirement System, Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019 to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Preliminary Record)(sphil, ) (Entered: 05/05/2025) |
| 05/06/2025 | 127 | USCA Case Number 25-1178 for 125 Notice of Appeal, filed by California Public Employees' Retirement System, Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. (sphil, ) (Entered: 05/06/2025) |
| 05/20/2025 | 128 | TRANSCRIPT ORDER FORM re 125 Notice of Appeal, by Plaintiff Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019, Movant California Public Employees' Retirement System (Brooks, Luke) (Entered: 05/20/2025) |

| 05/28/2025 | 129 | LETTER TO USCA and all counsel certifying the record is complete as to 125 Notice of Appeal, filed by California Public Employees' Retirement System, Shijun Liu, Individually and as Trustee of the Liu Family Trust 2019. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 25-1178) Text Only Entry (sphil, ) (Entered: 05/28/2025) |
|---|---|---|

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/24/2025 11:48:29 | | | |
| **PACER Login:** | Lobrooks9456 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-02384-GPG-SBP |
| **Billable Pages:** | 29 | **Cost:** | 2.90 |

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLORADO

 3    Civil Action No. 22-cv-02384-GPG-SBP

 4    MINCHIE GALOT CUPAT, Individually and on Behalf of All Others
      Similarly Situated,
 5
           Plaintiff,
 6
           vs.
 7
      PALANTIR TECHNOLOGIES, INC.; ALEXANDER C. KARP; DAVID GLAZER;
 8    and SHYAM SANKAR,

 9         Defendants.

10    ----------------------------------------------------------------

11                     REPORTER'S TRANSCRIPT
                        Status Conference
12
13    ----------------------------------------------------------------

14    Proceedings before the HONORABLE GORDON P. GALLAGHER, Judge,
      United States District Court for the District of Colorado,
15    commencing at 2:03 p.m. on the 24th day of April, 2024, United
      States Courthouse, Grand Junction, Colorado.

16                          APPEARANCES

17    For the Plaintiff CalPERS:
      LUKE O. BROOKS, ESQ. and DARREN J. ROBBINS, ESQ.,
18    Robbins Geller Rudman & Dowd LLP, 655 West Broadway,
      Suite 1900, San Diego, CA 91201
19
      For the Plaintiff Shujun Liu:
20    JEFFREY A. BERENS, ESQ., Berens Law LLC,
      2373 Central Park Boulevard, Suite 100, Denver, CO 80238
21
      For the Defendant Palantir Technologies, Inc.:
22    BORIS FELDMAN, ESQ., DAVID Y. LIVSHIZ, ESQ., and
      NICHOLAS A. CASELI, ESQ.,
23    Freshfields Bruckhaus Deringer US LLP, 175 Greenwich Street,
      51st Floor, New York, NY 10007
24
      NATHAN A. KEEVER, ESQ., Dufford Waldeck Milburn & Krohn, LLP
25    744 Horizon Court, Suite 300, Grand Junction, CO 81504
```

Erin E. Valenti, RMR, CRR
901 19th Street, Room A256, Denver, CO 80294
Proceedings reported by mechanical stenography; transcription produced via computer.

32

```
 1                    P R O C E E D I N G S

 2              (Counsel were present, and the following proceedings

 3      were had:)

 4              DEPUTY CLERK:  Court is now in session.

 5              THE COURT:  All right.  Good afternoon, everybody.

 6      We're here in 22-cv-2384.  This is Cupat et al. versus

 7      Defendant Palantir Technologies, Inc.  The matter comes on for

 8      essentially a status conference today.

 9              Let me go ahead and take entries of appearance,

10      starting with the plaintiffs.

11              MR. BROOKS:  Good afternoon, Your Honor.  Luke -- Luke

12      Brooks --

13              (Multiple speakers.)

14              THE COURT:  All right.  Let's start with Mr. Books,

15      and I'll have everybody who's not talking mute themselves.  And

16      I think that might get rid of our feedback.

17              MR. BROOKS:  Your Honor, it's Luke Brooks and Darren

18      Robbins from Robbins Geller Rudman & Dowd for the Plaintiff

19      CalPERS.

20              THE COURT:  All right.  And, Mr. Brooks, my

21      understanding is that your intent is to be in the primary

22      speaking role today?

23              MR. BROOKS:  That's correct, Your Honor.

24              THE COURT:  All right.  Then I'll just note that

25      Mr. Hood, Mr. Lieberman, Ms. Reilly, Ms. Oliver, and Mr. Gray
```

 1    are also either on the phone or checked in in some fashion, and

 2    as is Mr. Berens.

 3            Then let's turn to defense, please.

 4            MR. KEEVER:  Your Honor, Nathan Keever with the

 5    defendant as local counsel.  And with me today is David

 6    Livshiz, Nicholas Caseli, and Boris Feldman.  And Mr. Feldman

 7    will be handling the bulk of the discussion today.

 8            THE COURT:  All right.  Mr. Feldman, good afternoon.

 9    Let me make sure that you can hear me.

10            MR. FELDMAN:  Perfectly, Your Honor.  Thank you.  Good

11    afternoon.

12            THE COURT:  Okay.  All right.  Great.

13            I think the first question -- I suspect I know the

14    answer, but it probably overrides everything else -- is do the

15    plaintiffs intend to try and submit an amended complaint?

16            MR. BROOKS:  We do, Your Honor.

17            THE COURT:  All right.  With that in mind, then, I

18    want to look at a couple of different areas.  One of those

19    being the length of the complaint, which we obviously struck as

20    being significantly excessive; the other being how the

21    plaintiffs propose addressing the other issue that needs to be

22    brought up in terms of the registration.

23            And I think I have to have everybody go back and mute

24    themselves.  Somebody's not muted.  Can you tell who, Don?

25            DEPUTY CLERK:  I believe it's Mr. Brooks that doesn't

1    show muted, but we'll -- looks like he just muted, maybe.

2            THE COURT:  Okay.  So those are the two main areas.

3    With regard to the Rule 11 defect and the length, we -- or I'm

4    willing to accept a complaint, at this juncture, of no more

5    than 75 pages.  This last iteration was 212 pages long.

6            A couple of comments with regard to that.  First, in

7    terms of the false and misleading statements and omissions

8    section, that section was some 70 pages long.  In that, the

9    plaintiffs went document by document and extensively quoted

10   from each document, selectively bolding and italicizing certain

11   text and then repeating the same general reasons and statements

12   in each document that were fraudulent.

13           One thing that wasn't clear to me is if the challenged

14   statement was only the bolded and italicized statement and the

15   remaining text was simply for context or if the bolding and

16   italicizing was just intended to highlight the statement that

17   tied it to plaintiffs' general themes.  And I'll note that in a

18   prior case, Judge Krieger made the same observation and had the

19   same concern.

20           What I need to know is exactly what statement

21   plaintiff believes to be fraudulent and what part of that

22   statement.  And I think it's probably going to be most

23   effective if that is then integrated in some reasonable and

24   logical fashion into the narrative, consolidated therein.

25           In any event, I think the plaintiffs only need to

1    focus on the statements they really think are fraudulent or

2    that give important context to their scheme liability theory

3    and integrate those into the factual chronology.  That's

4    already done to some extent, but that's one of the reasons that

5    Section 7 is so repetitive and unnecessary, and a lot of extra

6    heft could be eliminated by doing that.

7         The additional scienter allegations in Section 9 in

8    the last complaint were largely duplicative of the scienter

9    allegations elsewhere.  This seems to me to have been easily

10   integrated into plaintiffs' allegations concerning the

11   pertinent factual events.  Perhaps plaintiffs also don't need

12   or can drastically shorten their introduction and their summary

13   of the factual chronology.  And then the factual chronology,

14   that is largely repetitive of each other.

15        I will note I think that the Section 11 standing

16   allegations and the length of that are somewhat understandable,

17   because plaintiff needs to plead traceability in the wake of

18   the *Slack* decision.  But as there's little post-*Slack* authority

19   with regard to traceability, perhaps these are issues that can

20   be cleaned up after we discuss our second issue, which is with

21   regard to how the plaintiffs think they want to propose to

22   address traceability.

23        I understand one theory that you're going to go on is

24   essentially probability, but, put simply, that theory may not

25   fly.  So we need to talk about whether you have an alternate

1    theory that you may want to address in terms of traceability,

2    whether the plaintiff is proposing in some fashion to address

3    discovery on that, how the plaintiff wants to address the

4    mandatory stay that's going to be juxtaposed against that if

5    another motion to dismiss is filed.

6         So let me turn, Mr. Brooks, to you for thoughts on

7    both of those topics, the length of the complaint and then how

8    you want to address traceability.

9         MR. BROOKS:  Thank you, Your Honor.  In terms of

10   length of complaint, we -- we have read and understand the

11   Court's order.  We understand that there's a lot of repetition

12   in the complaint, and that arises out of several different

13   things, including one issue, which is that there's a scheme

14   liability claim here.  And we wanted to be very clear that

15   that's a separate -- those claims are separate from the

16   10b-5(b) claims under false and misleading statements.

17        We have had the Court's order.  We're working on

18   reformulating the complaint.  I will say that it -- it --

19   having begun to undertake that work, it will be very difficult

20   to get it down to 75 pages.  The rework has included and will

21   include cutting substantial portions of the context around the

22   statements so that it's just the false statements that are

23   apparent.

24        And, you know, as the Court probably realizes, in

25   these cases, there's a little bit of -- of a damned if you do,

1    damned if you don't scenario whereby if you just include a bald

2    statement, the defendants often will complain that it's taken

3    out of context and you'll be dealing with arguments on that

4    score; and if you include too much, it's frustrating for -- for

5    the Court.

6        So we did try to -- given this long class period,

7    complicated fraud, we did try to balance it, Your Honor.  I

8    understand we did not get the balance correct, and so we're

9    seeking to rebalance that.  You know, our target had been to

10    get it down to around 125 pages, which is about 25 pages fewer

11    than the Pluralsight complaint, which was approved by the Tenth

12    Circuit.

13        As I said, 75 will be difficult.  We are cognizant of

14    the Court's need and desire to have something as short as

15    possible, and I would ask leave of the Court to make it 100.

16    And if we can do it in under 100, we will -- we will do that.

17        THE COURT:  I can live with 100.  That's -- that will

18    be the order of the Court.

19        MR. BROOKS:  Thank you, Your Honor.

20        In terms of the -- in terms of the tracing, what we've

21    done is, as the Court knows, described that it's a virtual

22    certainty, based on the facts of this case, that CalPERS

23    purchased at least one traceable share.  And in reality, it's

24    going to be many, many traceable shares.  Our intent -- we

25    believe that that is sufficient, under the law at the pleading

1   stage, in order to -- in order to get past the pleading stage

2   and then get into discovery.  And we've described, briefly, a

3   plan in discovery to -- to prove it.

4        I think that the Court is likely correct, although we

5   are in unchartered territory, that for proof, it may not be

6   sufficient to have --

7        THE COURT:  Give me just a moment.  Did we -- did we

8   lose somebody, Don, or did they just turn the screen off, which

9   is fine.  I just want to make sure we didn't lose anybody

10  critical to the --

11       DEPUTY CLERK:  I believe --

12       THE COURT:  One picture --

13       DEPUTY CLERK:  -- somebody turned his camera off.

14       THE COURT:  All right.  Fantastic.

15       Go ahead, sir.

16       MR. BROOKS:  I -- so in terms of proof, although I

17  don't think there's a case that says it directly, and part of

18  our proof probably would be a statistics expert which -- you

19  know, who had been qualified in a variety of different types of

20  cases to provide opinions relating to statistical probability

21  and analyzing evidence, our plan would be to also seek

22  discovery and prove it based on the records that are -- we

23  believe are available as described in the complaint.

24       If the Court is of the opinion that -- that

25  probability is insufficient to -- to get past the pleadings --

1    the pleadings stage and the pleading bar, then I do think that

2    the Court's suggestion of a -- of a partial lift of the PSLRA

3    discovery stay makes sense.  It can't be the law that -- that

4    we are both held to a standard of proof that's beyond any --

5    any other standard, really, in the law in terms of -- of

6    pleading tracing and then at the same time not allowed to have

7    discovery on that question.

8         THE COURT:  Have you given some thought to very

9    limited discovery to prove traceability in that posture if

10   there was a brief and extremely limited lifting of the stay?

11        MR. BROOKS:  Your Honor, we've given some thought as

12   to how we would do it in the course of discovery, and what we

13   would do is -- is try to, as the -- as the complaint describes,

14   bore in on the records that establish that at least some of the

15   shares that CalPERS purchased were registered.  I'm not sure --

16   and beyond that, Your Honor, I think we would be relying on

17   sort of experts and consultants to guide us in that area beyond

18   what we've described in the complaint.

19        And I -- not having gone through this process before,

20   I -- I don't -- I'm not sure precisely how limited the

21   discovery would be, just to be open and honest.  I don't want

22   to talk myself out of it, Your Honor.

23        THE COURT:  Sure.

24        MR. BROOKS:  But I just don't have a sense that it --

25   as to whether it would be something that is -- that's short and

1    fast or -- or longer.

2         THE COURT:  All right.  And I think the answer is you

3    might not know, but at this point do you have any reasonable

4    idea, with regard to the consolidated audit trail, whether that

5    requires a subpoena to access, whether that's public records

6    that you can access without it?  Any looking into that issue at

7    this juncture?

8         MR. BROOKS:  Yeah.  And it's my understanding that it

9    would require formal discovery to -- to access that, so

10   subpoenas, et cetera.

11        THE COURT:  All right.  Well, it appears to me -- and

12   I'm certainly going to turn to the defense at this point.  But

13   it appears to me at this juncture that what probably would be

14   most fruitful would be at the same time that you file your

15   amended complaint to also file a discovery motion, by then

16   having outlined or perhaps even discussed -- even though it

17   might be opposed -- with opposing counsel a plan for limited

18   discovery to see what you can do to prove traceability prior to

19   proceeding on the -- on the complaint, or at least on that

20   portion of it.

21        I think as we all know, we're a bit in unchartered

22   territory here.  There's a couple of circuits that have

23   addressed this issue, a number of district courts.  The Tenth

24   Circuit has not yet, and I don't think a district court in the

25   Tenth Circuit has yet directly squarely addressed this issue

```
 1    either.  So I'd like to see what the different options are

 2    before we move forward.

 3         It seems like simultaneously addressing an amended

 4    complaint along with a limited discovery plan that would have

 5    to occur, if it did occur -- and I'm certainly not saying it's

 6    going to, but if it did, it would have to -- or would require

 7    limited lifting of the stay to get to that juncture.  But it

 8    seems like addressing those in tandem is reasonable.  What type

 9    of time frame do you think you're looking at for addressing

10    those things?

11         MR. BROOKS:  Your Honor, we had 30 days for the

12    amended complaint, and I think we can do the discovery plan

13    concurrently by May 24th.

14         THE COURT:  Okay.  Mr. Feldman, let me turn to you,

15    sir.  What are your thoughts on all this?

16         MR. FELDMAN:  Thank you, Your Honor.  It's obvious

17    that you've dug into the issues.  I think both sides are

18    appreciative of that.  I don't know if you've ever read to your

19    kids or your grandkids the book *If You Give a Mouse a Cookie*.

20    Is that familiar to you, Your Honor?

21         THE COURT:  Various versions of it, although I think I

22    like the moose and the muffin better.

23         MR. FELDMAN:  Exactly.  Well, what I worry about is I

24    just heard them ask for a glass of milk and to offer expert

25    declarations with the complaint.  I think there's a legal
```

1    issue.  Obviously, that's for you to decide in ruling on the

2    motion to dismiss.  But I think the probability rationale is

3    not one -- you're absolutely right about the law in the Tenth

4    Circuit, but I think the law generally in other courts is

5    pretty clear that probability doesn't suffice.

6                And on the --

7                THE COURT:  That has certainly been the answer out of

8    the First and the Ninth, so it seems like at least a couple of

9    circuits are going that way.

10               MR. FELDMAN:  And on the issue of the limited

11   discovery stay, I don't know if you ever had interaction with

12   Judge Jeremy Fogel.  He was a judge in the Northern District of

13   California; then he was head of the Federal Judicial Center for

14   several years.  And in his first securities case as a district

15   judge, he granted -- he did a limited stay -- a limited lifting

16   of the stay under the Reform Act in the Ninth Circuit.  So I've

17   always followed the law on that very closely.

18               And what my friend, plaintiffs' counsel, indicated

19   about how unfair it would be if there are very tough pleading

20   standards and you can't even get discovery to help you on them,

21   that's the whole legislative scheme.  So I will spare you and

22   everyone on the call the argument about why lifting the stay

23   would be inappropriate.

24               In the prototypical case, Your Honor, if you buy

25   shares in an IPO, you show that you bought them that day from

 1  one of the investment bankers at the IPO price, and then you

 2  don't need to trace, because you bought in the IPO.  As soon as

 3  you start to deviate away from that, the law is quite strict.

 4  One might say harsh.  But because a Section 11 claim is

 5  essentially no fault against the issuer, Congress really wanted

 6  to limit who could bring it.

 7       So I think that your proposed solution is Solomonic.

 8  They file their complaint, and if they want to try to get

 9  discovery at the same time, they move to lift the stay.  And

10  then I'll save all my blather for our opposition to that.

11       THE COURT:  All right.  Well, I appreciate that.  I

12  think that everybody knows that is where we're going in terms

13  of essentially, putting it in lay terms for the record, a

14  policy argument over if Congress provided this statute, who do

15  they really think gets a remedy and how is it tailored to

16  figure that out.

17       I think that's where we are is determining beyond an

18  IPO, where traceability is certain, who else gets to dive into

19  that pool.  And, you know, different courts are struggling with

20  that, but that will be addressed I think extensively in the

21  briefing I suspect will be where we're heading.

22       So any problem, Mr. Feldman, with the 30-day

23  suggestion from counsel for the plaintiff?

24       MR. FELDMAN:  No.  It's -- it's good for us,

25  Your Honor.  Thank you.

1          THE COURT:  Okay.  Given -- given all of that, I'm not

2    sure that there's anything else that needs to be done today,

3    but let me turn back to you, Mr. Brooks.  Anything else that

4    you think I need to address?

5          MR. BROOKS:  Not today, Your Honor.  Thank you.

6          THE COURT:  Absolutely.

7          Mr. Feldman, how about from your perspective?

8          MR. FELDMAN:  Nothing else, Your Honor.  Thank you

9    very much.

10          THE COURT:  All right.  Well, I look forward to seeing

11    the renewed briefing and talking with you all as the case goes

12    on.

13          Have a great day, everybody.  We'll be in recess.

14          (The hearing was concluded at 2:22 p.m. on Wednesday,

15    April 24, 2024.)

16

17

18

19

20

21

22

23

24

25

1                          REPORTER'S CERTIFICATE

2          I, ERIN E. VALENTI, Official Court Reporter for the

3    United States District Court for the District of Colorado, a

4    Registered Merit Reporter and Certified Realtime Reporter, do

5    hereby certify that I reported by machine shorthand the

6    proceedings contained herein at the time and place

7    aforementioned and that the foregoing pages constitute a full,

8    true, and correct transcript.

9          Dated this 29th day of April, 2024.

10

11

12

13

14                                  _____/s/ Erin E. Valenti_____

15                                  ERIN E. VALENTI, RMR, CRR
                                    Official Court Reporter
16

17

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
Judge Gordon P. Gallagher

Lead Civil Action No. 1:22-cv-02384-GPG-SBP
*Consolidated with Civil Actions 1:22-cv-02805-GPG-SBP and 1:22-cv-02893-GPG-SBP*

MINCHIE GALOT CUPAT, Individually and on Behalf of All Others Similarly Situated,

     Plaintiff,

v.

PALANTIR TECHNOLOGIES INC.,
ALEXANDER C. KARP,
DAVID GLAZER, and
SHYAM SANKAR,
     Defendants.

**DEMAND FOR JURY TRIAL**

---

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................... 1

II.   JURISDICTION AND VENUE.............................................................. 4

III.  PARTIES .............................................................................................. 4

IV.  DEFENDANTS' FRAUDULENT SCHEME AND DISSEMINATION OF FALSE AND MISLEADING STATEMENTS ........................................... 7

    A.    Defendants Misrepresent the Efficiencies of Palantir Software................ 10

        1.    Defendants Misleadingly Portray Palantir as a "SaaS-like" Company in Connection with the Offering...................................... 10

        2.    Defendants Continued to Misrepresent Palantir's Operational Efficiencies After the Offering........................................................ 16

    B.    Defendants Implement the SPAC Scheme to Mask Stagnation in Palantir's Business by Purchasing High-Margin Revenue ....................... 19

        1.    Defendants Mischaracterize Palantir's Business Strategy ............ 21

        2.    Defendants Mislead About the Legitimacy and Sustainability of the SPAC Deals ........................................................................ 22

            a.    First Stage SPACs: Defendants Mischaracterize the SPACs' Use of Foundry........................................................ 22

            b.    Second Stage SPACs: Defendants Misrepresent the Sustainability of the SPAC Scheme ................................... 27

            c.    Third Stage SPACs: Defendants' Last-Gasp Expansion of the SPAC Scheme........................................ 36

        3.    Defendants' SPAC Scheme Was Designed to and Did Inflate Palantir's Key Performance Metrics .............................................. 39

            a.    Profit Margins .................................................................... 40

            b.    Reported Revenue, Revenue Growth, and TRDV.............. 44

            c.    Customer Count ................................................................ 47

            d.    Defendants Cite Palantir's Misleading Metrics as Evidence of Continued Sustainable Growth ...................... 48

- i -

**Page**

C.      Defendants Misrepresent the Momentum in Palantir's Business to
        Obscure Palantir's Declining Growth Trends ........................................... 50

        1.      The Offering: Defendants Misleadingly Depict an
                Accelerating Trend of Immense Revenue Growth......................... 53

        2.      3Q20 Earnings: Defendants Misleadingly Claim "Significant
                Momentum" Across the Business.................................................. 55

        3.      FY20 Earnings: Defendants Misleadingly State Commercial
                Pipeline Is "Substantial and Growing" and Government
                Growth Is Just at the "Tip of the Iceberg" ...................................... 56

        4.      1Q21 Earnings: Defendants Misleadingly Point to SPAC
                Customers as Proof of Commercial Momentum and Claim
                Government Momentum "Continues Unabated" ............................ 57

        5.      2Q21 Earnings: Defendants Misleadingly Portray a Strong
                Pipeline for Growth Across the Business ...................................... 60

        6.      3Q21 Earnings: Defendants Misleadingly Claim Commercial
                Segment Is "Consistently Accelerating" and Government
                Segment Is "Big and Building"....................................................... 61

        7.      FY21 Earnings: Defendants Misleadingly Claim U.S.
                Commercial Growth Will Double While Denying the
                Sequential Deceleration of Government Growth ........................... 62

        8.      1Q22 Earnings: Defendants Misleadingly Claim Palantir's
                Business Segments Are Seeing a "Reacceleration"...................... 63

D.      Defendants Falsely Assure Investors that Palantir Was Positioned
        to Achieve 30% Long-Term Revenue Growth......................................... 64

E.      Defendants Manipulated the Reporting of Key Reported Metrics in
        Order to Mislead the Market .................................................................. 65

        1.      Definition of "Customer": Defendants Start Including
                Customers from the Entire Prior Year in 1Q21............................. 66

        2.      Average Contract Duration: Defendants Stop Regular
                Quarterly Disclosures in 3Q21 .................................................... 66

- ii -

**Page**

3.  Palantir's Acquire, Expand, Scale Business Model: Defendants Stop Reporting All Related Metrics in 1Q22 ............... 67

4.  Total Remaining Deal Value ("TRDV"): Defendants Conceal Segment-Level Breakdown in 1Q22 ................................................ 69

5.  Average Revenue Per Customer: Defendants Switch to Only Reporting Palantir's Top 20 Customers in 1Q22 in Order to Hide that Customers Were Not Scaling Up .................................... 70

V.  LOSS CAUSATION ............................................. 71

    A.  November 2021 Loss Event ..................................................... 71

    B.  February 2022 Loss Event ..................................................... 73

    C.  May 2022 Loss Event ........................................................... 74

    D.  August 2022 Loss Event ....................................................... 75

VI.  THE INDIVIDUAL DEFENDANTS' $2.2 BILLION OF INSIDER TRADING FURTHER SUPPORTS A STRONG INFERENCE OF SCIENTER ................. 76

VII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE ............... 80

VIII.  CLASS ACTION ALLEGATIONS ....................................... 81

IX.  EXCHANGE ACT CLAIMS ............................................. 81

X.  SECURITIES ACT ALLEGATIONS .................................... 85

    A.  Securities Act Parties ........................................................... 85

    B.  The Registration Statement Contained Untrue Statements of Material Fact and Material Omissions ..................................... 86

        1.  Untrue Statements About Palantir's Operational Efficiencies and Margins ............................................................ 86

        2.  Untrue Statements About Strategic Partnerships ........................ 88

        3.  Untrue Statements About Growth Rates, Sustainability of Growth, and Total Addressable Market ("TAM") ............................ 88

- iii -

**Page**

C.      The Direct Listing Was an Integrated Offering ......................................... 91

D.      Even if Not Part of an Integrated Offering, Plaintiffs Purchased
        Shares Traceable to the Registration Statement .................................... 94

XI.     THE SECURITIES ACT CLAIMS ....................................................................... 96

- iv -

Lead Plaintiff California Public Employees' Retirement System ("CalPERS") and additional named plaintiff Shijun Liu, Individually and as Trustee of The Liu Family Trust 2019 ("Liu," and together with CalPERS, "Plaintiffs"), by and through their counsel Robbins Geller Rudman & Dowd LLP, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.[1]

## I.    INTRODUCTION

1.    This action asserts violations of the federal securities laws against software and data analytics company Palantir Technologies Inc. ("Palantir" or the "Company") and certain of its officers and directors on behalf of Plaintiffs and all other persons that purchased Palantir Class A common stock between September 30, 2020 and August 5, 2022, inclusive (the "Class Period"), and were damaged thereby.[2]

2.    Defendants (defined *infra*, ¶24) violated the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rules 10b-5(a) and (c) by engaging in a scheme to create a public market for Palantir stock and thereafter artificially inflate the trading price of Palantir

---

[1]    Plaintiffs' information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to, a review and analysis of: (i) public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of Palantir senior management's conferences with investors and analysts; (iii) interviews of former Palantir employees; (iv) interviews of former employees of companies in which Palantir invested; (v) releases and media reports issued about and disseminated by the Company; (vi) analyst reports issued about Palantir; (vii) other public information and data regarding the Company; and (viii) documents cited herein.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[2]    Unless otherwise stated, Palantir "shares" or "stock" refer to Palantir Class A common stock.

4879-7335-0845.v1

shares in order to sell <u>more than $2.2 billion</u> of their own Palantir stock.

3.　　In July 2020, Palantir announced it would go public via a direct listing.  The timing of the announcement followed Palantir's stellar but – unknown to investors – unsustainable 1H20 results.[3]  Defendants misleadingly claimed Palantir's 1H20 results were indicative of its prospects as a public company and that Palantir had successfully transitioned from selling expensive bespoke solutions to providing highly-efficient plug-and-play software.  When Palantir's actual performance as a public company threatened to undermine this narrative, Defendants implemented other facets of their scheme, which included the outright purchase of revenue in 20+ sham SPAC deals and altering Palantir's reporting of key metrics to obfuscate decelerating growth in its business segments.[4]

4.　　In furtherance of their scheme, Defendants also violated §10(b) of the Exchange Act and Rule 10b-5(b) by issuing a series of false and misleading statements and omissions concerning Palantir's: (1) operational efficiencies and product capabilities; (2) SPAC transactions; (3) decelerating growth trends; and (4) long-term revenue guidance.

5.　　Finally, the Securities Act Defendants (defined *infra*, ¶218) violated §11 of the Securities Act of 1933 ("Securities Act") by causing Palantir to issue a Registration

---

[3]　Palantir's fiscal year ("FY") runs concurrent with the calendar year.  Thus, the first half of 2020 ("1H20") comprised the first and second quarters of 2020 ("1Q20" and "2Q20").

[4]　Special purpose acquisition companies ("SPACs") are "blank check" companies that raise cash in an initial public offering ("IPO") to acquire a private company and bring that company public.  SPACs typically raise money through the private placement of additional equity securities in order to complete the acquisition, fund operations post-closing, and/or serve as a backstop to shareholder redemptions.  These private investments in public equity are known as "PIPE" financings.  The SPACs' need for PIPE funds created an opportunity for Palantir to effectively buy the growth and revenue it promised the market.

- 2 -

Statement (defined *infra*, ¶29 n.7), which contained untrue statements and omitted material facts about the Company's operations, product capabilities, and growth prospects.  The Registration Statement also asserted Palantir's growth strategy focused on deploying its software among a potential customer base of large companies with more than $500 million in annual revenue.  In truth, Palantir's commercial business strategy was predicated on buying illusory revenue and growth from nonviable SPACs with little or no revenue.

6.      As Defendants' fraud unraveled, Palantir's stock price plummeted via a series of disclosures.  By the end of the Class Period, Palantir's stock price had declined by 80% from its $45 Class Period high – right back to where it was at the start of the Class Period.



- 3 -

7.     Plaintiffs and other members of the Class (defined *infra*, ¶198 & n.42) suffered significant damages as a result of Defendants' misconduct as the relevant truth about Palantir reached the market.

## II.    JURISDICTION AND VENUE

8.     The claims alleged herein arise under §§11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o), §§10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

9.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1331, §22 of the Securities Act (15 U.S.C. §77v), and §27 of the Exchange Act (15 U.S.C. §78aa).

10.     Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act, and 28 U.S.C. §1391(b) as Palantir is headquartered in this District, and substantial acts in furtherance of the alleged misconduct occurred in this District.

11.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the national securities markets.

## III.    PARTIES

12.     Lead Plaintiff CalPERS is the largest state public pension fund in the United States, with more than 2 million members and more than $400 billion in assets under management.  CalPERS purchased Palantir stock during the Class Period, as set forth in its Certification (ECF 12-4) and incorporated herein, including shares traceable to the Registration Statement, and was damaged thereby.

13.     Plaintiff Liu purchased Palantir stock during the Class Period as set forth in

- 4 -

the Certification previously filed with the Court and incorporated herein, including shares traceable to the Registration Statement, and was damaged thereby.[5]

14.     Defendant Palantir is incorporated in Delaware and headquartered in Denver, Colorado.  In September 2020, the Company went public via a direct listing (the "Offering"), utilizing the Registration Statement through which Palantir shares became publicly listed on the New York Stock Exchange ("NYSE") under the ticker symbol "PLTR."

15.     Defendant Alexander C. Karp ("Karp") was, at all relevant times, Palantir's Chief Executive Officer ("CEO") and a member of its Board of Directors (the "Board").

16.     Defendant Peter Thiel ("Thiel") was, at all relevant times, Palantir's Chairman of the Board.

17.     Defendant Stephen Cohen ("Cohen") was, at all relevant times, Palantir's President and Secretary and a member of its Board.

18.     Defendant David Glazer ("Glazer") was, at all relevant times, Palantir's Chief Financial Officer ("CFO") and Treasurer.

19.     Defendant Shyam Sankar ("Sankar") was, at all relevant times, Palantir's Chief Operating Officer ("COO") and Executive Vice President.

20.     Defendant Kevin Kawasaki ("Kawasaki") was, at all relevant times, Palantir's Global Head of Business Development.

21.     Defendant Alexander Moore ("Moore") was a member of Palantir's Board when the Registration Statement was issued and signed the Registration Statement.

---

[5]     *Shijun Liu, Individually and as Trustee of The Liu Family Trust 2019 v. Palantir Techs. Inc.*, No. 1:22-cv-02893-PAB-KLM (D. Colo. Nov. 2, 2022) (ECF 1-1).

- 5 -

22.     Defendant Spencer Rascoff ("Rascoff") was a member of Palantir's Board when the Registration Statement was issued and signed the Registration Statement.

23.     Defendant Alexandra Schiff ("Schiff") was a member of Palantir's Board when the Registration Statement was issued and signed the Registration Statement.

24.     Karp, Cohen, Thiel, Glazer, Sankar, and Kawasaki are collectively referred to herein as the "Individual Defendants."   Palantir and the Individual Defendants are collectively referred to herein as the "Defendants."

25.     As a result of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of Palantir's quarterly reports, press releases, and presentations to investors and market participants.   They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Karp and Sankar participated in Company-wide town hall meetings that generally took place every other month, wherein updates were provided on Palantir's new contract wins.   The Individual Defendants sent and received widely disseminated monthly email updates that included metrics on the state of the Company's business, including the number of pilots started, converted, and cancelled, and the number of contracts cancelled.   They also had access to daily-updated dashboards with information on the start dates, expected completion dates, and expenditures on each of Palantir's contracts.   Regular "sales ops" team meetings were attended by Karp, Cohen, or Sankar.   The Individual Defendants participated in the fraudulent scheme alleged herein, and because of their positions with the Company and

- 6 -

4879-7335-0845.v1

their access to material nonpublic information, the Individual Defendants were aware of and/or recklessly disregarded the adverse facts specified herein.

## IV.    DEFENDANTS' FRAUDULENT SCHEME AND DISSEMINATION OF FALSE AND MISLEADING STATEMENTS

26.    Karp, Cohen, and Thiel cofounded Palantir in 2003.  Palantir offers bespoke software products built on its two customer-facing platforms, Gotham and Foundry, and reports in two business segments: commercial and government.  Its initial platform, Gotham, organizes and evaluates large, complex, and disparate datasets, and is used to design software for Palantir's government clients.  Historically, the vast majority of Palantir's customers were government clients.  In 2016, Palantir launched Foundry to attract commercial clients.  According to Palantir, Foundry is designed to link disparate and largely incompatible data sources into a central operating system.  Following Foundry's launch, Palantir grew its commercial client base such that, by 2020, the Company reported that 53% of its revenue was derived from commercial clients.

27.    For many years Defendants resisted taking Palantir public, as Karp told *The New York Times* in May 2014 that doing so would be "'corrosive to our culture, corrosive to our outcomes.'"  At that time, Karp had long held options to purchase 68.9 million shares of Palantir Class B common stock, which options were set to expire on December 3, 2021.  If Karp did not exercise the options before their expiration date he would lose all the shares.

28.    Karp's opinion on going public changed as the December 2021 expiration date on his options drew close.  As a private company, Palantir shares were illiquid and subject to an "illiquidity" discount, trading between $4.50 and $6.50 per share in the private markets in 2019 and 2020.  In order to exercise their options and dispose of their Palantir

- 7 -

4879-7335-0845.v1

shares at lucrative prices, Karp and the other Individual Defendants needed access to a public market.  In July 2020, Palantir announced a proposed public offering of its shares.[6] This required the consent of Karp, Thiel, and Cohen – as they occupied three of the Company's four Board seats when the decision was made to go public.

29.    On September 30, 2020, Palantir went public via a direct listing.[7]  In a direct listing, the Company does not raise any capital.  Instead, existing shares are sold by Company insiders at whatever price the market will bear without underwriting.  Utilizing a direct listing allowed Defendants to avoid the scrutiny and due diligence review that occurs in connection with a traditional IPO.

30.    As a private company, Palantir consistently reported net losses each year since inception, culminating with a 2019 net loss of $580 million.  Accordingly, to attain a high valuation, Defendants knew they had to demonstrate that Palantir was poised to post a profit, which meant sustaining its recent revenue growth and reporting improving

---

[6]    Following Palantir's July 2020 announcement that it would go public, the Company saw its share prices increase to $11.50 per share during 3Q20 (through September 1, 2020). This is consistent with the fact that an illiquidity discount is generally reduced when there is a probability of the company going public in the future.

[7]    On August 25, 2020, Palantir filed with the SEC a registration statement on Form S-1, which was followed by several amendments, the last of which was filed with the SEC on September 21, 2020 (the "Final Registration Statement").  The Final Registration Statement became effective on September 22, 2020.  That same day, Palantir also filed with the SEC a registration statement on Form S-8 (the "Form S-8").  On September 30, 2020, the first day of the Class Period, the Company filed with the SEC a final prospectus on Form 424B4 (the "Prospectus"), which was updated via a prospectus supplement filed with the SEC on November 13, 2020 (the "Prospectus Supplement").  The Form S-8, Prospectus, and Prospectus Supplement were each incorporated into and formed part of the Final Registration Statement.  The Final Registration Statement, Form S-8, Prospectus, and Prospectus Supplement are collectively referred to herein as the "Registration Statement."

- 8 -

operating efficiencies.  Capitalizing on the fact that Palantir had just posted 49% 1H20 revenue growth and significant margin expansion over the same period the prior year ("year-over-year" or "YoY"), Defendants misleadingly underscored these results as indicative of the growth investors could expect from Palantir as a public company.

31.     But Palantir's growth story was a fiction.  As Defendants were aware it would, Palantir's revenue growth rate decelerated beginning in 2021 as the Company's short-term COVID-19 contracts rolled off.  Palantir's government revenue growth rate peaked in 4Q20 (which began the day after Palantir went public) and sequentially declined in every subsequent quarter, while Palantir's organic commercial revenue growth rate (*i.e.*, ex-SPAC growth) significantly dropped in 4Q20 and failed to meaningfully recover.

32.     Defendants used a two-pronged approach to conceal Palantir's declining growth rates.  First, in violation of Rule 10b-5(a) and (c), Defendants devised and executed a scheme to create the appearance of continued robust high-margin growth.  In furtherance of the scheme, Defendants caused Palantir to invest in early-stage companies in *quid pro quo* exchanges for these companies signing contracts for Palantir's products and services that the companies neither needed nor could afford (the "SPAC Scheme"), a move Citibank would later describe as "nefarious."   Defendants further masked Palantir's declining performance by continually manipulating how they reported Palantir's key metrics.  Second, in violation of Rule 10b-5(b), Defendants issued a series of materially false and misleading statements and omitted material facts concerning Palantir's performance and operations. The purpose of Defendants' fraudulent conduct was to take Palantir public through a direct listing and artificially pump up the price of Palantir stock, so that the Individual Defendants

- 9 -

could cash out billions of dollars by selling their own Palantir shares.

### A. Defendants Misrepresent the Efficiencies of Palantir Software

33.     Software companies whose products require significant amounts of high-cost customization and professional services typically have low margins and correspondingly command low valuation multiples.  In contrast, software companies with high margins that provide software as a service (or "SaaS") with little additional marginal cost – *i.e.*, plug-and-play systems – command far higher valuation multiples.  To command a higher valuation multiple, Defendants had to misleadingly portray Palantir as having left behind the days of creating custom software products.  Thus, when taking Palantir public, Defendants claimed that Palantir had "SAAS like economics regardless of [its] deployment target" and as a result was enjoying significantly improved efficiencies and margins.

### 1. Defendants Misleadingly Portray Palantir as a "SaaS-like" Company in Connection with the Offering

34.     Starting at the September 9, 2020 Investor Day presentation, Defendants strained mightily to portray Palantir as a highly-efficient, high margin SaaS-like company, rather than a low margin service or consulting company:

> [Sankar:] Apollo is really important because ***it enables us to have SAAS like economics regardless of our deployment target***.[8]

---

[8]     Plaintiffs allege both "scheme liability" under Rules 10b-5(a) and (c) and "misstatement liability" under Rule 10b-5(b).  The statements in **bold italics**, the statements and figures referenced in nn.12-14, 20, 23, 25-26, 29, and 35-36, and the figures presented in charts in ¶¶104, 107, 110, 112, 114, 116, and 128 are alleged to be materially false and misleading as bases for the Rule 10b-5(b) misstatement claim.  The scheme allegations under Rule 10b-5(a) and (c) are based both on these statements and the additional deceptive acts alleged herein.

4879-7335-0845.v1

\*       \*       \*

[Glazer:] ***So while it's true in the past that we did custom development work, and built bespoke applications, we aren't doing that today***.

35.     The statements detailed in ¶34 were false and misleading when made as Palantir was, in fact, still building "bespoke applications," engaged in "custom development work," and did not "have SAAS like economics regardless of [its] deployment target." Palantir's Gotham and Foundry products rarely fit into a customer's workplace straight "out of the box." Instead, Palantir was undertaking a lengthy, expensive, and highly-customized process to secure client contracts and build out software solutions. This entailed creating a need for the product, convincing a client they needed Palantir's expensive software, building it to the identified use, and closing a deal – all at low or no-cost to the prospective client (a "pilot"). Pilot deployments typically lasted months, during which time Palantir engineers had to rework or adapt a preexisting product, or build something new altogether. Foundry is not a SaaS-like software product with a predefined function, but rather a set of digital infrastructure tools which engineers use to build a bespoke product or "use case" themselves. Indeed, five days after the Class Period ended (and after Defendants unloaded billions of dollars' worth of their own Palantir shares), Sankar admitted that Palantir had been building bespoke applications all along. Distinguishing Palantir from "'most software companies [that] just want to sell software, generic software that they sell broadly to large swaths of the market'" (*i.e.*, SaaS-like companies), Sankar described Palantir's products as "'more like a grab bag from a leg[o] box that we can use to assemble the right product for the customer – to <u>custom build their product</u> today and in the future.'"

36.     To support their portrayal of Palantir as a SaaS-like Company with improved

- 11 -

efficiencies, Defendants highlighted recent improvements in the Company's contribution margin at the September 9, 2020 Investor Day presentation, stating:

> [Kawasaki:] And as you can see, here, **we're getting much more efficient, our contribution margins have increased nearly four times since the first quarter of 2019**.
>
> *          *          *
>
> [Glazer:] Our contracts are generally fixed fee our customers pay us for the all in cost to deliver, maintain and service these platforms.  And **we continue to do this more and more efficiently as our products have matured**, and adoption across our customer base has increased.   To measure this efficiency, we look to our margins. . . .   As gross margin has increased, **contribution margin is also improving, due to the improvements in our platform, and the fact that we still have a relatively small salesforce**.

37.     With respect to the Company's "Acquire, Expand, Scale" business model (*see infra*, ¶¶164-168), Kawasaki stressed that the Company had the capability to get <u>all</u> its customers to the high-revenue, high-margin "Scale" phase over time: "**When we look at this as a whole, all customers should be scale phase over time**."

38.     The Registration Statement (signed by Karp, Cohen, Thiel, and Glazer and declared effective on September 22, 2020) similarly sought to portray Palantir as a highly-efficient company with increasing margins and lower deployment times:

> **The improvements in our operating results have principally been driven by** increasing revenue and **a significant decrease in the time and number of software engineers required to install and deploy our software platforms**.
>
> **In particular, the time required to install our software and begin working with a customer has decreased more than five-fold since Q2 2019 to an average of 14 days in Q2 2020.  In some cases, our customers can now be up and running in six hours**.

39.     The Registration Statement also stated that all customers will Scale:

- 12 -

*We believe that all of our customers will move into the Scale phase over the long term. We also believe that contribution margin for Scale phase accounts will increase further as we become more efficient at deploying our software platforms across the entirety of our customers' operations and at managing and operating our software*.

40.     Defendants' statements in ¶¶36-39 emphasizing Palantir's margin growth and attributing it to product improvements and increased operational efficiencies were materially misleading. Defendants were aware that Palantir's historical margin improvement could not continue, because in order to post the growth rate that Defendants led the market to expect, Palantir had to quickly pivot to industries in which it had never operated. As Defendants acknowledged in the Registration Statement, "[c]ontinue[d] expansion into the commercial sector" was critical to Palantir's growth. Yet, Palantir's software was not easily adaptable outside of its established "use cases."[9] Rather, its software was expensive and required substantial customization for each client. To land customers in new industries, Palantir had to provide prospective clients with a pilot test run at low or no cost, during which Palantir was compelled to invest substantial time, money, and manpower finding a use for its software and then building a bespoke product to suit that use. Coupled with the highly-customized nature and high cost of Palantir's software, this meant signing new commercial customers was much more difficult, and closing deals was far more costly to Palantir than its existing commercial customers. Moreover, Palantir's expansion to new

---

[9]     Palantir's established "use cases" involved government entities and a limited number of large commercial applications, like the Skywise program used by the airline industry.

4879-7335-0845.v1

industries and customers required a costly buildout of the Company's sales force.[10]  And the substantial decreases in travel and office costs that Palantir experienced in FY20 due to COVID-19 were not indicative of normal operating costs.[11]  Thus, all the foreseeable costs associated with Palantir's commercial expansion efforts would (and did) result in much lower margins than those the Company experienced prior to the Offering.

41.    A typical pilot began with initial conversations between leadership at the potential client and a Palantir "Leverage" staff member.  Leverage staff were responsible for bringing in potential clients, convincing them to do a pilot, and closing the deal.  A c-suite Palantir executive would also speak with a member of the potential client's leadership, to discuss software needs.  These initial conversations could last months and involve dozens of meetings, during which the Palantir employees had to find a reason why a potential client needed Palantir's software.  Moreover, to even begin conducting a pilot and building out "use cases," Palantir would need access to a potential client's data.  This would often require the negotiation of non-disclosure agreements, and often companies would decline to proceed with a pilot simply because they did not wish to share their data.

42.    When a provisional contract was signed, however, Palantir went to work on a pilot.  Pilots generally lasted three months but could last much longer for large clients.  A

---

[10]   Karp acknowledged in February 2021 that Palantir was in the midst of an effort to more than double its direct sales force.  Palantir reported over $114 million of incremental costs attributable to increased sales and marketing headcount in FY21 and FY22.

[11]   Palantir's FY20 results reported $189.9 million of adjusted operating profit – over $132 million (70%) of which was the result of temporary travel and office cost reductions due to COVID-19.  In contrast, Palantir's FY22 results called out approximately $94 million of increased travel and office expenses as these temporary reductions were reversed.

- 14 -

Palantir pilot team typically comprised seven or eight employees, but could be as large as 50. This team included two leads, one from business development and one from product development. Once a contract was signed, the team would expend substantial time on the product the prospective client had agreed to try. At minimum, this consisted of reworking or adapting a preexisting product for the client. Other times, the engineering team had to design and build completely new features. The product, built on Foundry's foundation, was essentially a number of bricks. Each brick was a different Palantir product. It was the engineering team's job to try to rearrange the bricks into the shape the customer wanted.

43. Closing a deal at Palantir was challenging because the products Palantir sold were expensive and difficult to implement. Contrary to Defendants' public representations, it was not possible to simply throw someone the keys to a Palantir product and say "drive." Also, the pilot deployment process itself was time-consuming and expensive. Even after the pilot process, Palantir regularly failed to convert customers to longer-term contracts.

44. Because of all this, Palantir's operations were far less efficient than represented and its recent margin growth was unsustainable. Furthermore, Defendants also had no good faith basis to believe, and did not actually believe, their statements in ¶¶37 and 39 that "all of [Palantir's] customers will move into the Scale phase over the long term," as that was not the case historically and had become even more difficult as the Company expanded into new markets and industries.

45. Yet investors were swayed by Defendants' assurances. A September 22, 2020 *Seeking Alpha* article titled "Bullish On Palantir As It Is Just Beginning To Monetize Its Platforms" parroted Defendants' claims and highlighted that "the numbers tell a positive

- 15 -

story, <u>with contribution margins rising sharply and consistently every quarter</u>."

46.     The statements at Investor Day and in the Registration Statement described in ¶¶34, 36-39 above were all made in connection with (and to solicit interest in) the Offering, and remained live in the market throughout the Class Period.

### 2.     Defendants Continued to Misrepresent Palantir's Operational Efficiencies After the Offering

47.     Beginning with Palantir's November 13, 2020 3Q20 Form 10-Q (signed by Karp and Glazer), Defendants repeatedly claimed that: "***[C]ustomers are increasingly adopting our software, which can be ready in days***, over internal software development efforts, which may take months or years."[12]

48.     These statements were false and misleading when made.  Most Palantir software could not be "ready in days," but rather took months to develop and install for new customers. *Supra*, ¶¶35, 40-43.  Further, from 1Q21 onward, many of the Company's new commercial customers adopted Palantir solely due to SPAC swap deals, not because Palantir reduced timelines for developing internal software solutions.  *Infra*, §IV.B.

49.     During Palantir's February 16, 2021 FY20 earnings call, Defendants emphasized Palantir's increasing margins and efficiency in obtaining new customers:

[Glazer:] ***This rapid scaling and expanding contribution margin demonstrates the increasing efficiency of our customer acquisition and***

---

[12]   This statement was repeated in Palantir's: (i) February 26, 2021 FY20 Form 10-K (signed by Karp, Glazer, Cohen, and Thiel); (ii) May 12, 2021 1Q21 Form 10-Q (signed by Karp and Glazer); (iii) August 12, 2021 2Q21 Form 10-Q (signed by Karp and Glazer); (iv) November 9, 2021 3Q21 Form 10-Q (signed by Karp and Glazer); (v) February 24, 2022 FY21 Form 10-K (signed by Karp, Glazer, Cohen, and Thiel); and (vi) May 9, 2022 1Q22 Form 10-Q (signed by Karp and Glazer).

- 16 -

*onboarding process, which we believe will help fuel an expanding pipeline into 2021 and beyond*.

50.     During the Q&A portion of the call, Sankar highlighted both the purported

deployment speeds and "modularity" of Palantir's software:

> [Sankar:] ***[W]ith a few clicks you can deploy end-to-end powerful use cases.  Use cases that would have cost millions of dollars and taken many months can now be deployed in minutes***.
>
> ***It's about software-defined data integration and modularity.  That means that you get 100% of the power of Palantir, but with the ease of self-managing software***.  And these are examples of why we're confident in our long-term growth of being greater than $4 billion in 2025.

51.     In response to a separate question on the call, Kawasaki similarly touted the

"automat[ed] . . . delivery of Foundry" with "drag and drop" use cases:

> [Kawasaki:] Shyam just talked about how ***our TAM is expanding.  But we're automating the delivery of Foundry.  This means you can have full end-to-end use cases with no code, just drag and drop***.  And the result of this is that ***we can deliver the full power of our products, the small, medium and, of course, large institutions***.

52.     Beginning with Palantir's August 12, 2021 2Q21 Form 10-Q (signed by Karp

and Glazer), Defendants also repeatedly claimed that faster deployment times had

expanded the realm of potential customers, stating:

> ***Our software platforms can now be installed and ready for use within hours.  The speed with which our platforms can be deployed has significantly expanded the range of potential customers with which we plan on partnering over the long term***.  We anticipate that our reach among ***an increasingly broad set of customers***, in both the commercial and government sectors, will accelerate moving forward.[13]

---

[13]   This statement was repeated in Palantir's November 9, 2021 3Q21 Form 10-Q (signed by Karp and Glazer).   It was also repeated without the first sentence in Palantir's

- 17 -

53.     Contrary to Defendants' statements in ¶¶49-52 exalting Palantir's operational efficiencies, acquiring and onboarding new customers was not a process that took only "hours," "days," or "a few clicks" – but instead was a lengthy, time-consuming, and costly process, and Palantir had to incur far greater costs to close new deals than it spent on existing commercial customers.  *Supra*, ¶¶35, 40-43.

54.     Glazer's statements in ¶49 attributing Palantir's recent margin growth to increased efficiencies were materially misleading.  Glazer knew Palantir's success with its established clients could not translate into the same efficiencies with its "commercial expansion" to new customers, as its software customization efforts increased and pilot deployments failed more frequently when the deployments were in new industries, causing deterioration in Palantir's margins.  *Supra*, ¶¶35, 40-43; *infra*, ¶102.

55.     The statements in ¶¶50-52 that Palantir had automated the delivery of "drag and drop" Foundry use cases to a "few clicks" leading to an expansion of "the range of potential customers" were materially misleading, as the "drag and drop" use of Foundry was primarily limited to SPAC customers (*see infra*, ¶¶78,103) and was not broadly applicable to Palantir's traditional commercial customer base.  To the contrary, as explained *infra*, the SPAC transactions were sham deals obtained outside of Palantir's normal customer acquisition process; and because the SPACs badly needed Palantir's cash but not its product, they did not receive a standard (highly customized) Foundry product.

---

February 24, 2022 FY21 Form 10-K (signed by Karp, Glazer, Cohen, and Thiel) and May 9, 2022 1Q22 Form 10-Q (signed by Karp and Glazer).

- 18 -

4879-7335-0845.v1

**B.    Defendants Implement the SPAC Scheme to Mask Stagnation in Palantir's Business by Purchasing High-Margin Revenue**

56.    At the time of the Offering, Defendants defined Palantir's "potential customers" in the commercial sector as companies with more than $500 million in recurring annual revenue.  They did so because most early-stage companies did not need and could not afford Palantir, as its products are expensive to purchase and difficult to implement.

57.    By early 2021, market participants expressed concern about Palantir's slowing growth from commercial customers after the Company reported 4Q20 YoY commercial revenue growth of just 4%.  Defendants were well aware of this deceleration at the time of the Offering and frequently confirmed their "strong visibility into future revenues across [Palantir's] customer base."  *Infra*, ¶125.  The decelerating commercial revenue growth was particularly significant because Palantir's continued expansion into the commercial sector was a key growth driver.  *Supra*, ¶40.  As Morningstar summarized in August 2021: "[M]omentum in commercial is key to the long-term opportunity for Palantir."

58.    Because Palantir's actual growth and margin trends were inconsistent with Defendants' public representations, the Individual Defendants abruptly pivoted away from Palantir's publicly-stated "potential customers" and implemented the SPAC Scheme to foster an illusion of improved revenue and margin growth – further inflating Palantir's stock price while they were selling their shares.  In executing the SPAC Scheme, Defendants resorted to the outright purchase of revenue via 20+ sham transactions with early-stage, low- to no-revenue and/or barely solvent companies looking to be acquired by SPACs.  Palantir invested or committed to invest approximately $400 million in these deals.  And in exchange, each SPAC signed multiyear, multimillion-dollar contracts for Palantir software

- 19 -

4879-7335-0845.v1

which they were too nascent to need or afford.  The value of these deals often dwarfed the potential SPAC's annual revenue, with some agreements obligating the SPACs to immediately return up to 75% of Palantir's "investment" back to Palantir.

59.     Defendants knew that Palantir was unlikely to receive a substantial portion of the revenue contracted for under this scheme because the SPACs Palantir targeted were early-stage businesses that could not afford Palantir software.  In fact, the total amount due to Palantir under each contract exceeded the target SPAC's annual revenue, and most contracts cost the SPAC between $7 million and $10 million a year for five or six years.  In addition, Palantir completed due diligence of each SPAC before closing each transaction, and the Individual Defendants were personally involved in negotiating the SPAC deals. Shortly after each deal closed, Palantir had as much information about the SPACs as the SPACs themselves, as Foundry was, in Defendants' own words, the "single source of truth" for its customers.  In fact, according to Defendants, Foundry would "unlock" a "digital twin" of each company's "entire enterprise" and customer data in "hours," even "minutes," after installation and in "real time."  Sankar boasted: "[A]s a consequence of simply integrating your data into foundry, you now have a digital twin of your entire enterprise."

60.     Wejo, Boxed, Pear Therapeutics, Fast Radius, Starry Group, Babylon, and Bird Global are all bankrupt; Tritium is insolvent; Faraday Future trades at $1.19, Sarcos at $1.93, Rubicon at $0.22, Celularity at $3.47, Rigetti at $1.06, AdTheorent at $3.18, Lilium at $1.06, Blacksky at $1.13, Allego at $0.95, and Energy Vault at $1.17; and Embark Trucks, now privately owned after being taken private at $2.88 per share.  That almost all of the SPACs Palantir "partnered" with have declined to worthless or near-worthless status further

- 20 -

confirms what Defendants were aware of at the time Palantir entered the SPAC deals and when they spoke – that the SPACs were not legitimate, long-term customers.

### 1.   Defendants Mischaracterize Palantir's Business Strategy

61.    The Individual Defendants conceived the SPAC Scheme prior to the Offering and described in the Registration Statement (signed by Karp, Cohen, Thiel, and Glazer and effective September 22, 2020) Palantir's intent to enter into "strategic transactions" and "investments," while failing to disclose their true nature:

> As part of our business strategy, we have engaged in strategic transactions in the past and **expect to evaluate and consider potential strategic transactions, including acquisitions of, or investments in, businesses, technologies, services, products and other assets in the future.  We also may enter into relationships with other businesses to expand our products or our ability to provide services**.[14]

62.    Defendants knew the statements in ¶61 were materially misleading, as Defendants' true business strategy was not predicated on "strategic transactions," "acquisitions," or "investments" but instead on the undisclosed SPAC Scheme.  While the first SPAC deal was finalized in March 2021, these deals were high-dollar transactions (with both sides typically assisted by bankers and/or lawyers) whose negotiations were typically conducted over a three to four month period.  Thus, Defendants began to execute the SPAC Scheme in 4Q20 and had planned it at the time of the Offering, as demonstrated by the Registration Statement's use of the very same language – *i.e.*, the "strategic investment

---

[14]   Defendants repeated this statement in Palantir's November 13, 2020 3Q20 Form 10-Q (signed by Karp and Glazer), and continued to do so after they began executing the SPAC Scheme in Palantir's February 26, 2021 FY20 Form 10-K (signed by Karp, Glazer, Cohen, and Thiel) and May 12, 2021 1Q21 Form 10-Q (signed by Karp and Glazer).

- 21 -

program" (*see infra*, ¶¶83, 88) – Defendants used for the SPACs.[15]

### 2. Defendants Mislead About the Legitimacy and Sustainability of the SPAC Deals

63.     Palantir executed its first SPAC deal in March 2021, but did not disclose anything about the deals until May 2021.  When Defendants did begin to disclose certain aspects of Palantir's SPAC transactions, they misleadingly portrayed the SPAC Scheme as a sustainable "long-term strategy" involving "long-term" contracts with "compelling businesses."

### a. First Stage SPACs: Defendants Mischaracterize the SPACs' Use of Foundry

64.     Prior to May 11, 2021, Palantir entered into at least four roundtrip SPAC deals, buying approximately $171 million in future revenue in exchange for $112 million in PIPE funding (collectively, the "First Stage SPACs"):

- **Lilium**: $41 million on or around March 28, 2021, in exchange for a 5-year, $50 million Foundry subscription (approximately 1,000 times Lilium's 2021 revenue);

- **Sarcos**: $21 million on or around April 4, 2021 in exchange for a 6-year, $42 million Foundry subscription (over 8 times Sarcos's 2021 revenue);

- **Roivant Sciences**: $30 million on or around May 1, 2021 in exchange for a 5-year, $39 million Foundry subscription (nearly double Roivant's 2021 revenue); and

- **Celularity**: $20 million on or around May 5, 2021, in exchange for a 5-year, $40 million Foundry subscription (nearly double Celularity's 2021 revenue).

---

[15]   Throughout the Class Period, Defendants' use of the phrase "strategic transactions" or "strategic investments" referred solely to the SPAC deals.  Indeed, the very same statement in ¶61 describing "strategic transactions" was amended to include a reference to "special purpose acquisition companies" when Defendants began to disclose certain limited aspects of the SPAC investments in Palantir's May 12, 2021 1Q21 Form 10-Q.

- 22 -

65.     During the May 11, 2021 1Q21 earnings call, Sankar repeatedly sought to portray Palantir's SPAC customers as companies that had a legitimate use for Foundry:

> [Sankar:] And it's not just established industry players where **we are winning**, we are **seeing opportunities for companies to build their digital infrastructure around Foundry from day 0 where they can shave years off their ramps and mountains of risk off their road maps by cost efficiently standing on the shoulders of 15 years and more than $2 billion of R&D.  And we see this as the first salvo in expanding distribution of Foundry to broader markets and a broader set of customers**.
>
> In Q1, we entered into a partnership with **Lilium**, a revolutionary eVTOL transportation company **that will use Foundry to build an integrated business from the ground up, incorporating design and engineering, procurement, testing, production, quality, logistics and in-service operations**.  We have also partnered with Sarcos.
>
> We have always talked about Gotham as the digital Iron Man suit.  Well, these guys, they're building the physical Iron Man suit.  **Sarcos will leverage Foundry for all of Palantir's well-understood industrials and manufacturing use cases** . . . .   These customers and even **more prospects in our pipeline** are at the forefront of the next major sea change software . . . .
>
> **We are investing in innovation in the west, backing companies with ambitious goals and executing on our ability to move down market. And the fit is natural, our software can radically accelerate production ramps and time to market and help these companies get to scale on dramatically shorter time horizons**.

66.     Sankar reiterated that these companies would build their manufacturing operations around Foundry from "day 0":

> [Sankar:] And here, **we see a unique opportunity with ambitious companies to invest in both compelling management teams and compelling businesses and to partner with them on using our software from day 0**.  These are folks that are focused on winning. . . .
>
> **They viscerally understand the value of buying the best operating system for their enterprise, shaving years and mountains of risk off their road map**. . . .  Overall, we think this is a really compelling opportunity

- 23 -

to **accelerate our business**, to accelerate our distribution and to bet on our customers.

*        *        *

**And I call out companies like Lilium and Sarcos again that are going to build their operations around Foundry from day 0, using Foundry for ERP, CRM, manufacturing execution, for quality and much more**.

67.     Analysts noted Palantir's SPAC statements, with Morgan Stanley reporting in its May 12, 2021 analyst report that Palantir added "11 new commercial customers," was positioned for "durable 30% growth ahead," and had a "[m]ore [d]urable [g]rowth [p]rofile."

68.     In reality, Defendants knew the SPACs detailed in ¶64 above were too nascent to need Palantir's software for operations and/or lacked the revenue or commercial prospects to legitimately afford the longer duration Palantir subscription contracts.  These SPACs were not positioned to meaningfully utilize Foundry as they were all suffering huge operating losses in 2021 at the time the PIPE deals were signed and were on track for 2021 losses of $1 billion (Roivant), over €400 million (Lilium), over $109 million (Celularity), and approximately $81 million (Sarcos).  These losses were not one-offs.  Rather, Palantir was ultimately forced to sell approximately 90% of its $40 million Lilium investment at a 50%-80% loss, and Lilium, Celularity, and Sarcos received notices warning they would be delisted from Nasdaq, with Sarcos issuing a 1-for-6 reverse stock split to avoid that fate.  Thus, contrary to Defendants' statements in ¶¶65-66, the SPACs Palantir contracted with were not "compelling businesses" ready to "build their operations around Foundry from day 0" and to use Foundry for legitimate manufacturing or commercialization purposes.

69.     For example, Lilium was not positioned to use Foundry for "manufacturing execution."  Lilium had asserted it could make a battery-powered aircraft fly longer and with

- 24 -

heavier payloads than its competitors.  In truth, it was impossible for Lilium to accomplish its stated manufacturing goals absent a major breakthrough in battery technology and until it achieved numerous difficult aviation certifications from regulators, and the SPAC did not generate enough cash to commercially launch the jet.

70.     And Sarcos could not "leverage Foundry for all of Palantir's well-understood industrials and manufacturing use cases" because its "physical Iron Man suit" was (as Sarcos later stated in its 3Q21 Form 10-Q) still a "prototype" and "not yet commercially available."  Later, in its 3Q22 Form 10-Q, Sarcos acknowledged: "<u>We have no experience to date in high volume manufacture of our products, nor do we have the facility, employees or equipment needed to manufacture our products in high volumes</u>."  And ultimately, in November 2023, Sarcos shut down all robotics hardware commercialization efforts.

71.     Further, the costs for Roivant, Celularity, Sarcos, and Lilium under their Palantir contracts far exceeded each SPAC's annual revenue.  Thus, the substantial Palantir subscriptions further undermined the SPACs' commercial development by requiring each to spend its modest resources on unnecessary and expensive software.

72.     The Individual Defendants knew their SPAC strategy was a key area of interest for investors because they had to repeatedly field questions from analysts on the 1Q21 earnings call.  Analysts asked Defendants to address "the motivation behind these decisions" to invest in the SPACs and how they "view risk, investment size and potential return."  As explained in *supra*, ¶59, Defendants knew from Palantir's SPAC due diligence and installation data that the First Stage SPACs were largely nonviable and, therefore, offered minimal potential revenue value.  Nonetheless, Sankar, Glazer, and Kawasaki

- 25 -

repeatedly provided misleading assurances in response, concealing that their motivation was, in fact, to buy revenue for Palantir in order to conceal Palantir's declining metrics.

73.    Moreover, Defendants knew their statements in ¶¶65-66 concealed that Defendants had already expanded the SPAC Scheme by arranging to manufacture more high-margin revenue and illusory growth shortly after Palantir's May 11, 2021 earnings call (*infra*, ¶76).  Because SPAC transactions typically were negotiated over multiple months and involved bankers and/or lawyers on both sides, Defendants were negotiating most, if not all, of the Second Stage SPAC deals (defined *infra*, ¶76) when they convened the May 11, 2021 earnings call.  Indeed, some of the deals were just days or weeks from closing.  Yet, during the May 11, 2021 call, Sankar obliquely referred only to "prospects in our pipeline," and in its 1Q21 Form 10-Q filed the next day, Palantir referenced only the four First Stage SPAC deals while again concealing the massive SPAC Scheme expansion that was underway.  By concealing the full scope of the SPAC Scheme on the May 11, 2021 call, Defendants were able to extend it into subsequent quarters as they continued to cash out via their insider trading.

74.    At the June 8, 2021 Annual Shareholders Meeting, Sankar cited the SPAC deals as evidence of Palantir's product advancements and commercial market approach:

> [Sankar:] [O]ne of the most humbling and exciting things we are seeing right now is that a bunch of **day zero, hyper growth start-ups, free of legacy are choosing to build their offerings on top of our software**. . . .
>
> . . . To me, that's literally what an operating system is, **it is very validating of our end-to-end approach**.  It's allowed us to add extreme value over the do-it-yourself custom build approaches.  Or really, should I say, **customers are realizing that they can build on top of what they are buying with foundry**, and we expect to continue to make product investments here.

- 26 -

75.     However, contrary to the statements in ¶74 characterizing the SPAC sales as a validation of Palantir's business model, Defendants knew Palantir's SPAC partners did not have a legitimate need for Foundry and were not "choosing" Palantir's software in order to "build their offerings" – but were instead being paid to buy it.  Rather than "validating" Palantir's "end-to-end approach," the SPAC deals were unsustainable one-off *quid pro quo* transactions designed to enable Palantir to show high-margin revenue growth and only occurred because of the SPACs' need for PIPE funding.  *See supra*, ¶¶58, 64, 68-71; *infra*, ¶¶78, 103.

**b.      Second Stage SPACs: Defendants Misrepresent the Sustainability of the SPAC Scheme**

76.     Following the May 11, 2021 call, Palantir bought approximately $212 million in future revenue from at least nine different commercial clients in exchange for approximately $200 million in PIPE funding (collectively the "Second Stage SPACs"):

- **Wejo**: $35 million on or around May 28, 2021 in exchange for a 6-year, $50 million Foundry subscription;

- **Babylon Health**: $35 million on or around June 3, 2021 (Foundry subscription commitment undisclosed);

- **Boxed**: $20 million on or around June 13, 2021 in exchange for a $20 million, 5-year Foundry subscription with $15 million payable within 30 days of closing;

- **Pear Therapeutics**: $10 million on or around June 21, 2021 in exchange for a 3-year, $9.3 million Foundry subscription;

- **Embark Trucks**: $18 million on or around June 22, 2021 (Foundry subscription commitment undisclosed);

- **Fast Radius**: $20 million on or around July 18, 2021 in exchange for a 6-year, $45 million Foundry subscription signed in May 2021 with nearly $10 million paid at SPAC close in February 2022;

- 27 -

- **Tritium**: $15 million on or around July 27, 2021 in exchange for a 5-year, $21 million Foundry subscription;

- **AdTheorent**: $15 million on or around July 27, 2021 in exchange for a 5-year, $20 million Foundry subscription;

- **Faraday Future**: $25 million in or around July 2021 in exchange for a 6-year, $47 million Foundry subscription; and

- **FinAccel**: $10 million on or around August 2, 2021 (SPAC cancelled).[16]

77.    During Palantir's August 12, 2021 2Q21 earnings call, Sankar again asserted

that the SPACs' widespread use of Foundry was proof that the product was "for everyone":

> [Sankar:] *[W]hat we've really proven over the last few quarters, and that's really reflected in the tremendous growth of the commercial customer count, 32% growth in Q2, is that Foundry is for everyone*.

*    *    *

> And these young guns, they see Foundry as an *alternative to building bespoke* solutions in AWS or Azure or any other cloud.  *They need software today that is ready for any tomorrow.  Our software is that enabling platform*, and a growing number of companies from early stage to newly public companies, they're pursuing that vision on Foundry.  We refer to these organizations as day 0 companies.
>
> *The innovation in our distribution is enabling us to partner with these organizations across many industries* as they build their offerings on Foundry.  For example, in biotech, *Cellularity [sic] is leveraging our experience in both pharma R&D and manufacturing to accelerate drug development and set a new standard for cell-based therapies.  Roivant is drawing on the work that we've done*, spanning pharma companies like Sanofi and Merck Group and public health platforms like N3C UNITE to pool

---

[16]  Defendants mentioned Wejo and Boxed by name on the August 12, 2021 2Q21 earnings call.  Palantir's 2Q21 Form 10-Q, released the same day, disclosed Babylon Health, Boxed, Pear Therapeutics, AdTheorent, FinAccel, Tritium, and Fast Radius by name, but it described Embark Trucks as an "[a]utonomous vehicle company" and Faraday Future as an "[e]lectric vehicle company."  Defendants did not disclose the names of these latter two companies until six months later – in the February 24, 2022 FY21 Form 10-K.

- 28 -

and share trial data with development partners and **build out real-world
evidence capabilities to support key disease areas**.

In automotive, **Wejo is building a SaaS ecosystem [of] connected vehicle
data spanning use cases across OEMs, suppliers, insurers and
government authorities on top of foundry**.  In logistics, **Box is building a
digital twin**, incorporating both shipment and sales operations, spanning raw
materials all the way through to end customers, and just so much more.

We are making Foundry accessible to even more day 0 companies with
Foundry for Builders, a program which supports early-stage companies with
access to Foundry, allowing these companies to build their operations on
Foundry from the outset, **enabling them not just to efficiently manage, but
actually to wield the increasing complexity of their growing businesses
to disrupt incumbents and to win in the marketplace**.

[T]hese companies . . . are just founders, entrepreneurs and engineers
focused on winning, and **they see Foundry as the best way to do that**.

78.    Sankar's statements in ¶77 above were materially false and misleading.

Defendants knew Foundry was not an "alternative to building bespoke solutions," but

instead required substantial costly customization for each client.  S*upra*, ¶¶35, 40-43.  The

partial, "out of the box" versions of Foundry that Palantir provided the SPACs were only a

pretext for *quid pro quo* arrangements, and were not broadly applicable to Palantir's normal

commercial customers.  Nor was it "innovation in [Palantir's] distribution" that enabled these

"partnerships," but instead Palantir's willingness to contemporaneously provide multimillion-

dollar PIPE funding that secured the deals.

79.    Defendants highlighted the SPACs as proof that "Foundry is for everyone,"

but far from establishing the viability and sustainability of commercial expansion, these

"customers" comprised a limited universe of financially-desperate companies willing to sign

Foundry subscriptions in exchange for a quick cash infusion.  Indeed, these SPACs lacked

the revenue or commercial ability to even continue as "going concerns" – let alone afford

- 29 -

the longer duration Palantir subscription contracts.[17]   Five (Wejo, Boxed, Pear Therapeutics, Fast Radius, and Babylon Health) are now bankrupt.   A sixth, Tritium, is insolvent.

80.   For example, Celularity was not leveraging Foundry or Palantir "to accelerate drug development."   As Celularity founder Bob Hariri acknowledged – less than two weeks after the deal – Celularity and its medicine were still "'in its infancy.'"   In fact, Celularity ultimately ceased using Palantir software because the software had never performed as promised and Palantir failed to properly support the Foundry platform.

81.   Nor was Wejo building a SaaS ecosystem "on top of [F]oundry" with "use cases across OEMs, suppliers, insurers and government authorities."   In reality, Palantir's Foundry software was fundamentally incompatible with Wejo's technology and products. Wejo was a company established to analyze and sell automotive data.   And while Foundry is an organizational tool for structuring data across varying data sets, the majority of Wejo's operational data is of a single type – *i.e.*, that from automakers (OEMs) like GM, Ford, and Volkswagen.   Moreover, due to legal restrictions, <u>Wejo could not even put its data on Palantir's platform without approval from the automakers, which they refused to give</u>.   Of course Palantir, having a "digital twin" of the platform (*supra*, ¶59), knew that Wejo was unable to upload the automaker data or meaningfully use the Foundry platform.   For these

---

[17]   "Going concern" is an accounting term used to indicate the belief that a company has the resources needed to continue operating.   Auditors of public companies are responsible for evaluating whether there is substantial doubt as to the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited.   Going concern doubts have been raised by management and/or auditors of approximately 16 of the 20 SPACs Palantir partnered with.

- 30 -

reasons, Wejo never developed *any* marketable products with Foundry, let alone an "ecosystem [of] connected vehicle data."  Ultimately, Wejo went bankrupt in summer 2023 – due in part to the outsized Foundry subscription that Wejo could not afford, but was obligated to pay in exchange for Palantir's PIPE funding.

82.     And for Fast Radius, Foundry was not an "enabling platform" allowing it to be "ready for any tomorrow," as Palantir insisted on an immediate $9.4 million upfront payment from Fast Radius.  Indeed, its extensive due diligence into Fast Radius, which Glazer participated in, focused on Fast Radius's financing and cash positions for the coming 12 months.  Tellingly, Fast Radius declared bankruptcy approximately nine months after Palantir funded its investment.

83.     On the August 12, 2021 call, Glazer and Kawasaki sought to deflect investor concerns about Palantir potentially "buying revenue," stressing that the SPACs only contributed 1% of Palantir's 2Q21 revenue and were part of a "long-term strategy":

> [Glazer:] In the first half of the year, we committed to invest $250 million, and we funded approximately $20 million of those commitments to date.  We have and expect to continue to make additional strategic investments in the future.  *In the second quarter, $3 million or less than 1% of our quarterly revenue was from companies we invested in as part of the strategic investment program we launched earlier this year*.
>
> *            *            *
>
> [Head of Palantir Investor Relations:] (inaudible) asks, <u>can you guys describe your long-term vision with your pipe investments into pre-revenue companies?  The talk is Palantir's buying revenue</u>, but I believe it is a clever, high-risk, high-reward strategy, enhancing network effects.
>
> [Kawasaki:] Thank you.  This is a huge opportunity for us to invest in our customers.  And that's something we feel we've always done.  Now we can do it with our balance sheet.  *These are companies that we think we will be working with for a very long time*.

- 31 -

\*     \*     \*

So I'll also break down the numbers a little bit here.  Dave already mentioned that **less than 1% of our revenue came from this program in Q2. Additionally, of the $925 million of total TCV in Q2, $543 million from this program.  This is a long-term strategy, and the deal is a long term as well.  So we expect longer duration and time to revenue recognition**.

84.    Defendants knew that Palantir was, in fact, artificially inflating its commercial performance by "buying revenue."  *Supra*, ¶59.  They also knew from SPAC due diligence and installation data that, contrary to Glazer's and Kawasaki's statements in ¶83, the First and Second Stage SPACs were overwhelmingly nonviable businesses, not companies that Palantir expected to be "working with for a very long time," or part of a "long-term strategy" that could provide $543 million (or even a substantial portion of that) in total contract value ("TCV").  Indeed, Palantir's Second Stage SPACs included $88 million of investments in no-or-nearly-no-revenue companies in exchange for at least $107 million in software subscriptions: Embark Trucks (no revenue in 2021), Faraday Future (no revenue in 2021 but $47 million Foundry subscription), Wejo ($2.57 million in 2021 revenue but $50 million Foundry subscription), and Pear Therapeutics ($4.2 million in 2021 revenue but $9.3 million Foundry subscription).  These SPACs were teetering on insolvency, as some publicly stated soon thereafter.[18]  Nonetheless, Defendants' misleading assurances to analysts' inquiries worked, as an August 12, 2021 Jefferies analyst report reiterated that Palantir's

---

[18]   Unsurprisingly, the Second Stage SPACs suffered dramatic declines in stock price during the Class Period, falling on average approximately 80% from their IPO prices.  Five are bankrupt; Tritium is insolvent; Nasdaq has issued Faraday Future a delisting notice; AdTheorent – the only other Second Stage SPAC still publicly-traded – is being taken private; and Embark's stock price declined approximately 99% before being taken private.

4879-7335-0845.v1

"partnership investments are paying off as net new logo growth accelerates."

85.     Only three months after Palantir's investment, Faraday Future was revealed to be an "EV scam" that had never been in a position to sell a car; that of the 14,000 reservations for the FF91 vehicle Faraday reported, only several hundred were paid and the others simply unpaid indications of interest; and that China's infamous securities fraudster Jia Yueting was involved in managing the Company post-SPAC.

86.     Similarly, a January 6, 2022 short-seller report and subsequent securities fraud lawsuit revealed that Embark Trucks had far more limited operational and technological capabilities than publicly disclosed, held "no patents, [and] has only a dozen or so test trucks."   Defendants' effort to conceal the actual identity of Embark Trucks – describing it only as an "[a]utonomous vehicle company" in Palantir's 2Q21 Form 10-Q – further confirms their efforts to conceal the SPAC Scheme.   Embark laid off 70% of its workforce in March 2023 and was then taken private.

87.     Defendants' knowledge of the Second Stage SPACs' precarious financial state is further confirmed by Palantir's insistence that Boxed and Fast Radius make front-loaded payments immediately following Palantir's PIPE investments.   For example, in exchange for $20 million from Palantir – the precise amount Fast Radius needed to complete its PIPE funding – Fast Radius signed a $45 million, 6-year Foundry subscription in May 2021.   Consistent with its extensive due diligence into Fast Radius before the closing, which Glazer participated in, and which focused on Fast Radius's financial position, Palantir insisted on an immediate $9.4 million upfront payment from Fast Radius due at close and another provision allowing Fast Radius out of the deal if it paid $19.5 million

- 33 -

within a certain time frame.[19]  Fast Radius declared bankruptcy approximately nine months after Palantir funded its investment.  Similarly, Palantir demanded $15 million of the now-bankrupt Boxed's $20 million Foundry subscription (**75%**) 30 days after close.  These upfront payments are further evidence that Defendants did not believe, as they represented to investors, that Fast Radius or Boxed were part of "a long-term strategy," or "long term deal[s]" with "longer duration and time to revenue recognition."

88.    Kawasaki also claimed on the August 12, 2021 call that the SPACs were "choosing Foundry" and that Palantir delivered the "full power" of Foundry to them:

> [Kawasaki:] **We are now delivering the full power of Foundry to small companies** through a subscription model, and we're doing this across many sectors, ranging from health care to robotics to software companies, SaaS businesses **using Foundry to build their offerings**.
>
> *         *         *
>
> Now these are companies that have cutting-edge technology of their own, and **they're choosing Foundry to help drive their vision forward**.  And we think many will follow and our strategic investment program accelerates this.

89.    Contrary to the statements in ¶88, Palantir's SPAC partners did not have a legitimate need for Foundry and were not "choosing" the software to "build their offerings."  Rather, these SPAC "partners" merely signed up for expensive multi-year Foundry subscriptions as *quid pro quo* exchanges for desperately needed PIPE funding.  Nor were Defendants providing the SPACs the "full power" of Foundry.  Palantir supported the SPAC customers with a fraction of the engineers required for typical commercial contracts and no

---

[19]   The terms of Fast Radius' (i) Foundry subscription cost and (ii) immediate upfront payment were not made public until November 26, 2021, and March 30, 2022, respectively.

- 34 -

salespeople, and unlike Palantir's typical commercial accounts, provided the SPACs only parts of Foundry, delivering the product all at once without the bespoke setup its non-SPAC commercial customers received.  As Celularity explained in its 1Q23 Form 10-Q, it ceased using Palantir software in January 2023 because "the software has not performed as promised and . . . <u>Palantir has failed to provide the Company with the professional services necessary to successfully implement, integrate and enable the Foundry platform</u>."

90.     Beginning with Palantir's August 12, 2021 2Q21 Form 10-Q (signed by Karp and Glazer), Palantir misleadingly portrayed its SPAC "investments" as legitimate growth-enhancing partnerships that would expand Palantir's customer base:

> ***Our proximity to these businesses and the industries in which they are operating has enhanced . . . our own product and business development efforts, as we continue expanding access to our platforms to the broadest possible set of customers***.[20]

91.     Contrary to the statements in ¶90, rather than "enhanc[ing]" Palantir's "business development efforts" and "expanding access" to its products, Defendants knew the SPAC Scheme was undertaken to conceal Palantir's stagnating growth by generating artificial short-term "demand" that was illusory and unsustainable.

92.     Defendants' statements (¶¶83, 88, 90) also omitted that Defendants had already expanded the SPAC Scheme by arranging to manufacture additional margin and revenue growth through at least seven more SPAC transactions shortly after Palantir's

---

[20]   This statement was repeated in Palantir's: (i) November 9, 2021 3Q21 Form 10-Q (signed by Karp and Glazer); (ii) February 24, 2022 FY21 Form 10-K (signed by Karp, Glazer, Cohen, and Thiel); and (iii) May 9, 2022 1Q22 Form 10-Q (signed by Karp and Glazer).

- 35 -

August 12, 2021 earnings call (*infra*, ¶93).

### c. Third Stage SPACs: Defendants' Last-Gasp Expansion of the SPAC Scheme

93.     Within months of its August 12, 2021 call, Palantir purchased $91.5 million in future revenue from approximately seven more commercial clients in exchange for approximately $117.5 million in PIPE funding (the "Third Stage SPACs").  Three of the deals totaled $65.2 million in purchased revenue, $17 million of which was front-loaded:

- **BlackSky**: $8 million on or around September 1, 2021 in exchange for $8 million Foundry subscription payable "over multiple years";

- **Energy Vault**: $8.5 million on or around September 8, 2021 in exchange for $7.5 million Foundry subscription payable at $3 million a year over two and a half years; and

- **Rubicon Technologies**: $35 million on or around December 15, 2021 (negotiated in September 2021 but amended in December 2021) in exchange for at least $17 million in Palantir services payable within 12 months and $30 million thereafter through October 2024 (a total commitment of $49.7 million).

94.     The four remaining deals had unknown subscription terms (estimated to be at least $26 million), in exchange for approximately $66 million in PIPE funding:

- **Allego**: $20 million on or around September 9, 2021 for unknown exchange ("Allego is a customer of Palantir");

- **Starry Group**: $16 million on or around October 6, 2021 in exchange for what appears to be an estimated $16 million Palantir subscription agreement over 3 or 4 years;

- **Rigetti**: $10 million on or around October 6, 2021 in exchange for what appears to be an estimated $10 million Palantir subscription agreement over 3 or 4 years; and

- **Bird Global**: $20 million on or around November 29, 2021 for unknown exchange ("[w]e are a customer of Palantir").

95.     During Palantir's November 9, 2021 3Q21 earnings call, Sankar again

- 36 -

stressed that the SPAC customers were using Foundry to manage their operations:

> [Sankar:] ***These companies have enormous ambition and deeply value the step change in speed and the reduction of expenses Foundry delivers when consumed as Infrastructure as a Service. Wejo is able to develop market-ready applications in as little as 6 weeks on Foundry. Sarcos is integrating 0.5 trillion data points per month to accelerate design, maintenance and commercialization of their Iron Man suits. Lilium is flying through ground and flight testing [wielding] the vast data generated by every sensor streaming from the aircraft***.
>
> *     *     *
>
> ***We started this program to supercharge earlier-stage companies, enabling them to create a central operating system for their data and to scale rapidly from Day 0. These companies, they're not just managing their data and their operations, they are wielding them to blitz, scale and win***.

96.    On the same call, Glazer highlighted the $640 million "long term" revenue the

Company would generate from these "investments":

> [Glazer:] Just to repeat some numbers and get some context with our Q4 guide, ***we're expecting 40% revenue growth for the year in 2021***. . . . We've invested about – invested about $150 million through Q3.
>
> Total revenue from the program is about 2% of revenue for the year through Q3, ***and there's about $640 million of total revenue long term from this program at the end of the quarter***.

97.    Contrary to Sankar's statements in ¶95, Wejo, Sarcos, and Lilium were not

using Foundry to manage, commercialize, and scale their operations. *Supra*, ¶¶69-70, 81.

Nor was Foundry delivering a "reduction [in] expenses" to these companies or any of

Palantir's other SPAC customers. To the contrary, most of the Foundry subscriptions cost

the SPACs between $7 million and $10 million a year – a burdensome cost these nascent

companies could not afford. *Supra*, ¶¶59-60, 68-71, 79-82; *infra*, ¶98. Moreover, as with

the prior SPAC deals, the Third Stage SPAC investments were *quid pro quo* transactions

- 37 -

undertaken to conceal Palantir's stagnating growth.  Palantir therefore did not "start[]" making SPAC investments to "supercharge earlier-stage companies," as claimed in ¶95 above, but instead implemented the SPAC Scheme to buy artificially inflated high-margin revenue so that Palantir could post the growth Defendants promised investors.

98.     Glazer's statements in ¶96 were also materially misleading for highlighting the expected revenue from the SPAC program and the anticipated revenue growth for 2021 inflated by the SPACs – as Defendants knew Palantir was unlikely to ever receive a substantial portion of the contracted-for SPAC-related revenue.  Indeed, Defendants knew from Palantir's due diligence and the complete customer data it "unlocked" minutes after installing Foundry that most of these Third Stage SPACs could not afford Foundry and were either insolvent or nearly so.[21]  For example, as reported by *WasteDive* on November 21, 2022, Rubicon attributed its subsequent layoffs and restructuring to "'higher software subscription costs'" from its Palantir agreement.  Moreover, it was known to or recklessly disregarded by Defendants at the time of each deal that these SPACs were operating at substantial losses in 2021: Rubicon ($915,000 net loss); Bird Global ($279 million net operating loss); Starry Group ($166.5 million net loss); BlackSky ($120 million operating loss); Allego (€126 million net loss); Rigetti ($23.2 million net loss); and Energy Vault ($3.3

---

[21]   Defendants also knew from their close relationships with some of Palantir's Third Stage SPACs that these companies could not afford Foundry.  For example, Rigetti executive Spencer Rascoff is on Palantir's Board, and Rigetti is connected to the Thiel-founded Y Combinator.  Likewise, Thiel's friend and fellow PayPal alumnus Roelof Botha is on the Bird Global Board.  And Thiel Capital Managing Director and former PayPal executive Jack Selby, who facilitated several investments in Palantir, was on the Board of Founder SPAC, which merged with Rubicon in Rubicon's SPAC, and subsequently joined Rubicon's Board.

4879-7335-0845.v1

million net loss). And subsequent to these deals (or immediately before them, as with Bird Global), the auditors or management of almost all of the Third Stage SPACs expressed going concern doubts. All lost over 50% of their listing stock price by the end of the Class Period. Rubicon, Rigetti, and Allego have been issued notices warning of delisting from Nasdaq and NYSE, respectively. Starry Group and Bird Global are now bankrupt.

99.     That Defendants went to great lengths to conceal the details (going so far as to hide even the names of some) of the Third Stage SPACs from investors further confirms their desire to conceal their true state as well as the scope and purpose of the SPAC Scheme. In its SEC filings, Palantir concealed Starry Group as a "[t]elecommunications company," Allego as an "[e]lectric vehicle charging company," and Bird Global as a "[m]obility company." Moreover, Palantir concealed details concerning the Allego, Starry Group, Rigetti, and Bird Global deals, including the deal value of the contracts. Palantir also concealed from the market the names of approximately $70 million worth of deals reached in September 2021 (Rubicon, Allego) and October 2021 (Starry Group) – until later in February 2022 (Rubicon) and May 2022 (Allego, Starry Group).

100.    Glazer's statement on the November 9, 2021 earnings call (¶96) also omitted that Defendants had already expanded the SPAC Scheme by entering into *quid pro quo* agreements with Bird Global on or around November 29, 2021 and with Rubicon on or around December 15, 2021 (which had been negotiated in September 2021).

### 3.     Defendants' SPAC Scheme Was Designed to and Did Inflate Palantir's Key Performance Metrics

101.    Defendants' implementation of the SPAC Scheme was designed to and did manipulate Palantir's reported profit margins, revenue growth, total remaining deal value

- 39 -

("TRDV"), and customer count – the key metrics that Defendants pointed to as evidence of acceleration in the commercial sector in order to prop up the trading price of Palantir stock.

### a.     Profit Margins

102.    As explained above, Palantir's attempt to expand its commercial business to new customers and industries was an expensive and time-consuming endeavor – and resulted in declining profit margins throughout the Class Period (*see supra*, ¶¶35, 40-43):



103.    The SPAC transactions were designed to and did mask the full extent of Palantir's deteriorating margins.  Palantir's SPAC deals had a much lower cost to obtain and implement than its typical commercial contracts, inflating Palantir's margins significantly.  Contrary to typical commercial deals, there were no salespeople involved in the SPAC deals.  Furthermore, whereas a single non-SPAC commercial client typically required about eight Palantir employees' support to create a bespoke Foundry platform, eight Palantir employees could support ten SPACs.  And because the SPACs were locked into Foundry subscriptions as a prerequisite to receiving PIPE funding, Palantir did not need to create bespoke products for its SPAC clients or give them the full Foundry

- 40 -

treatment afforded non-SPAC clients.  Instead, the SPAC customers were provided off-the-rack and partial Foundry applications.  Because the costs associated with SPAC deals were approximately 10% as much as its traditional commercial contracts, these deals materially inflated Palantir's reported margins – masking the true extent of the decline in margins as the Company struggled to efficiently expand to non-SPAC commercial clients.

104.    From the time Palantir began recognizing revenue from the SPAC Scheme in 2Q21 until the scheme unraveled in 2Q22, Defendants repeatedly reported misleadingly inflated contribution margins[22]:

| Source[23] | Quarter | Contribution Margin | Commercial Contribution Margin |
|---|---|---|---|
| August 12, 2021 Form 10-Q (signed by Karp and Glazer) | 2Q21 | *58%* | *52.3%* |
| November 9, 2021 Form 10-Q (signed by Karp and Glazer) | 3Q21 | *57%* | *56.3%* |
| February 24, 2022 Form 10-K (signed by Karp, Glazer, Cohen, Thiel) | 4Q21 | *58%* | *57.6%* |
| May 9, 2022 Form 10-Q (signed by Karp and Glazer) | 1Q22 | *57%* | *55.0%* |

105.    The table below illustrates how the SPAC deals inflated Palantir's commercial

---

[22]   Contribution margin is Palantir's "revenue less [the] cost of revenue and sales and marketing expenses, excluding stock-based compensation, divided by revenue."  As Defendants emphasized in their SEC filings, contribution margin is "an important measure of the efficiency of [the] business," and was the sole "key non-GAAP business measure to help [Defendants] evaluate [their] business, identify trends affecting [their] business, formulate business plans and financial projections, and make strategic decisions."

[23]   Each of these SEC filings reported enterprise-wide contribution margins and segment-level contribution.  The commercial contribution margin percentages have been calculated using those reported segment-level contribution numbers and the calculation indicated in each SEC filing.  Glazer also provided these contribution margin figures during the earnings calls for 2Q21 (Glazer: "*58%*"), 3Q21 (Glazer: "*57%*"), and 1Q22 (Glazer: "*57%*").

- 41 -

contribution margins, estimating conservatively that a 90% contribution margin from the SPACs inflated commercial contribution margins in 2021-2022 by as much as 17.7%[24]:

|  | 2Q21 | 3Q21 | 4Q21 | 1Q22 |
|---|---|---|---|---|
| Commercial revenue | $143,523,000 | $174,310,000 | $193,886,000 | $204,567,000 |
| Contribution margin (as reported) | 52.3% | 56.3% | 57.6% | 55.0% |
| SPAC Revenue | $3,000,000 | $19,000,000 | $26,300,000 | $39,200,000 |
| Contribution margin ex-SPAC (at 90% CM) | 51.5% | 52.2% | 52.5% | 46.8% |
| Reported contribution margin inflated by: | 1.6% | 7.9% | 9.7% | 17.7% |

106.    Indeed, excluding the SPAC customers that Palantir bought in 2021 reveals that it was, in fact, operating at a significant loss on new organic commercial customers:

|  | 1Q21 | 2Q21 | 3Q21 | 4Q21 | FY21 |
|---|---|---|---|---|---|
| Avg revenue per commercial customer | $ 2,213,567 | $ 1,816,747 | $ 1,515,739 | $ 1,318,952 | $ 4,384,578 |
| Avg contribution profit (loss) per commercial customer | $ 1,209,050 | $ 950,899 | $ 853,713 | $ 759,898 | $ 2,432,286 |
| Avg revenue per new YTD commercial customer | $ 39,455 | $ 272,323 | $ 433,522 | $ 455,228 | $ 830,693 |
| Avg contribution profit (loss) per new YTD commercial customer | $ (570,455) | $ (183,677) | $ 28,269 | $ 269,088 | $ 169,336 |
| Avg revenue per new YTD commercial customer (Ex-SPAC) | $ 39,455 | $ 224,769 | $ 196,173 | $ 226,078 | $ 413,932 |
| Avg contribution profit (loss) per new YTD commercial customer (Ex-SPAC) | $ (570,455) | $ (356,971) | $ (310,903) | $ 33,342 | $ (333,567) |

107.    SPAC revenue also misleadingly inflated adjusted operating margins:

---

[24]   The true costs of the SPAC Scheme – the PIPE investments that enabled the sales – were not reflected as an expense to Palantir under Palantir's contribution margin formula.

| Source[25] | Quarter | Adjusted Operating Margin |
|---|---|---|
| August 12, 2021 Release (signed by Karp) | 2Q21 | ***31.1%*** |
| November 9, 2021 Release (signed by Karp) | 3Q21 | ***29.6%*** |
| February 24, 2022 Release (signed by Karp) | 4Q21 | ***28.7%*** |
| May 9, 2022 Release (signed by Karp) | 1Q22 | ***26.3%*** |

108.    The following table illustrates how the SPAC deals inflated Palantir's adjusted operating margin, estimating conservatively that a 90% profit margin from the SPACs inflated Palantir's adjusted operating margin during 2021-2022 by as much as 30.4%:

| | 2Q21 | 3Q21 | 4Q21 | 1Q22 |
|---|---|---|---|---|
| Revenue | $375,642,000 | $392,146,000 | $432,867,000 | $446,357,000 |
| Adjusted operating margin (as reported) | 31.1% | 29.6% | 28.7% | 26.3% |
| | | | | |
| SPAC Revenue | $3,000,000 | $19,000,000 | $26,300,000 | $39,200,000 |
| Adjusted operating margin ex-SPAC (at 90% profit margin) | 30.6% | 26.5% | 24.7% | 20.2% |
| Reported adjusted operating margin inflated by: | 1.6% | 11.6% | 16.1% | 30.4% |

109.    Thus, the SPAC Scheme masked the timing and extent of the stagnation and declines in Palantir's commercial contribution margin and adjusted operating margin, thereby inflating its reported margins.  As a result, the SPAC Scheme misled investors as to

---

[25]  Each Palantir earnings release ("Release") issued during the Class Period was incorporated into a Form 8-K signed by Karp and filed with the SEC on the date of issuance.  Glazer and Sankar also provided these misleading adjusted operating margin figures during the earnings calls for 2Q21 (Glazer: "***31%***"), 3Q21 (Glazer: "***30%***"), and 1Q22 (Glazer/Sankar: "***26%***") as evidence of the Company's purported path to profitability.

4879-7335-0845.v1

the true profitability (or lack thereof) of the Company's commercial expansion efforts.

### b.   Reported Revenue, Revenue Growth, and TRDV

110.   Palantir had no reasonable expectation of long-term revenue from the SPACs over the length of their contracts – as most lacked the revenue and cash flow to afford the Palantir contracts and did not have a clear path to commercial production or operations on the scale Defendants represented.  Nevertheless, from the time Palantir began recognizing revenue from the SPAC Scheme in 2Q21 until the scheme unraveled in 2Q22, Defendants continuously reported misleadingly inflated revenue growth, as shown in the table below:

| Source[26] | Quarter | Commercial Revenue | Growth YoY | U.S. Growth YoY |
|---|---|---|---|---|
| August 12, 2021 Form 10-Q (signed by Karp and Glazer) and Release (signed by Karp) | 2Q21 | $ 143,523,000 | 28% | 90% |
| November 9, 2021 Form 10-Q (signed by Karp and Glazer) and Release (signed by Karp) | 3Q21 | $ 174,310,000 | 37% | 103% |
| February 24, 2022 Form 10-K (signed by Karp, Glazer, Cohen, Thiel) and Release (signed by Karp) | 4Q21 | $ 193,886,000 | 47% | 132% |
| May 9, 2022 Form 10-Q (signed by Karp and Glazer) and Release (signed by Karp) | 1Q22 | $ 204,567,000 | 54% | 136% |

---

[26]   For 4Q21, commercial revenue is derived from the prior quarterly revenue and annual revenue disclosed in the FY21 Form 10-K.  Sankar, Glazer, and Kawasaki also cited these misleading figures on the earnings calls for 2Q21 (Glazer: "*$144 million*" commercial revenue, "*28%*" commercial revenue growth; Glazer/Sankar: "*90%*" U.S. commercial revenue growth), 3Q21 (Glazer: "*$174 million*" commercial revenue; Glazer/Sankar/Kawasaki: "*37%*" commercial revenue growth, "*103%*" U.S. commercial revenue growth), and 1Q22 (Glazer: "*$205 million*" commercial revenue; Glazer/Sankar/Kawasaki: "*54%*" commercial revenue growth; Glazer/Sankar: "*136%*" U.S. commercial revenue growth) as evidence of the "accelerating" commercial business.

- 44 -

111.    The SPAC Scheme enabled Palantir to report this revenue growth by purchasing high-margin revenue to misleadingly prop up its reported commercial results – as the SPAC deals accounted for revenues of $3 million in 2Q21, $19 million in $3Q21, $26.3 million in 4Q21, and $39.2 million in 1Q22.  In fact, absent the SPAC revenue, Palantir's commercial growth had stagnated (*see infra*, ¶123), and Company-wide revenue growth would have fallen below Palantir's 30% long-term annual growth target in 3Q21 – three full quarters before 2Q22 when Palantir admitted to falling below the target:



112.    Palantir further touted, as part of "Investment Agreements," the "maximum potential revenue" of its SPAC arrangements reported, as shown in the table below:

| Source[27] | Quarter | Maximum Potential Revenue |
|---|---|---|
| August 12, 2021 Form 10-Q (signed by Karp and Glazer) | 2Q21 | *$ 428 million* |
| November 9, 2021 Form 10-Q (signed by Karp and Glazer) | 3Q21 | *$ 640.2 million* |
| February 24, 2022 Form 10-K (signed by Karp, Glazer, Cohen, Thiel) | 4Q21 | *$ 767.9 million* |
| May 9, 2022 Form 10-Q (signed by Karp and Glazer) | 1Q22 | *$ 754.9 million* |

---

[27]   The FY21 Form 10-K and 1Q21 Form 10-Q disclosed a "total value" rather than a "maximum potential revenue" figure.  The 4Q21 potential revenue was calculated based on the to-date total in the 3Q21 Form 10-Q and the annual total in the FY21 Form 10-K.

- 45 -

113.    Thus, in addition to reporting misleading short-term revenue, the SPAC deals also allowed Palantir to eventually report $767.9 million of additional TRDV, creating the illusion of sustainable growth in the Company's commercial segment.  In fact, SPACs represented over 20% of the $3.8 billion in TRDV by December 31, 2021 (<u>and more than 76% of the YoY increase</u>), at least a quarter of the $925 million in contracts Palantir signed in 2Q21, and roughly one-third of Palantir's Class Period revenue growth by early 2022.

114.    Thus, from the time Palantir began entering into contracts with the SPACs in 1Q21 until the scheme unraveled in 2Q22, Defendants continuously reported misleadingly inflated TRDV figures, as shown in the table below:

| Source | Quarter | TRDV | Commercial TRDV |
|---|---|---|---|
| May 11, 2021 Earnings Call (Glazer) | 1Q21 | *$ 2.8 billion* | *not disclosed* |
| August 12, 2021 Earnings Call (Glazer) | 2Q21 | *$ 3.4 billion* | *$ 2.1 billion* |
| November 9, 2021 Earnings Call (Glazer, Sankar, and Kawasaki) | 3Q21 | *$ 3.6 billion* | *$ 2.2 billion* |
| February 24, 2022 Form 10-K (signed by Karp, Glazer, Cohen, Thiel) | 4Q21 | *$ 3.8 billion* | *$ 2.6 billion* |
| May 9, 2022 1Q22 Earnings Call (Glazer) | 1Q22 | *$ 3.5 billion* | *not disclosed* |

115.    These "maximum potential revenue" and TRDV figures were materially misleading – as Defendants were aware that Palantir was unlikely to receive a substantial portion of the revenue contracted for under Defendants' scheme.  *Supra*, ¶¶59-60.  The SPACs Palantir partnered with had little to no revenue, no commercial prospects, and could not afford Palantir's software – and almost all of them have either gone bankrupt or declined in value to worthless or near-worthless status.  *Supra*, ¶¶60, 68-71, 79-82, 84 & n.18, 85-87, 98.  Defendants had no reasonable expectation of "long-term" revenue,

- 46 -

growth, or equity from the SPAC deals.

### c.   Customer Count

116.    The SPAC Scheme also allowed Palantir to report misleadingly high customer count and growth starting in 2Q21.[28]  Even though many of Palantir's SPACs lacked the revenue or commercial ability to continue as "going concerns," let alone afford the longer duration Palantir subscription contracts (even in the short term), Palantir nonetheless included its SPAC "partners" in its customer count:

| Source[29] | Quarter | Customer Count (net new) | Commercial Customer Growth |
|---|---|---|---|
| August 12, 2021 Release (signed by Karp) | 2Q21 | *20* | *32%* (sequential) |
| November 9, 2021 Release (signed by Karp) | 3Q21 | *34* | *46%* (sequential) |
| February 17, 2022 Release (signed by Karp) | 4Q21 | *34* | - |
| May 9, 2022 Release (signed by Karp) and Earnings Call (Kawasaki) | 1Q22 | *40*; *86% growth* (YoY) | *25%* (sequential); *207%* (YoY); *368%* (U.S. YoY) |

117.    These customer count figures were materially misleading, as the SPACs were not organic commercial customers that chose Foundry to meet legitimate business needs, but rather were businesses too nascent to afford or need Palantir's software that had

---

[28]  Palantir changed its definition of "customer" in 1Q21.  *Infra*, ¶162.

[29]  Glazer, Sankar, and Kawasaki also provided these misleading customer figures during the earnings calls for 2Q21 (Glazer/Sankar: "*20 net new customers*"; Glazer/ Sankar/Kawasaki: "*32%*" sequential commercial customer growth), 3Q21 (Glazer/Sankar: "*34 net new customers*," "*46%*" sequential commercial customer growth), and 1Q22 (Glazer/Sankar: "*40*" *net new customers*"; Sankar: "*86% year-over-year*" customer growth; Glazer/Kawasaki: "*25%*" sequential commercial customer growth, "*207%*" YoY commercial customer growth; Kawasaki: "*368%*" YoY U.S. commercial customers growth) as evidence of the Company's purported commercial expansion.

- 47 -

agreed to unnecessary software contracts in exchange for much needed PIPE funding. *Supra*, ¶¶58, 68-71.

### d. Defendants Cite Palantir's Misleading Metrics as Evidence of Continued Sustainable Growth

118.    Starting when Palantir began recognizing SPAC revenue in 2Q21, Defendants repeatedly pointed to misleadingly-inflated commercial metrics (*supra*, §§IV.B.2.a-IV.B.2.c) as evidence of the commercial segment's successful expansion.

119.    For instance, on the August 12, 2021 earnings call, Sankar and Glazer cited inflated commercial revenue growth and customer count metrics as proof of "product innovation" and "continued efficiencies" driving growth:

> [Sankar:] ***Cutting-edge product and continued efficiencies in distribution drove exceptionally strong year-over-year Q2 results***.
>
> Total revenue grew 49% in Q2.  U.S. commercial revenue accelerated to ***90%***. . . . .  ***We added 20 net new customers in Q2 alone***, while generating $7.9 million of average revenue per customer. . . .  ***The number of commercial customers grew 32% over last quarter***.
>
> \*        \*        \*
>
> ***Product innovation is at the core of these results*** and the momentum that's driving our business forward.
>
> \*        \*        \*
>
> [Glazer:] Second quarter commercial revenue growth accelerated to ***$144 million***, up ***28% year-over-year*** compared with 19% growth in the first quarter.  ***Speed and innovation are driving strong results in our commercial business***, particularly in the U.S., where commercial revenue growth accelerated to ***90% year-over-year*** in Q2 . . . .

120.    On the November 9, 2021 earnings call, Sankar and Glazer again pointed to revenue, customer count, and TRDV metrics as proof of "accelerating" commercial growth:

4879-7335-0845.v1

[Sankar:] ***Commercial revenue growth has accelerated in every quarter over the last year*** from 4% in Q4 2020 to 19% in Q1 to ***28% in Q2 now 37% in Q3***. At this scale, acceleration like this is gravity defined. U.S. commercial revenue growth accelerated once again to ***103% year-over-year***. We added ***34 net new customers in Q3***. To put this in perspective, our ***commercial customer count grew by 46% sequentially. We have more than doubled our commercial customer count at the beginning of the year***.

*　　*　　*

[Glazer:] Looking at our Q3 revenue year-over-year by segment, ***we continue to see broad-based momentum in our commercial business***. Total commercial revenue was ***$174 million, up 37%*** and representing our ***third straight quarter of accelerating commercial revenue growth***.

***Our investments in product and distribution continue to drive growth***, particularly in the U.S., where ***commercial revenue increased 103%*** in Q3.

*　　*　　*

***Our forward indicators also really strong. Total deal value up 50% to $3.6 billion. Total deal value in commercial doubled to $2.2 billion***.

121. And on the May 9, 2022 earnings call, Glazer and Kawasaki again highlighted accelerating (and inflated) commercial revenue and customer counts:

[Glazer:] ***Commercial revenue growth accelerated for the fifth consecutive quarter***. First quarter commercial revenue increased 54% year-over-year to ***$205 million***, up from a ***47% increase*** in the fourth quarter. . . . U.S. commercial revenue growth accelerated to ***136% in the first quarter, up from 132% in Q4***.

*　　*　　*

[Kawasaki:] ***We had our strongest quarter for winning new commercial customers overall***. Commercial customer count up ***25% sequentially and up 207% from a year ago. And in the United States, commercial customer count grew 368%. We expect continued growth in commercial customer acquisition***.

122. The statements detailed in ¶¶119-121 were materially misleading when made. Palantir's reported commercial growth was not driven by "investments in product

- 49 -

and distribution," but rather was the result of the unsustainable SPAC Scheme, which materially and artificially inflated the commercial metrics that Defendants reported (*i.e.*, profit margins, revenue, revenue growth, TRDV, and customer count).  These inflated metrics concealed that, rather than "accelerating," Palantir's organic commercial revenue growth rate had stagnated.  *See supra*, ¶¶31, 57; *infra*, §IV.B.3.

### C. Defendants Misrepresent the Momentum in Palantir's Business to Obscure Palantir's Declining Growth Trends

123.   Throughout the Class Period, Defendants claimed that Palantir's government and commercial segments were continuing to accelerate the tremendous growth it posted in early 2020 and at the time of the Offering.  This growth story was necessary to prop up Palantir's stock price, enabling the Individual Defendants to sell their Palantir shares at artificially inflated prices.  However, unbeknownst to investors, at the time of the Offering the Company's commercial revenue growth rate was set to decline significantly in 4Q20 (the quarter that began the day after the Offering).  Without the inclusion of revenue that Palantir bought and paid for via *quid pro quo* SPAC deals, Palantir's Class Period commercial growth rate never recovered to pre-Offering levels:



124.   In addition to this commercial growth stagnation, Palantir's government growth rate peaked in 4Q20 before suffering six sequential quarters of declining revenue growth rates – falling from 85% YoY in 4Q20 to 13% YoY in 2Q22:



125.   Defendants were aware throughout the Class Period that Palantir's growth had decelerated and had direct insight into the negative trends then impacting Palantir. Indeed, at Investor Day, Defendants emphasized that there were a "<u>number of factors that provide strong visibility and stability for future revenue growth</u>" – highlighting Palantir's TRDV, customer base, average length of contract, and ratable revenue recognition as key factors in the "<u>stability and predictability of our revenues</u>."  Throughout the Class Period, Defendants reiterated that they maintained "<u>strong visibility into future revenues across [Palantir's] customer base</u>" (3Q20 call) and claimed that "<u>visibility into future growth is strong</u>" (2Q21 call) – highlighting the aforementioned metrics as evidence of "<u>increased visibility for durable long-term growth</u>" (2Q21 call).  The "strong visibility" provided by the average length of Palantir's contracts increased from 3.5 years at the time of the Offering to 3.9 years by the end of 2Q21.  Palantir's customer base was also very narrow, with 125

- 51 -

customers at the start of the Class Period and approximately 300 by the end.  Palantir also had additional lead time with regard to notice of government revenue dropping off the books due to the lengthy nature of the government contracting and procurement process.

126.     Given the importance of each customer and the size of each contract, and as Defendants expressly acknowledged in Palantir's SEC filings, the Company's "sales efforts ha[d] historically depended on the <u>significant direct involvement of [its] senior management team, including Mr. Karp</u>."  Palantir's senior management team also included Cohen, Glazer, Sankar, and Kawasaki.  As Karp admitted on January 17, 2023: "<u>I run this business, for better or worse.  I know how the business is doing</u>."  Thiel also had heavy involvement in securing deals, from facilitating Palantir's government business to negotiating for commercial sector projects.  The involvement of Palantir's c-suite executives and Thiel in the customer acquisition process was necessary given the Company's acknowledged "limited direct sales force."  Moreover, Karp, Glazer, and the other "c-suite" executives had access to dashboards that were updated daily and provided them additional granular information on the Company's contracts – including a contract's signature date, expected "completion date," and Palantir's expenditures on the contract.

127.     Although Defendants were aware Palantir had hit a growth wall, Palantir's method of recognizing revenue obscured the financial impact of the slowdown from investors.  As explained in the Registration Statement and Palantir's quarterly SEC filings:

> We generally recognize revenue from our platforms and O&M services over the contractual term.  As a result, a portion of the revenue we recognize in each quarter is derived from customer contracts generally entered into during previous periods.  Consequently, <u>a decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue that we</u>

- 52 -

<u>recognize for that quarter.  However, such a decline would negatively affect our revenue in future quarters.  Accordingly, the effect of significant downturns in sales or renewals, significant customer terminations, and potential changes in our contracting terms and pricing policies would not be fully reflected in our results of operations until future periods</u>.

Defendants were thus aware of the negative trends in Palantir's expected revenue at least two quarters (*i.e.*, six months) before Palantir reported the effects of those trends fully as reflected in the Company's publicly reported financials.  Despite this advanced knowledge, Defendants continued to falsely tout Palantir's positive growth story quarter after quarter.

### 1. The Offering: Defendants Misleadingly Depict an Accelerating Trend of Immense Revenue Growth

128.  The Registration Statement, which became effective on September 22, 2020, emphasized that Palantir was experiencing accelerating growth at the time of the Offering, stating "***[o]ur growth this year has accelerated***" and including the following graph:



129.  The statement and graph in ¶128 misled investors.  In truth, the temporary boost that Palantir received in 1H20 from short-term contracts related to clients' responses to the COVID-19 pandemic was neither sustainable nor representative of Palantir's growth

potential.[30]  As one former Palantir employee later admitted, "COVID really accelerated the growth of the company" so the direct listing "got brought forward."  The Company's COVID-19 contracts, however, were much shorter in duration than Palantir's typical contracts, and Palantir had failed to secure additional contracts sufficient to offset the expected loss of the temporary surge in revenue from these contracts.  As a result, Defendants were aware from their "strong visibility" into future revenues that: (i) the government segment's growth performance was set to peak in 4Q20 and decelerate sequentially in 1Q21; and (ii) organic growth rates in the commercial segment (*i.e.*, growth achieved outside of the SPAC Scheme) were set to decline in 4Q20.  ¶¶123-127.  In order to grow on the commercial side at the pace claimed by Palantir, the Company was entirely dependent on the SPAC Scheme.  *See supra*, § IV.B.  Defendants were thus aware that, contrary to the misleading impression of accelerating revenue growth, Palantir's revenue growth was set to decelerate.

130.    Based on the growth story Defendants pitched in connection with the Offering, Palantir shares traded between $9 and $10 per share on the first day of trading.  The Individual Defendants immediately took advantage of the inflation in the price of Palantir shares by collectively dumping nearly 48.7 million shares during the first three days of the

---

[30]  Defendants acknowledged with their FY20 earnings that "a lot of new 2020 U.S. defense opportunities started as [a] crisis response to COVID," and that the Company purportedly "helped 100 commercial organizations" on COVID-19-related issues in 2020.

- 54 -

Offering, pocketing more than $483 million.[31]

### 2. 3Q20 Earnings: Defendants Misleadingly Claim "Significant Momentum" Across the Business

131.    Following the Offering, Palantir's November 12, 2020 3Q20 Release (signed by Karp) repeated the mantra of continued growth, stating:

> **Our growth and momentum across the business have continued**.

*       *       *

> **The demand for our software has increased steadily over the past year**.

*       *       *

> **We are continuing to see significant momentum in our business across the commercial sector this year, both in the United States and abroad**.

132.    Also on November 12, 2020, Palantir convened a conference call with analysts and investors to discuss Palantir's 3Q20 results.  During his prepared remarks, Glazer asserted that the tremendous growth would continue on the commercial side:

> [Glazer:] **Taken together with continued revenue growth from our acquire phase customers, we believe the rapid growth in revenue from new customers creates a strong basis for future growth** to augment the consistent expansion we are generating from our install base of customers in the expand and scale basis.

133.    Contrary to the statements in ¶¶131-132, "growth and momentum across the business" had not continued, and Defendants were not "continuing to see significant momentum" in the commercial sector.  Rather, at the time the statements in ¶¶131-132 were made – in the midst of 4Q20 – Defendants knew that the commercial revenue growth

---

[31]   To ameliorate potential investor concerns, Defendants incorporated a 180-day lockup period into Palantir's direct listing, limiting the supply of stock by assuring the market that company insiders could only sell 20% of their shares prior to February 18, 2021.

- 55 -

rate had already dropped significantly to a modest single-digit YoY growth, and that the government segment's revenue growth rate was set to begin a sequential decline in 1Q21.

134.    Defendants' scheme and misrepresentations caused Palantir's stock price to soar to $45 per share by late January 2021.  But as Karp later acknowledged to *CNBC* in January 2023, "I never thought we were that good when the share price was $40."

### 3.    FY20 Earnings: Defendants Misleadingly State Commercial Pipeline Is "Substantial and Growing" and Government Growth Is Just at the "Tip of the Iceberg"

135.    During Palantir's February 16, 2021 FY20 earnings call, Sankar stressed that Palantir's new account pipeline for commercial customers was thriving and growing:

[Sankar:] ***Our pipeline is substantial and growing***.  These deals, they start in the Acquire phase of our 3-phase model and with new customers who were acquired in the year that had yet to even join a phase.  ***Both of these groups performed exceptionally, a very positive forward-looking indicator***.

\*        \*        \*

***And it's still very clear that we're just at the beginning.  Our customers include only 8 of the Fortune 100, 12 of the Global 100 and only 24 of the Global 300.  The opportunity in front of us is immense and growing***.

136.    Sankar also claimed government growth was "just at the tip of the iceberg":

[Sankar:] The full year government revenue rose 77%, led by ongoing momentum in the U.S., which grew 91%.  As tremendous of a year as 2020 was for the government segment, ***we believe we are just at the tip of the iceberg, and we are well positioned to capture significant new opportunities in 2021 and beyond***.

137.    Sankar and Glazer also claimed that the Company's COVID-19 contracts would continue to provide a government segment tailwind:

[Sankar:] ***And while a lot of new 2020 U.S. defense opportunities started as crisis response to COVID, almost all of it is relevant to enduring***

4879-7335-0845.v1

*problems and needs*.

*      *      *

[Glazer:] ***We expect a tailwind for government as these customers renew and expand***.

138.     The statements in ¶¶135-137 above were false and misleading when made. Contrary to being "just at the tip of the iceberg" and "expect[ing] a tailwind" for government revenue growth, Sankar and Glazer knew at the time these statements were made (in the middle of 1Q21) that the government segment's revenue growth rate had already peaked in 4Q20 and had begun a sequential decline in 1Q21.  *Supra*, ¶¶124-127.  Moreover, Defendants admitted that Palantir's COVID-19 contracts were much "shorter-than-usual" contracts, and Palantir had failed to secure additional contracts sufficient to offset the expected loss of these temporary contracts.  Further, the cost savings and efficiencies Palantir gained from COVID-19 were not scalable.  Contrary to the claim that the commercial "pipeline [wa]s substantial and growing," Sankar and Glazer also knew Palantir's organic (non-SPAC) commercial segment growth rates were not set to meaningfully recover from their 4Q20 decline.

139.     The lockup period expired two days later on February 18, 2021.  When it did, the Individual Defendants quickly pocketed more than $594 million in insider sales.

### 4.     1Q21 Earnings: Defendants Misleadingly Point to SPAC Customers as Proof of Commercial Momentum and Claim Government Momentum "Continues Unabated"

140.     On Palantir's May 11, 2021 1Q21 earnings calls, Sankar highlighted the Company's purported ongoing "commercial tailwind": "Where the government response to the pandemic has been efficacious, *we are seeing a commercial tailwind*."

- 57 -

141.   In response to a question regarding the "confidence in the commercial revenue growth," Kawasaki confirmed that Palantir was building a "bigger and bigger pipeline" and was "going to continue to see acceleration" across the commercial business:

[Kawasaki:] [S]o as we build **bigger and bigger pipeline** here, we're feeling good about how that funnel is flowing through.  And if you combine that with the additional product investments, the road map that we're executing on, **we have every reason to believe that we're going to continue to see acceleration across all these dimensions**.

142.   Kawasaki similarly claimed that Palantir's commercial sales cycle was "[h]eating up" and gaining "momentum" with new small and medium-sized business clients:

[Kawasaki:] **[W]e signed up a number of great small and medium-sized businesses recently**. . . .  **Our sales cycle is [h]eating up**.

\*       \*       \*

Yes, **the commercial business is gaining more and more momentum**. As we mentioned, it grew 72% in the U.S.  So what we're seeing is where economies are opening, **there's just incredible traction there**.  We've hired 50 sales folks in the last quarter.  **You're starting to see that translate through in terms of activity**, 2.5x the number of qualified opportunities in the U.S. and the U.K., double the number of commercial pilots, the product investments that we've made around modularization and archetypes, those are what are translating also into increased activity.  **It's what's fueling our ability to do substantially more pilots here**.

. . . **We continue to win deals in Europe.  [Faurecia], Lilium in Europe**, Fuzhou, Engie.  So a bunch of momentum there.  And as Europe starts to open and manage through the pandemic, **we're also expecting the same sort of tailwind that we've seen in the U.S. in Europe**.

143.   With respect to the government segment, Sankar claimed that "**the momentum in our government business continues unabated**," and both Sankar and Glazer repeatedly claimed that the Company was experiencing government tailwinds:

[Sankar:] As we look forward, over the balance of the year, **we continue to have tailwinds** as we pursue opportunities across both defense and civilian

- 58 -

agencies in our government business.

*. . .* ***This work dovetails with the strong pipeline we see in our government business across a variety of defense initiatives, and we expect deal activity to increase over the course of the year***.

\*        \*        \*

[Glazer:] ***We expect this momentum to continue as we have a significant pipeline of government deals building in Q2 and beyond that we believe will fuel durable, elevated growth in our government segment***.

144.   On the call, an analyst specifically queried: "On the government business, there's a lot of questions about the sustainable strength post-COVID."  In response, Sankar claimed the government business was "continuing to build," "accelerat[ing]" and would remain robust after the pandemic:

[Sankar:] ***We've seen work across health care, DoD, civilian agencies, accelerate inside the U.S. and outside of the U.S.  We've also seen that the pipeline is continuing to build there.  We're expecting a lot of defense-related activity to build over the back half of the year and into next year***.

145.   The statements listed in ¶¶140-144 above were false and misleading. Contrary to the claim of "momentum in [the] government business continu[ing] unabated" with "tailwinds" and a "strong pipeline," Sankar, Kawasaki, and Glazer knew at the time these statements were made (*i.e.*, in the middle of 2Q21) that Palantir's government segment's revenue growth rate was already in the midst of a sequential decline that had started the prior quarter.  *Supra*, ¶¶124-127.  Indeed, just the month before, Palantir had been notified the Navy decided to end an $84 million contract in February 2022 – a year earlier than the potential end date of February 2023 – and pay Palantir only $36 million, or less than half the potential award amount.  And, contrary to Sankar's and Kawasaki's claim

- 59 -

that the commercial segment was gaining "more and more momentum" with a "bigger and bigger pipeline," in reality the expansion in Palantir's commercial sector was driven by the unsustainable SPAC Scheme.

### 5. 2Q21 Earnings: Defendants Misleadingly Portray a Strong Pipeline for Growth Across the Business

146.    On Palantir's August 12, 2021 2Q21 earnings call, Glazer reported that the Company expected elevated growth in both its government and commercial segments:

> [Glazer:] ***We continue to build a strong pipeline of opportunities within our government segment, and we expect these deals to drive sustained, elevated growth in our government business moving forward***.

> Second quarter ***commercial revenue growth accelerated*** to $144 million, up 28% year-over-year compared with 19% growth in the first quarter. ***Speed and innovation are driving strong results in our commercial business***, particularly in the U.S., where commercial revenue growth accelerated to 90% year-over-year in Q2, up from 72% in Q1.[32]

147.    The statements in ¶146 were false and misleading.  In reality, Glazer knew at the time these statements were made (*i.e.*, the middle of 3Q21) that the government segment's revenue growth rate was in the midst of a third consecutive quarter of sequential decline.  *Supra*, ¶¶124-127.  Further, it was the SPAC Scheme – not "speed and innovation" – that was driving the stronger results Palantir reported in the commercial segment.

---

[32]   These statements went hand-in-hand with Sankar's and Glazer's misleading 2Q21 statements citing SPAC-inflated commercial metrics as evidence of "product innovation" and "continued efficiencies" driving growth.  *Supra*, ¶119.

- 60 -

>   **6.**   **3Q21 Earnings: Defendants Misleadingly Claim Commercial Segment Is "Consistently Accelerating" and Government Segment Is "Big and Building"**

148.   Palantir reported disappointing 3Q21 earnings results on November 9, 2021. *See infra*, ¶175.   Karp, Cohen, and Glazer, however, took advantage of the time lag between the end of 3Q21 (September 30, 2021) and the public announcement of the 3Q21 results (November 9, 2021) to sell an additional $150 million in stock.

149.   On the November 9, 2021 3Q21 earnings call, Sankar repeatedly emphasized Palantir's "accelerating commercial business," claiming "***[c]utting-edge product and continued innovation and distribution drove these exceptional results in Q3. And you can really see that in the consistently accelerating commercial business***."[33]

150.   With respect to the government segment, Sankar claimed that the government "***pipeline in aggregate is big and building***," and was "***just at the beginning of big secular trends here, trends that we anticipated and have invested in for years***."

151.   The statements in ¶¶149-150 were false and misleading.   Sankar knew at the time these statements were made (*i.e.*, the middle of 4Q21) that the government segment's revenue growth rate was in the midst of a fourth consecutive quarter of sequential decline. *Supra*, ¶¶124-127.   And the "consistently accelerating" commercial segment was only accelerating because of the revenue Palantir recognized from SPACs – not "[c]utting-edge product and continued innovation" as Defendants claimed.

---

[33]   These statements went hand-in-hand with Sankar's and Glazer's misleading 3Q21 statements citing SPAC-inflated commercial metrics as evidence of "accelerating" commercial growth.   *Supra*, ¶120.

4879-7335-0845.v1

### 7. FY21 Earnings: Defendants Misleadingly Claim U.S. Commercial Growth Will Double While Denying the Sequential Deceleration of Government Growth

152.    On Palantir's February 17, 2022 FY21 earnings call, Karp claimed that Palantir was on track to "double" its U.S. commercial growth in 2022:

> [Karp:] Obviously, to the extent we get this to work, you could expect even higher growth than what we have, although I'm very happy with.  It was like we've doubled USG U.S. commercial now from 50 to 100, 100 to 200.  *I believe we will double it again this year*.

153.    And even though the Company had already seen four sequential quarters of deceleration in government revenue growth, Karp flat out denied the true state of affairs when an analyst asked: "It did decelerate pretty materially in Q1 in terms of the growth. Can you give us your perspective on what's happening on the government side?":

> [Karp:] . . .  *Are there – is a deceleration in actual one over a long time series?  The answer is clearly no*. . . .

154.    The statements listed in ¶¶152-153 above were false and misleading. Directly contrary to Karp's denial of a deceleration in the government business, at the time these statements were made (*i.e.*, in the middle of 1Q22) the government segment's revenue growth rate was actually in the midst of the fifth consecutive quarter of sequential decline.  Nor was the Company positioned to double its U.S. commercial growth again in 2022, as the commercial expansion Palantir had experienced in 2021 was a product of the SPAC Scheme, which represented a finite universe of revenue that Palantir had almost completely tapped.  Indeed, Defendants would announce that Palantir was winding down its SPAC "investments" less than three months later.

- 62 -

4879-7335-0845.v1

### 8. 1Q22 Earnings: Defendants Misleadingly Claim Palantir's Business Segments Are Seeing a "Reacceleration"

155.    On the May 9, 2022 1Q22 earnings call, Defendants claimed there was a "reacceleration" of revenue growth in both business segments:

> [Glazer:] ***In Q2 to date, we've already seen the reacceleration of U.S. government revenue and expect acceleration of the overall government segment to follow in the next quarter or shortly thereafter***.

> \*     \*     \*

> [Kawasaki:] So in this macro environment, ***we feel very well positioned for the full year and beyond***.  Our U.S. government revenue represented 42% of our Q1 revenue, and a significant amount of this is in the defense space.  ***Our commercial business has been outpacing the government business, accelerating in each of the last 5 quarters to a 54% growth rate in Q1***.  And as Shyam just mentioned, in Q2, we've already seen some reacceleration in the U.S. government business, which we think is a long-term trend and ***expect acceleration of the overall government segment this quarter or shortly after***.[34]

156.    The statements listed in ¶155 above were false and misleading.  Defendants misleadingly assured the market that government revenue growth was "reaccelerating," when in reality at the time of these statements (*i.e.*, the middle of 2Q22) the government segment's revenue growth rate was actually in the midst of a sixth consecutive quarter of sequential decline.  *Supra*, ¶¶124-127.  And the commercial segment's sequential growth in revenue was only made possible by the inclusion of the roundtrip SPAC deal revenue.  *Supra*, §IV.B.

---

[34]  These statements went hand-in-hand with Glazer's and Kawasaki's misleading 1Q22 statements citing SPAC-inflated commercial metrics as evidence of "winning" new commercial customers.  *Supra*, ¶121.

- 63 -

### D. Defendants Falsely Assure Investors that Palantir Was Positioned to Achieve 30% Long-Term Revenue Growth

157.    Beginning in February 2021, Defendants repeatedly (mis)represented that Palantir was poised to generate annual revenue growth of more than 30% in each of the next five years such that Palantir would break $4 billion in annual revenue by 2025 – guidance that Defendants would abandon just 18 months later in August 2022.  Starting on the February 16, 2021 FY20 earnings call, Defendants committed Palantir to this guidance:

> [Karp:] *[W]e are providing long-term guidance, pretty radical in the sense that we are committing to keeping a growth threshold of above 30% for the next 5 years* . . . .

> \*        \*        \*

> [Glazer:] Starting in 2021, *we expect greater than 30% annual revenue growth each year for the next 5 years*.

158.    Defendants reiterated this misleading revenue guidance in its subsequent earnings releases through 1Q22, beginning with Palantir's May 11, 2021 1Q21 Release:

> *Per long-term guidance policy, as provided by our Chief Executive Officer, Alex Karp, we continue to expect: Annual revenue growth of 30% or greater for 2021 through 2025*.[35]

159.    Glazer also repeated this misleading revenue guidance on subsequent earnings calls through 1Q22, beginning with the May 11, 2021 1Q21 earnings call:

> [Glazer:] *Continuing to execute the guidance strategy set forth by our CEO, Alex Karp, in our year-end 2020 earnings call with regard to long-term revenue guidance, we are providing and will continue to provide*

---

[35]   This statement (¶158) was repeated in Palantir's: (i) August 12, 2021 2Q21 Release (signed by Karp); (ii) November 9, 2021 3Q21 Release (signed by Karp); (iii) February 17, 2022 FY21 Release (signed by Karp); and (iv) May 9, 2022 1Q22 Release (signed by Karp).

- 64 -

*[revenue] guidance of [greater than] 30% . . . for this year and the next [4] years at each earnings call*.[36]

160.    The representations in ¶¶157-159 above were false and misleading.  As discussed in *supra*, §IV.C, at the time of each statement, Karp and Glazer knew that Palantir had already hit a wall in its growth rate in both business segments.  This sequential decline in growth rates had commenced in 1Q21 and worsened each quarter in which this guidance was reiterated.   To mask this decline, Defendants implemented the SPAC Scheme, which materially distorted Palantir's reported financial metrics, as discussed in *supra*, ¶¶101-122.  Further, Defendants knew that Palantir would not realize a substantial portion of the SPAC deals.  *See supra*, ¶¶59-60.  Nor was the SPAC Scheme sustainable, as Defendants had tapped the universe of SPACs from whom Palantir could purchase revenue within nine months of the first deal.  As a result, Defendants had no reasonable basis to believe, and did not believe, Palantir could achieve the long-term guidance that Karp and Glazer touted in ¶¶157-159.  Indeed, if not for the SPAC Scheme artificially (and temporarily) propping up Palantir's declining revenue growth rate, Palantir's growth rate would have fallen below the 30% long-term annual growth number in 3Q21 – three full quarters before 2Q22 when Palantir so acknowledged.  *Supra*, ¶111.

**E.    Defendants Manipulated the Reporting of Key Reported Metrics in Order to Mislead the Market**

161.    As the Company experienced declining growth rates and profitability in 2021,

---

[36]   Glazer repeated this statement (¶159) in substantially the same format during Palantir's: (i) August 12, 2021 2Q21 earnings call; (ii) November 9, 2021 3Q21 earnings call; and (iii) May 9, 2022 1Q22 earnings call.

- 65 -

Defendants began manipulating key metrics critical to evaluating the state of Palantir's business in furtherance of their scheme in violation of Rule 10b-5(a) and (c).

**1.    Definition of "Customer": Defendants Start Including Customers from the Entire Prior Year in 1Q21**

162.    For its quarterly earnings reports, Palantir originally defined a "customer" as one might expect, *i.e.*, "an organization from which we have recognized revenue in a reporting period."  But starting with its 1Q21 earnings, Defendants altered the definition of "customer" to include "an[y] organization from which we have recognized revenue during the trailing twelve month period."  That is, instead of reporting the number of customers from whom Palantir received revenue during the current quarter, Palantir manipulated its "customer" reporting beginning in 1Q21 to report the total number of customers from whom it received revenue during any of the four prior quarters.  By doing so, Defendants artificially inflated Palantir's customer count and the revenue recognized from each customer starting in 1Q21 by including the temporarily boosted financial performance in 2Q20, 3Q20, and 4Q20, which was driven by the COVID-19-related contracts Palantir entered into during 2020.

**2.    Average Contract Duration: Defendants Stop Regular Quarterly Disclosures in 3Q21**

163.    Defendants repeatedly cited average contract duration as a metric providing strong visibility into future revenue – as it measured the additional number of years Defendants expected to generate revenue under existing customer contracts.  As it was increasing, Defendants regularly reported this metric every quarter, touting an average contract length of 3.6 years in 3Q20 and FY20, up to 3.7 years in 1Q21, and then 3.9 years

- 66 -

in 2Q21.  Defendants acknowledged with their 3Q20 earnings that such increases provided them with "additional visibility on the revenue."  Defendants, however, failed to disclose average contract duration with 3Q21, 1Q22, or 2Q22 earnings – only revealing with FY21 earnings that it had fallen to an average of 3.5 years.  This change was designed to and did further obscure the deterioration in Palantir's prospects, and prevented investors from assessing the stability and sustainability of future revenue growth.

### 3.    Palantir's Acquire, Expand, Scale Business Model: Defendants Stop Reporting All Related Metrics in 1Q22

164.    Defendants claimed in the Registration Statement and subsequent quarterly SEC filings that Palantir's entire business model, with respect to acquiring and growing its customer accounts, had three phases: (1) Acquire; (2) Expand; and (3) Scale.  Each customer was categorized into one of these "cohorts" on December 31st each year:

- **Acquire** (or customer acquisition) is the first phase.  During this phase, Palantir acquires new customers through pilot deployments of Palantir software.  *See supra*, ¶¶35, 40-43.  Customer accounts are operated at a loss during the Acquire phase.  Customers are cohorted into this phase if, as of the end of a calendar year, Palantir has recognized less than $100,000 in revenue from the customer that year.

- **Expand** (or account growth) is the second phase during which Palantir invests significant resources and accounts are operated at a loss to drive future revenue growth.  Customers are cohorted into the Expand phase when: (i) Palantir has recognized more than $100,000 in revenue in a calendar year; and (ii) the account has a negative contribution margin during the year at issue, as determined as of the end of the year.

- **Scale** (or account profitability) is the final phase.  During this phase, Palantir's investment costs relative to revenue generally decrease, while usage of the platform increases across the customer's operations.  Palantir stated that after having installed and configured the software across an entire enterprise, customers become more self-sufficient in their use of its platforms, including developing software and applications that run on top of the platforms, while still continuing to benefit from the support of Palantir's operations and maintenance services.  Customers are cohorted into the Scale phase when: (i) Palantir has recognized

- 67 -

more than $100,000 in revenue in a calendar year; and (ii) the account has a positive contribution margin during the year at issue, as determined at year-end.

165.   **Palantir's Business Model**.   According to Defendants, Palantir's entire approach to sales and marketing was built around the first two phases of its business model, and its ability to turn a profit hinged on the third phase.  As customers move from Acquire to Expand to Scale, Palantir's costs decrease and its revenue and contribution margin increase.  Thus, Defendants' "objective is to make the Acquire and Expand phases as short as possible" to quickly get to Scale.  Defendants repeatedly told investors that "[w]e believe that *all* of our customers will move into the Scale phase over the long term."

166.   To this end, Palantir presented investors with detailed quantitative information regarding the Acquire, Expand, Scale phases in all of its quarterly SEC filings under the heading "Our Business Model" from the start of the Class Period up until the filing of the FY21 Form 10-K.   Each filing provided investors with updates on the revenue and contribution margins derived from each cohort for the prior year.  These Acquire, Expand, and Scale disclosures were critical as they were the way investors could gauge the Company's commercial segment growth prospects.

167.   But throughout the Class Period, Palantir's new customers were failing to advance through the cohorts to the Scale phase.   As these deteriorating business prospects threatened to emerge, Defendants began to actively conceal this information from the market, eliminating all disclosures related to the Acquire, Expand, and Scale phases – beginning with Palantir's 1Q22 Form 10-Q.   That is, <u>Defendants stopped reporting data and metrics for the three customer phases on which it had built its entire business model to go public</u>.

- 68 -

| | 2020 | | 2021 | | | | 2022 | |
|---|---|---|---|---|---|---|---|---|
| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| **Current YTD revenue from customers in the Acquire phase at the end of the prior FY** | $ 41.1 | $ 77.1 | $ 3.6 | $ 8.0 | $ 15.6 | $ 45.1 | Not Disclosed | |
| **Current YTD contribution margin from customers in the Acquire phase at the end of the prior FY** | $ (4.2) | $ 13.2 | $ (4.3) | $ (7.5) | $ (7.1) | $ 7.2 | | |
| **Current YTD revenue from customers in the Expand phase at the end of the prior FY** | $ 254.4 | $ 360.4 | $ 12.4 | $ 48.9 | $ 62.1 | $ 83.3 | Not Disclosed | |
| **Current YTD contribution margin from customers in the Expand phase at the end of the prior FY** | $ 104.3 | $ 169.4 | $ 0.5 | $ 25.4 | $ 27.9 | $ 37.5 | | |
| **Current YTD revenue from customers in the Scale phase at the end of the prior FY** | $ 452.2 | $ 613.4 | $ 324.8 | $ 651.1 | $ 993.4 | $ 1,300.0 | Not Disclosed | |
| **Current YTD contribution margin from customers in the Scale phase at the end of the prior FY** | $ 312.0 | $ 429.4 | $ 214.4 | $ 416.7 | $ 635.8 | $ 819.0 | | |

168.    Concealing the detailed cohort information tracking the performance of the Company's new FY21 customers was designed to and did obscure Palantir's diminishing business prospects for its organic (*i.e.*, non-SPAC) customers, including the: (i) revenue and contribution margins associated with each cohort of new customers acquired in FY21; (ii) rate at which Palantir's customers signed in 2021 had failed to advance through the cohorts to profitability; and (iii) SPAC Scheme's effect in masking this downward trend.

### 4.    Total Remaining Deal Value ("TRDV"): Defendants Conceal Segment-Level Breakdown in 1Q22

169.    Palantir's customer contracts are typically multiyear agreements, and the Company recognized revenue over the contract's life.  TRDV represents the total value of the contracts that Palantir had been awarded but not yet recognized as revenue.  Thus, TRDV purportedly provided management significant visibility into Palantir's future expected revenue and was cited by Defendants as a "key" measure of future revenue visibility.

170.    Palantir disclosed TRDV in the government and commercial sectors separately, although it reported these figures inconsistently.  The Registration Statement,

- 69 -

3Q20 Form 10-Q, and FY20 Form 10-K provided updates on government segment TRDV for 2Q20, 3Q20, and FY20, respectively, yet the 1Q21, 2Q21, and 3Q21 Forms 10-Q each concealed current quarterly TRDV information and instead misleadingly referred back to TRDV as of the end of FY20.  While Defendants provided quarterly updates on enterprise-wide TRDV on earnings presentations, they concealed the split between government and commercial in both 1Q21 and 1Q22.  *See supra*, ¶115.  This change was designed to and did further obscure the distinction in growth trends between the two sectors, preventing investors from gleaning the truth about the adverse trends affecting both business segments, as they were masked by the commercial segment's SPAC-inflated TRDV.

### 5. Average Revenue Per Customer: Defendants Switch to Only Reporting Palantir's Top 20 Customers in 1Q22 in Order to Hide that Customers Were Not Scaling Up

171. Average revenue per customer represented the average amount of revenue Palantir recognized from all its customers during a specified period.  In 1Q21 and 2Q21, Palantir emphasized this increasing metric as proof that the Company was continuing to demonstrate its "ability to grow customer relationships at scale."  As the metric decreased in 3Q21 and 4Q21, Palantir shifted, claiming that the lower average revenue per customer was just the "result of [their] growing customer count."  Then in 1Q22, Defendants further attempted to conceal declines in the metric by omitting the figure from the market altogether and switching to only reporting "average revenue for the top twenty customers."  By manipulating Palantir's reporting of this metric at the same time as the Acquire, Expand, Scale information – and disclosing information for only the largest customers that already provided significant revenue – Defendants were able to conceal from investors that

- 70 -

Palantir's newest customers were not scaling up in size or profitability.

## V.   LOSS CAUSATION

172.   The market for Palantir stock was open, well-developed, and efficient during the Class Period – throughout which Palantir stock traded at artificially inflated prices due to Defendants' misconduct.  As the relevant truth about Palantir's business and prospects entered the market through a series of partial disclosures, the artificial inflation came out of Palantir's stock price over time.  As a result of their purchases of Palantir stock during the Class Period, which relied upon the integrity of the market price, Plaintiffs and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

173.   The corrective impact of the partial disclosures during the Class Period, however, was tempered by Defendants' continuing scheme and misleading statements and omissions.  Each partial disclosure did not on its own fully remove the inflation from Palantir's stock price.  Defendants' ongoing scheme, misrepresentations, and omissions maintained the price of Palantir stock at artificially inflated levels.

174.   The disclosures that corrected the market price of Palantir shares are detailed below.  All or a substantial portion of each of these stock price declines were due to firm-specific, fraud-related disclosures and not market, industry, or firm-specific, non-fraud factors.

### A.   November 2021 Loss Event

175.   On November 9, 2021, before the market opened, Palantir issued its 3Q21 Release – which revealed a significant deceleration in Palantir's revenue growth, including quarterly revenue of $392 million (36% YoY revenue growth), and projected 4Q21 revenue

- 71 -

of $418 million (which would represent 30% YoY revenue growth, compared to 49% YoY revenue growth in the prior quarter).  That same day, Palantir also filed its 3Q21 Form 10-Q, which revealed that Palantir's government revenue had actually <u>declined</u> on a sequential basis from $232 million to $218 million for 3Q21 and that its contribution margins had also declined.  The price of Palantir shares declined on this news, falling 9.3% to $24.25 per share on November 9, 2021, on abnormally high volume, as compared to a 0.4% decline in the S&P 500 Index and a 0.4% decline in the S&P Information Technology Index.[37]

176.    Following the close of the market on November 9, 2021, numerous analyst firms published reports reacting negatively to this news.  For instance:

- RBC Capital Markets ("RBC") published a report downgrading Palantir stock from "[s]ector [p]erform" to "[u]nderperform," citing "government deceleration" as one reason for the downgrade and noting "[w]e believe Palantir got direct benefits from COVID-related spending and those benefits have already faded."  The report also cited "commercial deceleration" and commented on "[c]racks [e]merging in the [SPAC] [s]tory," stating: "We do not believe revenue from SPAC investments is sustainable . . . ."  The report also expressed "lowered confidence in 30%+ growth" in light of the deceleration in both the commercial and government businesses.

- Deutsche Bank called the quarter "[t]hesis [c]hallenging" and citing "[s]urprising [g]ovt [d]ecel, SPAC [i]nvestments and [m]argins."  In particular, Deutsche Bank noted Palantir's "[g]overnment business decelerating significantly" and that, "excluding related party revenue, [commercial] actually decelerated."  It also stated: "Gross margins continue to compress and contribution margins declined, all raising questions around the mix and [long-term] profitability of the business."

- William Blair published an analyst report, "estimat[ing]" that without the SPACs Palantir's commercial revenue "likely" had decelerated; that revenue from the SPACs was, in their view, unsustainable; and that overall total deal value was down sequentially excluding SPACs.

---

[37]   Palantir's annual reports on Form 10-K compared the performance of its returns to the returns of the S&P 500 Index and the S&P Information Technology Index.

- 72 -

177.    In response, Palantir's stock price declined another 7.1%, on unusually high volume, to close at $22.52 per share on November 10, 2021, while the S&P 500 and S&P Information Technology Indices declined only 0.8% and 1.7%, respectively.  All told, Palantir's two-day stock price decline totaled nearly 16%, compared to respective two-day declines of just 1.2% and 2.1% in the S&P 500 and S&P Information Technology Indices.

### B.    February 2022 Loss Event

178.    On February 17, 2022, Palantir issued its FY21 Release – which revealed that Palantir's government business continued to decelerate to just 26% YoY growth in 4Q21 (compared to a 76% YoY growth rate earlier in the year).  The same day, Palantir issued: (i) its FY 2021 Business Update presentation, which revealed declining YoY contribution margins, falling from 62% in 4Q20 to 58% in 4Q21; and (ii) accompanying remarks that further revealed Palantir's TRDV at quarter's end was $3.8 billion – indicating significant business deceleration.  Factoring out Palantir's SPAC Scheme, Palantir's total deal value was essentially <u>flat</u> year-over-year.  Further, as was later revealed, Palantir's government TRDV had actually <u>declined</u> by $100 million from the prior year and $200 million from the prior quarter.  Additionally, although Defendants provided 2022 revenue guidance, 1Q22 operating margin guidance of 23% was below analysts' consensus of 28%.

179.    Analysts reacted negatively to this news.  RBC published a report on the same day reiterating an underperform rating while reducing its price target by 40% to $9 from $15.  William Blair issued a report highlighting Palantir's decelerating growth and calling SPACs a "[k]ey [t]ailwind," and after the market closed, Deutsche Bank published a report reducing its price target because contribution margins declined and total deal value

- 73 -

"excluding related party contributions [*i.e.*, SPACs] decelerated to 1% y/y growth."

180.    The price of Palantir shares declined on this news, falling nearly 16% to close at $11.77 per share on February 17, 2022 on abnormally high trading volume, while the S&P 500 Index only declined 2.1% and the S&P Information Technology Index declined only 3.1%.  Palantir's stock price continued to decline on February 18, 2022 as the market digested and reacted to the adverse information, dropping another 6.4% while the S&P 500 and S&P Information Technology Indices declined just 0.7% and 1.1%, respectively.

### C.    May 2022 Loss Event

181.    On May 9, 2022, before the market opened, Palantir issued its 1Q22 Release – which revealed that Palantir expected 2Q22 revenue of $470 million, which would represent only 25% YoY growth – substantially below the Company's 30% long-term revenue guidance.  Further, Palantir's 2Q22 guidance of 25.1% YoY revenue growth and 20% operating margin was approximately one-third below consensus estimates of 28.8% and 26.5%, respectively.  Also on May 9, 2022, after the market closed, Palantir filed its 1Q22 Form 10-Q, which disclosed Palantir's Starry Group and Allego SPAC investments.  The 1Q22 Form 10-Q also revealed that Palantir had received over $39 million in revenue from its SPAC Scheme during the quarter, meaning that without this program standalone 1Q22 revenue growth would have been <u>only 19%</u>.  That same day, Defendants convened a conference call, on which they disclosed that the Company's total deal value had actually <u>declined by $300 million</u> during the quarter, that Palantir had "<u>wound the [SPAC] program down</u>," and the Company was reporting "negative $0.02 impact on earnings per share from the marketable securities."  Defendants also disclosed that SPACs' contribution to total

deal value was $755 million in the quarter, down from $965 million in 4Q21.

182.    Analyst firms reacted negatively to this news on May 9, 2022:

- RBC published a report downgrading Palantir, citing as "disappointing" that "1Q topline lacked upside to consensus," that "2Q guide missed consensus on both revenue growth & profitability," and that "Total Deal Value growth ex 'investment agreements' declined both Y/Y and Q/Q."

- Credit Suisse decreased its target price citing as "[n]egatives" the news that "excluding ~$39M of SPAC investments, standalone growth was 19.4% y/y in Q1 vs. 26.3% y/y in Q4" and that "[r]eported total remaining deal value of $3.5 billion (26% y/y) compared to $3.8 billion (35% y/y) in Q4, declining $300 million sequentially."

- Despite the partial disclosures of SPAC-related problems, analysts saw the program's winding down as the right move, while noting they lacked the ability to calculate the underlying businesses' strength.  Analysts such as William Blair and RBC noted they were "disappointed with fewer disclosures in the 10-Q" and forced to guess about the state of some of Palantir's SPAC investments, without knowing some had already been terminated.

183.    The price of Palantir shares declined on this news, falling 21% over a single trading day to $7.46 per share by market close on May 9, 2022, on abnormally high trading volume, while the S&P 500 and S&P Information Technology Indices fell just 3.2% and 3.9%, respectively.  Palantir's stock price fell another 10% over the next two days, again on high trading volume, as the 1Q22 Form 10-Q was released and analysts further downgraded Palantir stock, to close at $6.71 per share on May 11, 2022.  By contrast, the S&P 500 Index declined only 1.4% and the S&P Information Technology Index declined only 1.8% over May 10-11, 2022.

**D.    August 2022 Loss Event**

184.    On August 8, 2022, Palantir issued its 2Q22 Release – which stated that Palantir expected 2022 revenue to be in a range of $1.9 billion to $1.902 billion, which would represent an annual YoY revenue growth rate of only 23%.  This was well below the

- 75 -

Company's 30% long-term guidance, despite Defendants reaffirming this figure nearly halfway through the quarter.  The release further stated that the "revised guidance excludes <u>any</u> new major U.S. government awards."  The release also disclosed that Palantir had terminated several SPAC contracts, further reducing TCV, and that its growth had further decelerated without SPACs.  The same day, Palantir released its 2Q22 Form 10-Q, which disclosed additional SPAC-related information.  In a related earnings call, Glazer admitted that the Company's deal value remained "roughly ***flat*** quarter-over-quarter" at $3.5 billion.

185.   Analyst and market commentators reacted negatively to this news.  For instance, on August 9, 2022, RBC published a report that provided a deep dive into Palantir's SPAC-related misconduct.  The report stated: "Most importantly, we estimate the SPAC-related [total contract value] potentially at-risk of not fully converting into revenue is <u>$406M</u> (note some of this may have already been recognized) and count <u>at least 15 SPAC customers that have substantial doubt as going concerns</u> (based on their respective filings)."  The report continued: "21 of these companies are now publicly listed; none of the 20 listed SPACs are trading above their $10 reference price (<u>the vast majority are now trading in the <$5 penny stock range</u>)."

186.   The price of Palantir stock declined again on this news, falling 19% over two trading days (-14.2% on August 8 and -5.8% on August 9) to $9.25 per share by market close on August 9, 2022, on abnormally high trading volume, while the S&P 500 and S&P Information Technology Indices only fell 0.5% and 1.9%, respectively.

## VI.   THE INDIVIDUAL DEFENDANTS' $2.2 BILLION OF INSIDER TRADING FURTHER SUPPORTS A STRONG INFERENCE OF SCIENTER

187.   The Individual Defendants had substantial incentive to commit the fraud

- 76 -

alleged herein.  In August 2020, in furtherance of the scheme, Palantir's Board established a Special Compensation Committee to assess the propriety of Karp's, Cohen's, and Sankar's compensation, which granted to the executives the following awards:

| Named Executive Officer | Number of Shares of Class B Common Stock Covered by Award | Type of Award |
|---|---|---|
| Alexander Karp | 141,000,000 | Stock Option |
| Alexander Karp | 39,000,000 | RSU Award |
| Stephen Cohen | 13,500,000 | Stock Option |
| Stephen Cohen | 13,500,000 | RSU Award |
| Shyam Sankar | 7,500,000 | Stock Option |
| Shyam Sankar | 7,500,000 | RSU Award |

188.    These awards were substantial, with Karp's alone valued at the time at $1.1 billion.  *The Wall Street Journal* described the award as one of "the biggest compensation packages ever awarded."  Glazer also received an award of restricted stock units covering more than 4 million shares.  To unlock these awards, all the Individual Defendants were required to do was take Palantir public, which they did in September 2020.

189.    In connection with and immediately following Palantir's direct listing, the Individual Defendants commenced a massive insider selling spree.  Their Class Period insider sales of 122,038,868 Palantir shares for <u>over $2.2 billion</u> in proceeds supports a strong inference that the Individual Defendants timed their respective trading with knowledge of the alleged fraud and sought to capture the stock's artificially inflated trading price before the market could absorb the truth regarding Palantir's actual growth and margin trends.  As demonstrated below and in Appendix 1, the magnitude of the Individual Defendants' sales is extraordinary – if not unprecedented – and represented significant proportions of each of their total shares[38]:

---

[38]   The percentage sold calculation equals the number of shares sold divided by total

4879-7335-0845.v1

| Defendant | Shares Sold | Proceeds | % Sold | % Sold incl. vested |
|---|---|---|---|---|
| Alexander Karp | 52,976,553 | $1,050,011,752 | 89% | 40.6% |
| Peter Thiel | 47,391,859 | $783,336,392 | 27% | 22.5% |
| Stephen Cohen | 11,036,391 | $188,188,139 | 99.99% | 27.8% |
| Shyam Sankar | 6,444,950 | $117,701,892 | 77% | 41.3% |
| David Glazer | 4,189,115 | $63,134,903 | 72% | 71.7% |

190.    The total proceeds and percentage of holdings sold are astronomical – Karp's stock sales yielded him 95,200% more than his 2021 compensation, Cohen 15,200% more than his 2021 compensation, Sankar 23,000% more than his 2021 compensation, and Glazer 13,900% more than his 2021 compensation.

191.    Defendants timed their sales suspiciously to coincide with peak Palantir stock prices, offloading more than 116 million shares in the 13 months before the first corrective disclosure on November 9, 2021, or 95% of the shares they sold during the Class Period. Defendants dramatically tempered their sales as the relevant truth was revealed to the market through a series of disclosures and Palantir's stock price declined.[39]

192.    The rates at which each Individual Defendant sold his stock after the Class

---

shares.  Total shares, used to calculate "% Sold," represent the sum of Class A shares sold during and held on the last day of the Class Period.  Total shares, used to calculate "% Sold incl. vested," include Class A and Class B shares held as of November 2, 2022, Class B common stock subject to options exercisable within 60 days of November 2, 2022, and Class B common stock subject to RSUs for which the applicable vesting and settlement conditions will be satisfied within 60 days of November 2, 2022.  This total thus includes an additional five months of vesting, and, therefore, presents an overly conservative estimate of Defendants' percentage of shares sold.

[39]  In addition, Karp, Cohen, and Glazer took advantage of the time lag between the end of 3Q21 (September 30, 2021) and the public announcement of Palantir's disappointing 3Q21 results (November 9, 2021) to sell over $150 million in stock, collectively.

- 78 -

Period are also dramatically out of line with their Class Period insider sales.[40]  The table below depicts the Individual Defendants' sales on an average monthly basis.

| Defendant | Number of Shares Sold | | Rate (shares/month) | | |
|---|---|---|---|---|---|
| | Class Period | Post-CP | Class Period | Post-CP | CP vs. Post-CP |
| Karp | 52,976,553 | 7,026,434 | 2,358,006 | 320,354 | 636.1% greater |
| Thiel | 47,391,859 | 20,000,000 | 2,109,429 | 911,854 | 131.3% greater |
| Cohen | 11,036,391 | 3,817,785 | 491,234 | 174,063 | 182.2% greater |
| Sankar | 6,444,950 | 6,413,542 | 286,867 | 292,411 | 1.9% less |
| Glazer | 4,189,115 | 2,344,705 | 186,459 | 106,901 | 74.4% greater |

193.    For Palantir's founders, selling in such volumes would normally dilute their ownership and control of the Company, as Class A shares entitle the holder to one vote per share and Class B shares (convertible into Class A shares) entitle the holder to ten votes per share.  Karp, Thiel, and Cohen, however, had formulated a plan that would allow them to balance these competing concerns.

194.    To ensure their control of Palantir regardless of the number of Class B shares they converted or Class A shares they sold, Karp, Thiel, and Cohen implemented one of the most aggressive governance structures ever devised.  In particular, in August 2020, the Company created a special class of stock – Class F for "founders."  The Class F shares, owned by Thiel, Karp, and Cohen through a trust, guarantee the founders at least 49.99999% of the total votes, "notwithstanding the number of outstanding shares of Class A common stock and Class B common stock or the Founders' relative ownership of shares of Class A common stock and Class B common stock," so long as they retained a collective

---

[40]   The Individual Defendants' stock sales before the Class Period (if any) are not publicly reported, as Palantir was not publicly listed until September 30, 2020.

- 79 -

"Ownership Threshold" equal to approximately 6%.

195.    This structure allowed the founders to "<u>effectively [retain] control [of] all matters submitted to a vote of the stockholders for the foreseeable future</u>."   As the cofounders die, control of the Class F shares is consolidated with the remaining founders. The provision terminates only when the last of Palantir's founders dies.[41]

## VII.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE

196.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that: (i) Defendants made public misrepresentations or failed to disclose material facts during the Class Period; (ii) the omissions and misrepresentations were material; (iii) Palantir stock traded in an efficient market; and (iv) Plaintiffs and Class members purchased, acquired, and/or sold Palantir stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed.  Based upon the foregoing, Plaintiffs and Class members are entitled to a presumption of reliance upon the integrity of the market.

197.    Plaintiffs and Class members are also entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

---

[41]   Moreover, pursuant to the Founder Voting Trust Agreement, the Class F shares cannot be sold.  The trust through which Karp, Cohen, and Thiel hold the Class F shares is prohibited from transferring or converting the shares, and the founders are prohibited from transferring their interest in the trust.

- 80 -

## VIII.  CLASS ACTION ALLEGATIONS

198.   Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on

behalf of a class, consisting of all those who purchased Palantir Class A common stock

during the Class Period (the "Class") and were damaged thereby,[42] as:

- The members of the Class are so numerous that joinder is impracticable;

- Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct;

- Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained competent and experienced counsel.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class;

- Common questions of law and fact exist as to all of the Class and predominate over any questions solely affecting individual members of the Class, including: (i) whether the federal securities laws were violated by Defendants' acts as alleged herein; (ii) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages; and

- A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

## IX.  EXCHANGE ACT CLAIMS

### COUNT I
### For Violation of §10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder

199.   Plaintiffs repeat and reallege each and every allegation set forth above.

200.   This Count is brought against each of the Defendants based upon §10(b) of

the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

---

[42]   Excluded from the Class are Defendants, Palantir's officers and directors, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have had a controlling interest.

- 81 -

201.    Defendants engaged in a course of conduct pursuant to which they knowingly and/or recklessly engaged in acts, transactions, and practices which operated as a fraud and deceit upon Plaintiffs and the other Class members in connection with the purchase and sale of securities.  Defendants knowingly and/or recklessly made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed a course of business, which conduct was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members; (ii) artificially inflate and maintain the market price of Palantir stock; and (iii) cause Plaintiffs and other Class members to purchase or otherwise acquire Palantir stock at artificially inflated prices.  In furtherance of this unlawful scheme and course of conduct, Defendants, and each of them, took the actions set forth herein.

202.    During the Class Period, Palantir stock was traded on an active and efficient market.  As a result of Defendants' misconduct, the market price of Palantir stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Palantir's business and financial condition which were concealed by the Individual Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Palantir stock at prices artificially inflated by Defendants' wrongful conduct and in doing so relied upon the price of the securities, the integrity of the market for the securities, and/or the Defendants' statements, and were damaged thereby.

203.    Palantir's stock price declined as Defendants' scheme unraveled and the relevant truth and its impact on Palantir's financial results and prospects entered the market

- 82 -

4879-7335-0845.v1

through a series of partial disclosures, causing injury to Plaintiffs and Class members. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said stock, or would not have purchased or otherwise acquired them at the inflated prices paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Palantir stock was substantially lower than the prices paid by members of the Class. The market price of Palantir stock declined upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

204. By reason of the conduct alleged herein, Defendants knowingly or recklessly violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

205. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of Palantir's stock during the Class Period.

## COUNT II
### For Violation of §20(a) of the Exchange Act

206. Plaintiffs repeat and reallege each and every allegation set forth above.

207. This Count is brought against each of the Defendants pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

208. During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Palantir, and conducted and participated, directly and indirectly, in the conduct of Palantir's business affairs. By reason of their senior management positions and/or being directors of Palantir, each Individual Defendant had the power to direct the actions of, and exercised the same to cause, Palantir to engage in the unlawful acts and conduct complained of herein. Karp, Thiel, and Cohen also owned all

- 83 -

of Palantir's Class F shares through a trust, which shares guarantee Karp, Thiel, and Cohen at least 49.99999% of the total votes, effectively giving them full control over Palantir, even if their collective ownership of Palantir fell to just 6%.  The Individual Defendants, therefore, were "controlling persons" of Palantir within the meaning of §20(a) of the Exchange Act.  By reason of the above conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Palantir.

209.    Palantir had the power to control and influence the Individual Defendants through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations. Thus, Palantir had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants.  By reason of the above conduct, Palantir is liable pursuant to §20(a) of the Exchange Act for the violations committed by the Individual Defendants.

**COUNT III**
**For Violation of §20A of the Exchange Act**

210.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

211.    This Count is brought against Karp, Cohen, Thiel, Sankar, and Glazer pursuant to §20A of the Exchange Act, on behalf of Plaintiffs and members of the Class who were damaged by these defendants' insider trading.

212.    As detailed herein, Karp, Cohen, Thiel, Sankar, and Glazer were in possession of material nonpublic information concerning Palantir.  They took advantage of their possession of material nonpublic information regarding Palantir to obtain billions of

- 84 -

dollars in insider trading profits during the Class Period.

213.    As set forth in Appendix 2, these defendants' sales of Palantir shares were made contemporaneously with Plaintiffs' purchases of Palantir shares during the Class Period.

214.    Plaintiffs and Class members who purchased shares of Palantir shares contemporaneously with sales by these defendants suffered damages because: (i) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (ii) they would not have purchased Palantir common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the misconduct alleged herein.

## X.    SECURITIES ACT ALLEGATIONS

### A.    Securities Act Parties

215.    Plaintiffs purchased Palantir shares traceable to the Registration Statement and were damaged thereby.

216.    Defendants Karp, Cohen, Thiel, Glazer, Rascoff, Schiff, and Moore are collectively referred to herein as the "Securities Act Individual Defendants."  Each of the Securities Act Individual Defendants had the opportunity to review and did approve, sign, and cause the Registration Statement to be filed with, and declared effective by, the SEC.

217.    Palantir is subject to liability for violations of the Securities Act as an issuer and control person.  Each of the Securities Act Individual Defendants is subject to liability for violations of the Securities Act as each was a director of Palantir and/or signed the

- 85 -

Registration Statement.

218.    Palantir and the Securities Act Individual Defendants are collectively referred to herein as the "Securities Act Defendants."

**B.    The Registration Statement Contained Untrue Statements of Material Fact and Material Omissions**

**1.    Untrue Statements About Palantir's Operational Efficiencies and Margins**

219.    The Registration Statement represented that Palantir's operating results were improving and that the Company was getting much more efficient at installing and deploying its complex software products:

> ***The improvements in our operating results have principally been driven by*** increasing revenue and a ***significant decrease in the time and number of software engineers required to install and deploy our software platforms***.
>
> ***In particular, the time required to install our software and begin working with a customer has decreased more than five-fold since Q2 2019 to an average of 14 days in Q2 2020.  In some cases, our customers can now be up and running in six hours***.

220.    The Registration Statement also cited the ease with which Palantir's software platforms could "accommodate new users, workflows, and use cases":

> ***Increase our reach within existing customers***.  The value that our software creates is what drives our expansion within individual organizations.  Our platforms are designed to ***easily accommodate new users, workflows, and use cases***.  This allows us to rapidly scale within an institution.

221.    The Registration Statement further represented that all customers were expected to enter the "Scale phase," which indicated improved margins:

> ***We believe that all of our customers will move into the Scale phase over the long term.  We also believe that contribution margin for Scale phase accounts will increase further as we become more efficient at deploying***

- 86 -

*our software platforms across the entirety of our customers' operations and at managing and operating our software.*

222.   The statements in ¶¶219-221 emphasizing Palantir's margin growth and attributing it to product improvements and increased operational efficiencies were materially misleading.  In reality, Defendants were aware that Palantir's historical margin improvement could not continue, because in order to post the growth rate that Defendants led the market to expect, Palantir had to quickly pivot to industries in which it had never operated.  Yet, Palantir's software was not easily adaptable outside of its established "use cases," was expensive, and required substantial customization for each new client.  To land customers in new industries, Palantir had to provide prospective clients with a pilot test run at low or no cost, during which Palantir was compelled to invest substantial time, money, and manpower finding a use for its software and then building a bespoke product to suit that use.  Coupled with the highly-customized nature and high cost of Palantir's software, this meant signing new commercial customers was much more difficult, and closing deals was far more costly to Palantir than its existing commercial customers.  In addition, as Palantir had moved into industries in which it had not previously operated, its pilot deployments failed more frequently, and the expenses associated therewith further deteriorated Palantir's margins.  This expansion to new industries and customers also required a costly buildout of the Company's sales force, and the substantial cost savings that Palantir experienced in FY20 due to COVID-19 were not indicative of normal operating costs.  Thus, all the foreseeable costs associated with Palantir's commercial expansion efforts would and did result in much lower margins than those Palantir experienced at the time of the Offering, and the Securities Act Defendants had no reasonable basis to believe and did

- 87 -

4879-7335-0845.v1

not, in fact, believe, that "all of [their] customers will move into the Scale phase over the long term," as that was historically not the case and was more difficult as Palantir expanded into new markets.

### 2. Untrue Statements About Strategic Partnerships

223. The Registration Statement identified a strategy to engage in "strategic transactions" to continue to grow the Company:

> As part of our business strategy, **we** have engaged in strategic transactions in the past and **expect to evaluate and consider potential strategic transactions, including acquisitions of, or investments in, businesses, technologies, services, products and other assets in the future. We also may enter into relationships with other businesses to expand our products or our ability to provide services**.

224. The statements in ¶223 were materially false or misleading, in that Palantir's growth plan was not centered on "pursuing specific channel-selling opportunities with leading cloud hosting providers" or other "strategic transactions," but instead was dependent on an undisclosed plan to offset expected declines in Palantir's business by artificially inflating its total deal value, commercial client base, short-term commercial client revenue, and profit margins by "investing" in early-stage businesses consisting primarily of SPAC target companies (that had little or no revenue, and far less than $500 million in recurring annual revenue), on the condition of, and in exchange for, these businesses entering into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to need or afford.

### 3. Untrue Statements About Growth Rates, Sustainability of Growth, and Total Addressable Market ("TAM")

225. The Registration Statement emphasized that Palantir was experiencing

- 88 -

accelerating growth at the time of the Offering, stating "*[o]ur growth this year has accelerated*."  The Registration Statement also included the following graph:



226.     The Registration Statement emphasized Palantir's growth opportunity, estimating Palantir's TAM "to be approximately *$119 billion across the commercial and government sectors*.  Specifically, Palantir's "*estimate of the TAM in the commercial sector is $56 billion*," comprised of "*approximately 6,000 companies with more than $500 million in annual revenue*," and "*$63 billion*" *for* "*the government sector*."

227.     The Registration Statement also stated that Palantir's recent win in federal court in a case had fostered a "*shift in government acquisition*" that would allow Palantir to become "*the central operating system for all U.S. defense programs*," and "*represents a significant expansion of our TAM with the U.S. federal government*."

228.     The Registration Statement further identified a "number of strategies to continue to grow the company," including:

> *Become the default operating system for data across the U.S. government*.  Our successful lawsuit against the U.S. Army, brought in 2016, is transforming the way the entire U.S. government buys software, not just the military.  *We are working towards becoming the default operating system across the U.S. government.  Our victory in federal court now*

- 89 -

***makes that possible***.

229.   On November 13, 2020, Palantir supplemented the Registration Statement via the filing of the Prospectus Supplement, which was incorporated by reference into and formed part of the Registration Statement.   This November Prospectus Supplement bolstered Palantir's growth story, reporting:

> For the three months ended September 30, 2020, we generated $289.4 million in revenue, ***reflecting a 52% growth rate*** from the three months ended September 30, 2019, when we generated $190.5 million in revenue. In the nine months ended September 30, 2020, we generated $770.6 million in revenue, ***reflecting a 50% growth rate*** from the nine months ended September 30, 2019, when we generated $513.2 million in revenue.

230.   The statements detailed in ¶¶225-229 were materially false or misleading. Palantir's reported revenue and deal value growth rates were not sustainable and were set to decelerate beginning in 4Q20.  In particular: (i) organic commercial growth was set to sharply decelerate in 4Q20; and (ii) the government segment's growth performance was set to peak in 4Q20 and decelerate thereafter in 1Q21.  Defendants were aware of this at the time, as they had "strong visibility into future revenues across [its] customer base" due to the multiyear, multimillion-dollar nature of their contracts, the fact that Palantir recognized revenue ratably, and the narrow nature of Palantir's customer base of just 125 customers at the time.  Palantir also had additional lead time with regard to notice of government revenue dropping off the books due to the lengthy nature of the government contracting and procurement process.  Via their "strong visibility," Defendants were aware that: (iii) Palantir's commercial segment growth plan was dependent on investing in early-stage SPACs with far less than $500 million in recurring annual revenue; (iv) the Company's government segment's revenue and deal value had been temporarily inflated by short-term

- 90 -

contracts which government agencies had entered into with Palantir in connection with their responses to the COVID-19 pandemic; and (v) as a result of (i)-(iv), the statements in the Registration Statement about government and commercial businesses' growth trends and addressable markets were overstated and misleading.

## C.     The Direct Listing Was an Integrated Offering

231.    Defendants caused Palantir to execute a Company-sponsored direct listing whereby Company insiders and early shareholders sold Palantir shares in a single liquidity event, distributing Palantir's shares to the public while concurrently making a market for those securities on the NYSE.  The direct listing and distribution of Palantir's shares to the public thereby constituted an integrated public offering without regard to whether the shares purchased were designated as registered or unregistered.

232.    The Registration Statement represented the first information about Palantir filed with the SEC designed to support public trading in its stock.  Prior to the direct listing, Palantir's existing shares were "restricted securities" and not freely tradeable.  Restricted securities typically include a restrictive legend or other notice electronically appended to the securities to notify the transfer agent and other securities professionals that such securities cannot be freely traded until the restrictive legends are removed.  To facilitate selling in the direct listing, Palantir coordinated with its transfer agent to have such restrictive legends removed in order to allow Palantir stock to be sold in the direct listing and traded thereafter.

233.    Publicly distributing securities through the direct listing was designed to and did benefit Palantir by improving the attractiveness of its executive compensation packages – which frequently involved stock options – because once a public market for such

securities existed, executives could easily sell them upon vesting of their stock options.  In addition, the direct listing transaction was designed to and did benefit Palantir's controlling persons and other shareholders by immediately providing a source of liquidity for these shareholders who previously held restricted securities with no established public market in which to sell them.  Indeed, from the outset Karp made clear that the Offering was made as part of a single plan of financing and for the same general purpose: to provide "the people at Palantir who built this company over 17 years [with] access to liquidity."

234.    This "access to liquidity" was not limited to stockholders whose shares were registered via the Registration Statement, but rather was designed to and did allow access to liquidity for existing Palantir shareholders who held unregistered shares as well.  However, the Offering was limited to only one class of Palantir securities, the Class A common stock.   Indeed, the Registration Statement discussed all Palantir shares, regardless of registration status:

> [A]s of June 30, 2020, we had a total of 496,530,269 shares of our Class A common stock outstanding, assuming the settlement of 55,521,520 RSUs for which the service-based vesting condition was satisfied as of June 30, 2020 into the same number of shares of Class A common stock, 1,089,984,003 shares of our Class B common stock outstanding, assuming the Capital Stock Conversion, and 1,005,000 shares of our Class F common stock outstanding.[43]

Pursuant to the Registration Statement, a total of 489,128,232 shares would be available for trading on the first day.  Of that amount, 257,135,415 shares of Class A common stock were to be registered in connection with Palantir's Offering with up to 231,992,817

---

[43]   To trade Palantir's Class B common stock, they first had to be converted into Class A common stock.  Class F shares were excluded from the Offering.

4879-7335-0845.v1

unregistered shares also available for immediate sale in the Offering. According to the Registration Statement, "<u>substantially all of these shares may be immediately sold</u> either by the Registered Stockholders pursuant to this prospectus or by our other existing stockholders under Rule 144 since such shares held by such other stockholders will have been beneficially owned by non-affiliates for at least one year," subject to the lock-up agreements. In other words, the Registration Statement unlocked "<u>substantially all</u>" of Palantir's shares, including both registered and unregistered shares, and was utilized to make available, offer, and sell all of the shares sold in the direct listing.

235.    The Registration Statement remained effective for 90 days, or until December 28, 2020. Throughout this period, registered and unregistered shares were sold into the public market created via the direct listing. All of the Company's shares, whether they were registered or unregistered, traded at the same prevailing trading prices at any given time. Each shareholder received the same consideration for Palantir shares in the public market.

236.    In sum, the Offering was a single, unified liquidity event wherein all sales between September 30, 2020 and December 28, 2020: (i) were part of a single plan of financing; (ii) involved the same class of securities; (iii) were made at or about the same time; (iv) received the same type of consideration; and (v) were made for the same general purpose. Thus, the Offering was a single integrated offering such that all shares sold between September 30, 2020 and December 28, 2020 are deemed registered and are traceable to the Registration Statement. And because CalPERS purchased 1,280,700 shares during this period, it has statutory standing under §11.

4879-7335-0845.v1

**D.      Even if Not Part of an Integrated Offering, Plaintiffs Purchased Shares Traceable to the Registration Statement**

237.    Plaintiffs purchased shares directly traceable to the Registration Statement. The probability that CalPERS purchased at least one registered share is so high as to constitute a legal certainty.  With discovery, a reliable chain of title can be constructed that will allow Plaintiffs to prove they purchased shares traceable to the Registration Statement using account-level data and well-accepted accounting methods.

238.    As set forth in the Registration Statement, on the first day of trading, a maximum total of 489,128,232 shares of Palantir Class A common stock were available to trade.  This amount included 257,135,415 registered shares (52.6%), leaving 231,992,817 unregistered shares available to trade.

239.    Between October 16, 2020 and December 18, 2020, CalPERS purchased 1,280,700 shares of Palantir common stock.  A simple application of the 52.6% probability that any single share purchased was a registered share establishes that the probability that CalPERS did not purchase a single registered share is infinitesimally small.  In particular, the likelihood is equal to $(1 - 52.6\%)^{1,280,700}$, which is approximately $4 \times 10^{-414,881}$.  The resulting probability would be expressed by a zero, followed by a decimal point, followed by more than 400,000 additional zeros, then a 4.[44]

---

[44] Standard business software applications report this probability as zero.  The probabilities in this section were computed using the mpmath and gmpy2 Python libraries. Even assuming that CalPERS' purchases were filled in round lots of 100 shares (the number of shares in a NYSE round lot) and that registered shares were only sold in round lots, the corresponding probability of CalPERS purchasing zero registered shares would be $(1 - 52.6\%)^{12,807}$.

- 94 -

240.    In practice, the ratio of registered shares to unregistered shares would have varied each day depending on how many of each type of share had been sold into the market.  By the time of CalPERS' purchases between October 16 and December 18, 2020:

(a)    Insiders sold at least 50,449,187 registered shares into the open market by October 2, 2020; this figure had increased to 59,200,084 by December 14, 2020.[45]  Thus, at least 50,449,187 registered shares would have been available to trade on all days on which CalPERS purchased shares in the 90 days following the Offering.

(b)    The maximum number of unregistered shares available to trade was 231,992,817 shares.  Therefore, no more than 231,992,817 unregistered shares would have been available to trade on any day when CalPERS purchased shares.

(c)    Ignoring the additional shares sold by insiders after October 2, 2020, registered shares constituted at least 17.9% (50,449,187 / (231,992,817 + 50,449,187)) of shares available to trade on any day that CalPERS purchased shares.

241.    Applying this conservative assumption, the probability of CalPERS purchasing no registered shares is $(1 - 17.9\%)^{1,280,700}$, which is approximately $1 \times 10^{-109,442}$, or zero followed by a decimal point, followed by more than 100,000 additional zeros after the decimal, then a 1.[46]

---

[45]   These figures represent open market sales of the following individuals as reported in SEC Form 4s: Jeffrey Johansing Buckley, Cohen, Glazer, Karp, Matthew A. Long, Moore, Rascoff, Sankar, Ryan D. Taylor, and Thiel.

[46]   Assuming CalPERS' purchases were filled in round lots of 100 shares and that registered shares were only sold in round lots, the probability of CalPERS purchasing no registered share lots is $(1 - 17.9\%)^{12,807}$.

- 95 -

242.    Subtracting any of these probabilities from 1 (or 100%) indicates that it is a virtual certainty that CalPERS purchased at least one registered share.  The corresponding likelihood based on the extremely conservative set of assumptions above would be no less than 99.99 (followed by 1,000+ to 400,000+ nines) percent.

243.    With appropriate discovery, Plaintiffs will be able to prove that they acquired shares directly traceable to the Registration Statement.  Broker-dealers, exchanges, and FINRA are required by law to maintain detailed, time-stamped transactional records which can be obtained through discovery.  These records show when securities in one account are transferred to another account, whether within the same broker-dealer or between different broker dealers.  Using these records along with transfer journals from Palantir's transfer agent Computershare Trust Company, N.A. ("Computershare") and underlying records regarding share registration from Computershare and/or Palantir, and applying well-accepted accounting methodologies such as first-in first-out and last-in first-out, Plaintiffs can reliably trace shares they purchased to the Registration Statement.

## XI.    THE SECURITIES ACT CLAIMS

### COUNT IV
### For Violation of §11 of the Securities Act

244.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶8-24 and ¶¶215-243 as if fully set forth herein.

245.    This Count is brought against each of the Securities Act Defendants pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of members of the Class who purchased Palantir stock traceable to the Registration Statement.

246.    This claim is based on strict liability and does not sound in fraud.  Plaintiffs do

- 96 -

not assert in this Count that any Securities Act Defendant committed intentional or reckless misconduct or that any Securities Act Defendant acted with scienter or fraudulent intent. While Plaintiffs disclaim any allegations of scienter or fraudulent intent with respect to these non-fraud claims, challenged statements of opinion or belief in the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made.

247.    The Registration Statement contained untrue statements of material fact and omitted material facts otherwise required to be stated therein necessary to make the statements made therein not misleading.

248.    Palantir is the issuer of the securities purchased by Plaintiffs and Class members who purchased Palantir stock traceable to the Registration Statement.  As such, Palantir is strictly liable for the untrue statements of material fact and/or omissions of material fact necessary to make the statements made in the Registration Statement not false or misleading.

249.    The Securities Act Defendants each signed the Registration Statement and are each strictly liable for untrue statements of material fact therein and the omission of facts necessary to make the statements made therein not misleading, unless able to carry their burden of establishing an affirmative "due diligence" defense.  The Securities Act Defendants each had a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and ensure that they were true and that there were no omissions of material fact that were required to be stated therein or otherwise rendered the statements made in the Registration Statement misleading.  None of the Securities Act Defendants made a reasonable investigation or possessed reasonable

- 97 -

grounds for the belief that the Registration Statement was accurate and without omissions of any material facts.  Had they done so, the Securities Act Defendants would have known of the material misstatements and omissions alleged herein.

250.    Plaintiffs acquired shares of the Company's stock traceable to the Registration Statement without knowledge of the untruths and/or omissions alleged herein.

251.    By virtue of the foregoing, each Securities Act Defendant violated §11 of the Securities Act.  Plaintiffs and the other members of the Class who purchased Palantir stock traceable to the Registration Statement are entitled to relief under §11.

252.    This claim is brought within one year of discovery of the untrue statements in and omissions from the Registration Statement and within three years after the Company's shares were sold in connection with the Offering.

253.    By reason of such conduct, the Securities Act Defendants are liable pursuant to §11 of the Securities Act.  As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's shares.

## COUNT V
## For Violation of §15 of the Securities Act

254.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶8-24 and ¶¶215-253 above as if fully set forth herein.

255.    This Count is brought against each of the Securities Act Defendants pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of members of the Class who purchased Palantir stock traceable to the Registration Statement.

256.    This claim does not sound in fraud.  Plaintiffs do not assert in this Count that any of the Securities Act Defendants committed intentional or reckless misconduct or that

- 98 -

any of the Securities Act Defendants acted with scienter or fraudulent intent.

257.   The Securities Act Defendants were each control persons of Palantir by virtue of their positions at Palantir as directors and/or senior officers.   The Securities Act Defendants each had relationships with other directors and/or officers and/or major shareholders of Palantir.  In addition, Karp, Thiel, and Cohen owned all of Palantir's Class F shares through a trust, which shares guarantee Karp, Thiel, and Cohen at least 49.99999% of the total votes, effectively giving them full control over Palantir, including whether, when, and how to execute the Offering and the contents of the Registration Statement, even if their collective ownership of Palantir fell to just 6%.

258.   The Securities Act Defendants were each critical to effectuating the Offering, based on their signing or authorization of the signing of the Registration Statement, by voting (including voting their shares) to execute the Offering, and by having otherwise directed through their authority the processes leading to execution of the Offering, including registration and sale of the shares in the public listing.

259.   Palantir had the power to control and influence the Individual Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations.  By virtue of the foregoing, Palantir had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants, including the content of the Registration Statement.

260.   By reason of such conduct, the Securities Act Defendants are liable pursuant to §15 of the Securities Act.  As a direct and proximate result of the wrongful conduct, Class

- 99 -

members suffered damages in connection with their purchases of the Company's shares.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs rescission or a rescissory measure of damages;

D.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and other costs and disbursements; and

E.      Awarding Plaintiffs and other members of the Class such other injunctive or equitable relief, including disgorgement and/or the imposition of a constructive trust, that may be deemed just and proper by the Court.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

- 100 -

DATED:  May 24, 2024                ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
                DARREN J. ROBBINS
                LUKE O. BROOKS
                J. MARCO JANOSKI GRAY
                ERIKA L. OLIVER
                CHRISTOPHER R. KINNON
                SARAH A. FALLON


                                      s/ Luke O. Brooks
                                    LUKE O. BROOKS

                655 West Broadway, Suite 1900
                San Diego, CA  92101
                Telephone:  619/231-1058
                619/231-7423 (fax)
                darrenr@rgrdlaw.com
                lukeb@rgrdlaw.com
                mjanoski@rgrdlaw.com
                eoliver@rgrdlaw.com
                ckinnon@rgrdlaw.com
                sfallon@rgrdlaw.com

                Lead Counsel for Plaintiffs

                JOHNSON FISTEL, LLP
                JEFFREY A. BERENS
                2373 Central Park Boulevard, Suite 100
                Denver, CO  80238-2300
                Telephone:  303/861-1764
                303/861-1764 (fax)
                jeffb@johnsonfistel.com

                Local Counsel

- 101 -

4879-7335-0845.v1

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on May 24, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Luke O. Brooks
LUKE O. BROOKS

ROBBINS GELLER RUDMAN
 & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  lukeb@rgrdlaw.com

4879-7335-0845.v1

CM/ECF - U.S. District Court:cod

## Mailing Information for a Case 1:22-cv-02384-GPG-SBP Cupat v. Palantir Technologies Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Naumon Amjed**
  namjed@ktmc.com,rdegnan@ktmc.com,hpaffas@ktmc.com,iyeates@ktmc.com,bschwartz@ktmc.com

- **Adam Marc Apton**
  aapton@zlk.com,ecf@zlk.com

- **Jeffrey Allen Berens**
  jeff@jberenslaw.com,michaelf@johnsonfistel.com,jeffb@johnsonfistel.com,paralegal@johnsonfistel.com

- **Luke Orion Brooks**
  lukeb@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com

- **Nicholas Angelo Caselli**
  nicholas.caselli@freshfields.com,filing_notice@freshfields.com,6188914420@filings.docketbird.com

- **Sarah A. Fallon**
  sfallon@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Boris Feldman**
  boris.feldman@freshfields.com,filing_notice@freshfields.com,jonathan.sampson@freshfields.com,Jeannette.Smith@freshfields.com,6188914420@filings.docketbird.

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com,kip@shumanlawfirm.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,mtjohnston@pomlaw.com,tsayre@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com

- **J. Marco Janoski Gray**
  mjanoski@rgrdlaw.com,e_file_sd@rgrdlaw.com,TerreeD@rgrdlaw.com

- **Nathan A. Keever**
  keever@dwmk.com,winegard@dwmk.com,dwmk@dwmk.com,stratton@dwmk.com

- **Christopher Ryan Kinnon**
  ckinnon@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com

- **David Y. Livshiz**
  david.livshiz@freshfields.com,filing_notice@freshfields.com,6188914420@filings.docketbird.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Erika L. Oliver**
  eoliver@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Kathryn A. Reilly**
  reilly@wtotrial.com,sanchez@wtotrial.com,CLJones@wtotrial.com

- **Darren Jay Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Sam D. Starritt**
  starritt@dwmk.com,winegard@dwmk.com,dwmk@dwmk.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# APPENDIX 1

**PLAINTIFFS' APPENDIX 1**

**KARP'S SALE OF PALANTIR STOCK DURING THE CLASS PERIOD**

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 9/30/2020 | $10.77 | 2,000,000 | $21,540,000.00 |
| 9/30/2020 | $9.72 | 1,600,000 | $15,552,000.00 |
| 10/1/2020 | $9.43 | 7,900,000 | $74,497,000.00 |
| 10/2/2020 | $9.10 | 2,600,000 | $23,660,000.00 |
| 11/16/2020 | $16.06 | 15,911 | $255,530.66 |
| 11/16/2020 | $15.79 | 1,269,212 | $20,040,857.48 |
| 12/2/2020 | $23.32 | 3,255 | $75,906.60 |
| 12/2/2020 | $22.55 | 909,191 | $20,502,257.05 |
| 12/2/2020 | $21.95 | 372,677 | $8,180,260.15 |
| 1/4/2021 | $23.78 | 697,499 | $16,586,526.22 |
| 1/4/2021 | $23.30 | 587,624 | $13,691,639.20 |
| 2/2/2021 | $33.89 | 17,919 | $607,274.91 |
| 2/2/2021 | $33.05 | 46,765 | $1,545,583.25 |
| 2/2/2021 | $31.77 | 661,897 | $21,028,467.69 |
| 2/2/2021 | $31.18 | 558,542 | $17,415,339.56 |
| 3/30/2021 | $21.96 | 76,180 | $1,672,912.80 |
| 3/30/2021 | $21.55 | 161,599 | $3,482,458.45 |
| 3/31/2021 | $23.54 | 101,821 | $2,396,866.34 |
| 3/31/2021 | $23.12 | 121,934 | $2,819,114.08 |
| 4/6/2021 | $23.15 | 1,308,465 | $30,290,964.75 |
| 4/7/2021 | $23.08 | 638,629 | $14,739,557.32 |
| 4/8/2021 | $23.19 | 638,629 | $14,809,806.51 |
| 4/19/2021 | $21.86 | 638,629 | $13,960,429.94 |
| 4/20/2021 | $22.36 | 65,436 | $1,463,148.96 |
| 4/20/2021 | $21.68 | 573,193 | $12,426,824.24 |
| 4/21/2021 | $22.54 | 244,636 | $5,514,095.44 |
| 4/21/2021 | $22.26 | 393,993 | $8,770,284.18 |
| 5/4/2021 | $21.99 | 19,108 | $420,184.92 |
| 5/4/2021 | $21.31 | 619,521 | $13,201,992.51 |
| 5/5/2021 | $21.50 | 638,629 | $13,730,523.50 |
| 5/6/2021 | $20.73 | 126,190 | $2,615,918.70 |
| 5/6/2021 | $19.99 | 512,439 | $10,243,655.61 |

- 1 -

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 5/13/2021 | $19.09 | 144 | $2,748.96 |
| 5/13/2021 | $18.41 | 355 | $6,535.55 |
| 5/19/2021 | $21.00 | 1,500 | $31,500.00 |
| 5/19/2021 | $20.66 | 637,129 | $13,163,085.14 |
| 5/20/2021 | $20.52 | 638,629 | $13,104,667.08 |
| 5/21/2021 | $20.85 | 638,629 | $13,315,414.65 |
| 6/7/2021 | $24.42 | 638,629 | $15,595,320.18 |
| 6/8/2021 | $25.05 | 26,483 | $663,399.15 |
| 6/8/2021 | $24.45 | 612,146 | $14,966,969.70 |
| 6/9/2021 | $24.49 | 638,629 | $15,640,024.21 |
| 6/21/2021 | $25.52 | 9,917 | $253,081.84 |
| 6/21/2021 | $25.15 | 628,712 | $15,812,106.80 |
| 6/22/2021 | $25.21 | 638,629 | $16,099,837.09 |
| 6/23/2021 | $26.34 | 200 | $5,268.00 |
| 6/23/2021 | $26.00 | 638,429 | $16,599,154.00 |
| 7/6/2021 | $24.76 | 638,629 | $15,812,454.04 |
| 7/7/2021 | $23.91 | 31,961 | $764,187.51 |
| 7/7/2021 | $23.04 | 606,668 | $13,977,630.72 |
| 7/8/2021 | $22.96 | 638,629 | $14,662,921.84 |
| 7/21/2021 | $22.48 | 638,629 | $14,356,379.92 |
| 7/22/2021 | $22.08 | 638,629 | $14,100,928.32 |
| 7/23/2021 | $21.82 | 638,629 | $13,934,884.78 |
| 8/2/2021 | $22.05 | 638,629 | $14,081,769.45 |
| 8/3/2021 | $21.96 | 638,629 | $14,024,292.84 |
| 8/4/2021 | $22.27 | 638,629 | $14,222,267.83 |
| 8/20/2021 | $23.94 | 398,655 | $9,543,800.70 |
| 8/20/2021 | $23.93 | 638,629 | $15,282,391.97 |
| 8/23/2021 | $24.63 | 638,629 | $15,729,432.27 |
| 8/24/2021 | $25.14 | 1,214,974 | $30,544,446.36 |
| 9/7/2021 | $26.56 | 638,629 | $16,961,986.24 |
| 9/8/2021 | $26.15 | 29,388 | $768,496.20 |
| 9/8/2021 | $25.51 | 609,241 | $15,541,737.91 |
| 9/9/2021 | $26.01 | 638,629 | $16,610,740.29 |
| 9/28/2021 | $26.53 | 62,443 | $1,656,612.79 |
| 9/28/2021 | $25.70 | 576,186 | $14,807,980.20 |

- 2 -

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 9/29/2021 | $25.54 | 56,677 | $1,447,530.58 |
| 9/29/2021 | $24.92 | 581,952 | $14,502,243.84 |
| 9/30/2021 | $24.95 | 5,700 | $142,215.00 |
| 9/30/2021 | $24.28 | 632,929 | $15,367,516.12 |
| 10/12/2021 | $23.56 | 638,629 | $15,046,099.24 |
| 10/13/2021 | $24.06 | 638,629 | $15,365,413.74 |
| 10/14/2021 | $24.46 | 638,629 | $15,620,865.34 |
| 10/26/2021 | $26.38 | 43,104 | $1,137,083.52 |
| 10/26/2021 | $25.72 | 595,525 | $15,316,903.00 |
| 10/27/2021 | $25.35 | 638,629 | $16,189,245.15 |
| 10/28/2021 | $25.51 | 638,629 | $16,291,425.79 |
| 11/3/2021 | $26.20 | 4,789 | $125,471.80 |
| 11/3/2021 | $25.88 | 633,840 | $16,403,779.20 |
| 11/4/2021 | $26.39 | 638,629 | $16,853,419.31 |
| 11/5/2021 | $26.06 | 638,629 | $16,642,671.74 |
| 11/16/2021 | $22.91 | 638,629 | $14,630,990.39 |
| 11/17/2021 | $22.66 | 638,629 | $14,471,333.14 |
| 11/18/2021 | $22.46 | 6,839 | $153,603.94 |
| 11/18/2021 | $21.66 | 631,790 | $13,684,571.40 |
| 11/22/2021 | $21.45 | 5,712 | $122,522.40 |
| 11/22/2021 | $20.75 | 289,971 | $6,016,898.25 |
| 11/23/2021 | $20.36 | 104,483 | $2,127,273.88 |
| 11/26/2021 | $20.89 | 195,443 | $4,082,804.27 |
| 11/29/2021 | $20.96 | 189,695 | $3,976,007.20 |
| 11/30/2021 | $21.17 | 10,669 | $225,862.73 |
| 11/30/2021 | $20.59 | 179,027 | $3,686,165.93 |
| **Total** | | **52,976,553** | **$1,050,011,752.45** |

- 3 -

**THIEL'S SALES OF PALANTIR STOCK DURING THE CLASS PERIOD**

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 9/30/2020 | $11.19 | 5 | $55.95 |
| 9/30/2020 | $11.19 | 794 | $8,884.86 |
| 9/30/2020 | $11.19 | 1,609 | $18,004.71 |
| 9/30/2020 | $11.19 | 2,633 | $29,463.27 |
| 9/30/2020 | $11.19 | 5,699 | $63,771.81 |
| 9/30/2020 | $11.19 | 9,369 | $104,839.11 |
| 9/30/2020 | $11.19 | 15,436 | $172,728.84 |
| 9/30/2020 | $11.19 | 17,756 | $198,689.64 |
| 9/30/2020 | $11.19 | 43,460 | $486,317.40 |
| 9/30/2020 | $11.19 | 53,239 | $595,744.41 |
| 9/30/2020 | $11.16 | 62,209 | $694,252.44 |
| 9/30/2020 | $11.16 | 2,018,004 | $22,520,924.64 |
| 9/30/2020 | $10.34 | 65 | $672.10 |
| 9/30/2020 | $10.34 | 9,790 | $101,228.60 |
| 9/30/2020 | $10.34 | 19,851 | $205,259.34 |
| 9/30/2020 | $10.34 | 32,469 | $335,729.46 |
| 9/30/2020 | $10.34 | 70,297 | $726,870.98 |
| 9/30/2020 | $10.34 | 115,553 | $1,194,818.02 |
| 9/30/2020 | $10.34 | 190,372 | $1,968,446.48 |
| 9/30/2020 | $10.34 | 218,992 | $2,264,377.28 |
| 9/30/2020 | $10.34 | 536,002 | $5,542,260.68 |
| 9/30/2020 | $10.34 | 656,609 | $6,789,337.06 |
| 9/30/2020 | $10.13 | 566,208 | $5,735,687.04 |
| 9/30/2020 | $10.13 | 18,367,343 | $186,061,184.59 |
| 10/1/2020 | $9.75 | 58,836 | $573,651.00 |
| 10/1/2020 | $9.75 | 418,672 | $4,082,052.00 |
| 10/1/2020 | $9.75 | 1,908,596 | $18,608,811.00 |
| 10/1/2020 | $9.75 | 1,983,906 | $19,343,083.50 |
| 10/2/2020 | $9.14 | 908 | $8,299.12 |
| 2/18/2021 | $25.93 | 600 | $15,558.00 |
| 2/18/2021 | $25.87 | 4,346,459 | $112,442,894.33 |
| 2/18/2021 | $25.10 | 3,315 | $83,206.50 |
| 2/18/2021 | $25.06 | 15,653,541 | $392,277,737.46 |

- 4 -

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 8/13/2021 | $25.00 | 3,262 | $81,550.00 |
| **Total** | | **47,391,859** | **$783,336,391.62** |

- 5 -

**COHEN'S SALES OF PALANTIR STOCK DURING THE CLASS PERIOD**

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 9/30/2020 | $10.00 | 1,000,000 | $10,000,000.00 |
| 10/1/2020 | $9.42 | 1,000,000 | $9,420,000.00 |
| 10/2/2020 | $9.09 | 2,000,000 | $18,180,000.00 |
| 11/16/2020 | $16.07 | 3,379 | $54,300.53 |
| 11/16/2020 | $15.58 | 596,621 | $9,295,355.18 |
| 11/17/2020 | $18.38 | 107,090 | $1,968,314.20 |
| 11/17/2020 | $17.80 | 343,785 | $6,119,373.00 |
| 11/17/2020 | $16.82 | 82,125 | $1,381,342.50 |
| 11/18/2020 | $18.86 | 166,756 | $3,145,018.16 |
| 11/18/2020 | $18.10 | 366,244 | $6,629,016.40 |
| 11/19/2020 | $18.55 | 533,000 | $9,887,150.00 |
| 2/18/2021 | $25.93 | 225,622 | $5,850,378.46 |
| 2/18/2021 | $25.07 | 924,378 | $23,174,156.46 |
| 2/19/2021 | $29.04 | 250,000 | $7,260,000.00 |
| 2/19/2021 | $27.71 | 300,000 | $8,313,000.00 |
| 2/22/2021 | $30.03 | 300,000 | $9,009,000.00 |
| 3/16/2021 | $26.40 | 39,341 | $1,038,602.40 |
| 3/16/2021 | $25.94 | 101,114 | $2,622,897.16 |
| 3/30/2021 | $21.96 | 28,611 | $628,297.56 |
| 3/30/2021 | $21.55 | 60,800 | $1,310,240.00 |
| 3/31/2021 | $23.54 | 38,309 | $901,793.86 |
| 3/31/2021 | $23.12 | 45,875 | $1,060,630.00 |
| 4/6/2021 | $23.16 | 60,000 | $1,389,600.00 |
| 5/4/2021 | $22.03 | 1,000 | $22,030.00 |
| 5/4/2021 | $21.33 | 29,400 | $627,102.00 |
| 5/13/2021 | $19.09 | 179 | $3,417.11 |
| 5/13/2021 | $18.41 | 442 | $8,137.22 |
| 6/1/2021 | $23.04 | 89,600 | $2,064,384.00 |
| 6/2/2021 | $24.39 | 30,000 | $731,700.00 |
| 6/15/2021 | $25.21 | 3,900 | $98,319.00 |
| 6/17/2021 | $25.21 | 26,100 | $657,981.00 |
| 7/6/2021 | $24.79 | 97,100 | $2,407,109.00 |
| 8/3/2021 | $22.04 | 45,000 | $991,800.00 |

- 6 -

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 8/17/2021 | $24.07 | 15,000 | $361,050.00 |
| 8/18/2021 | $25.45 | 22,900 | $582,805.00 |
| 8/20/2021 | $23.94 | 345,018 | $8,259,730.92 |
| 9/7/2021 | $26.55 | 200,000 | $5,310,000.00 |
| 9/8/2021 | $26.18 | 900 | $23,562.00 |
| 9/9/2021 | $26.09 | 18,645 | $486,448.05 |
| 9/21/2021 | $27.02 | 6,000 | $162,120.00 |
| 9/22/2021 | $27.43 | 114,000 | $3,127,020.00 |
| 9/23/2021 | $29.08 | 32,621 | $948,618.68 |
| 9/23/2021 | $28.54 | 129,199 | $3,687,339.46 |
| 10/5/2021 | $23.32 | 60,000 | $1,399,200.00 |
| 11/2/2021 | $26.63 | 1,500 | $39,945.00 |
| 11/2/2021 | $26.01 | 130,945 | $3,405,879.45 |
| 11/3/2021 | $26.09 | 17,555 | $458,009.95 |
| 11/22/2021 | $21.45 | 4,951 | $106,198.95 |
| 11/22/2021 | $20.75 | 251,319 | $5,214,869.25 |
| 11/23/2021 | $20.36 | 90,556 | $1,843,720.16 |
| 2/22/2022 | $10.62 | 251,863 | $2,674,785.06 |
| 2/23/2022 | $10.90 | 93,155 | $1,015,389.50 |
| 5/20/2022 | $8.09 | 203,178 | $1,643,710.02 |
| 5/23/2022 | $8.03 | 94,647 | $760,015.41 |
| 5/24/2022 | $7.54 | 56,668 | $427,276.72 |
| **Total** | | **11,036,391** | **$188,188,138.78** |

- 7 -

**SANKAR'S SALES OF PALANTIR STOCK DURING THE CLASS PERIOD**

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 9/30/2020 | $11.22 | 77,933 | $874,408.26 |
| 9/30/2020 | $10.65 | 435,242 | $4,635,327.30 |
| 9/30/2020 | $9.76 | 892,540 | $8,711,190.40 |
| 11/16/2020 | $16.02 | 4,732 | $75,806.64 |
| 11/16/2020 | $15.53 | 695,268 | $10,797,512.04 |
| 11/17/2020 | $17.03 | 300,000 | $5,109,000.00 |
| 11/20/2020 | $19.21 | 23,900 | $459,119.00 |
| 11/20/2020 | $18.43 | 119,444 | $2,201,352.92 |
| 11/23/2020 | $20.00 | 500,000 | $10,000,000.00 |
| 11/24/2020 | $22.50 | 100,000 | $2,250,000.00 |
| 11/27/2020 | $31.39 | 80,305 | $2,520,773.95 |
| 2/19/2021 | $29.00 | 300,000 | $8,700,000.00 |
| 2/19/2021 | $28.00 | 300,000 | $8,400,000.00 |
| 2/22/2021 | $30.00 | 300,000 | $9,000,000.00 |
| 2/22/2021 | $29.85 | 4,092 | $122,146.20 |
| 2/22/2021 | $28.94 | 29,505 | $853,874.70 |
| 2/22/2021 | $28.17 | 73,913 | $2,082,129.21 |
| 2/23/2021 | $26.79 | 9,855 | $264,015.45 |
| 2/23/2021 | $26.18 | 37,737 | $987,954.66 |
| 2/23/2021 | $24.59 | 2,408 | $59,212.72 |
| 5/13/2021 | $19.09 | 162 | $3,092.58 |
| 5/13/2021 | $18.41 | 399 | $7,345.59 |
| 5/20/2021 | $20.51 | 98,053 | $2,011,067.03 |
| 5/24/2021 | $21.00 | 50,000 | $1,050,000.00 |
| 7/19/2021 | $21.61 | 8,481 | $183,274.41 |
| 7/19/2021 | $21.29 | 164,059 | $3,492,816.11 |
| 8/20/2021 | $23.94 | 266,865 | $6,388,748.10 |
| 8/23/2021 | $24.65 | 114,435 | $2,820,822.75 |
| 8/24/2021 | $25.20 | 204,030 | $5,141,556.00 |
| 11/22/2021 | $21.45 | 3,822 | $81,981.90 |
| 11/22/2021 | $20.75 | 194,003 | $4,025,562.25 |
| 11/23/2021 | $20.36 | 69,894 | $1,423,041.84 |
| 11/24/2021 | $21.03 | 317,611 | $6,679,359.33 |

- 8 -

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 2/22/2022 | $10.62 | 194,817 | $2,068,956.54 |
| 2/23/2022 | $10.90 | 72,055 | $785,399.50 |
| 5/20/2022 | $8.09 | 157,267 | $1,272,290.03 |
| 5/23/2022 | $8.03 | 73,260 | $588,277.80 |
| 5/24/2022 | $7.54 | 43,863 | $330,727.02 |
| 7/22/2022 | $9.95 | 125,000 | $1,243,750.00 |
| **Total** | | **6,444,950** | **$117,701,892.23** |

- 9 -

**GLAZER'S SALES OF PALANTIR STOCK DURING THE CLASS PERIOD**

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 9/30/2020 | $11.22 | 75,505 | $847,166.10 |
| 9/30/2020 | $10.65 | 421,683 | $4,490,923.95 |
| 9/30/2020 | $9.76 | 864,733 | $8,439,794.08 |
| 10/1/2020 | $9.58 | 253,700 | $2,430,446.00 |
| 10/2/2020 | $9.16 | 186,000 | $1,703,760.00 |
| 11/16/2020 | $16.06 | 4,412 | $70,856.72 |
| 11/16/2020 | $15.69 | 451,373 | $7,082,042.37 |
| 11/17/2020 | $18.01 | 180,000 | $3,241,800.00 |
| 11/20/2020 | $19.21 | 15,689 | $301,385.69 |
| 11/20/2020 | $18.43 | 78,405 | $1,445,004.15 |
| 11/23/2020 | $20.94 | 39,283 | $822,586.02 |
| 11/23/2020 | $20.14 | 230,710 | $4,646,499.40 |
| 2/22/2021 | $29.85 | 3,617 | $107,967.45 |
| 2/22/2021 | $28.94 | 26,080 | $754,755.20 |
| 2/22/2021 | $28.17 | 65,333 | $1,840,430.61 |
| 2/23/2021 | $27.18 | 4,819 | $130,980.42 |
| 2/23/2021 | $26.46 | 84,373 | $2,232,509.58 |
| 2/23/2021 | $25.66 | 13,068 | $335,324.88 |
| 2/23/2021 | $24.58 | 3,900 | $95,862.00 |
| 5/13/2021 | $19.09 | 139 | $2,653.51 |
| 5/13/2021 | $18.41 | 343 | $6,314.63 |
| 5/20/2021 | $20.51 | 94,508 | $1,938,359.08 |
| 5/21/2021 | $20.85 | 106,682 | $2,224,319.70 |
| 6/28/2021 | $27.00 | 9,000 | $243,000.00 |
| 8/12/2021 | $24.72 | 54,000 | $1,334,880.00 |
| 8/18/2021 | $25.90 | 9,000 | $233,100.00 |
| 8/20/2021 | $23.94 | 93,961 | $2,249,426.34 |
| 8/23/2021 | $24.65 | 107,229 | $2,643,194.85 |
| 9/16/2021 | $27.90 | 9,000 | $251,100.00 |
| 9/20/2021 | $27.53 | 10,539 | $290,138.67 |
| 9/20/2021 | $26.25 | 7,461 | $195,851.25 |
| 9/21/2021 | $27.11 | 314 | $8,512.54 |
| 9/21/2021 | $26.62 | 71,686 | $1,908,281.32 |

- 10 -

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 10/29/2021 | $25.91 | 9,000 | $233,190.00 |
| 11/22/2021 | $21.45 | 1,339 | $28,721.55 |
| 11/22/2021 | $20.75 | 67,954 | $1,410,045.50 |
| 11/23/2021 | $20.36 | 24,485 | $498,514.60 |
| 11/24/2021 | $21.04 | 107,412 | $2,259,948.48 |
| 2/22/2022 | $10.62 | 68,070 | $722,903.40 |
| 2/23/2022 | $10.90 | 1,300 | $14,170.00 |
| 2/23/2022 | $10.90 | 25,177 | $274,429.30 |
| 2/24/2022 | $11.41 | 106,643 | $1,216,796.63 |
| 5/20/2022 | $8.09 | 54,814 | $443,445.26 |
| 5/23/2022 | $8.03 | 25,535 | $205,046.05 |
| 5/24/2022 | $7.54 | 15,288 | $115,271.52 |
| 8/2/2022 | $11.02 | 105,553 | $1,163,194.06 |
| **Total** | | **4,189,115** | **$63,134,902.86** |

- 11 -

# APPENDIX 2

**PLAINTIFFS' APPENDIX 2**

**DEFENDANTS' SALES MADE CONTEMPORANEOUSLY WITH PLAINTIFFS' PURCHASES**

| Name | Date of Transaction | Amount | Price |
|------|--------------------|--------|-------|
| Cohen | 2/18/2021 | 225,622<br>924,378 | $25.93<br>$25.07 |
| Thiel | 2/18/2021 | 600<br>4,346,459<br>3,315<br>15,653,541 | $25.93<br>$25.87<br>$25.10<br>$25.06 |
| Cohen | 2/19/2021 | 250,000<br>300,000 | $29.04<br>$27.71 |
| Sankar | 2/19/2021 | 300,000<br>300,000 | $29.00<br>$28.00 |
| Cohen | 2/22/2021 | 300,000 | $30.03 |
| Glazer | 2/22/2021 | 3,617<br>26,080<br>65,333 | $29.85<br>$28.94<br>$28.17 |
| Sankar | 2/22/2021 | 300,000<br>4,092<br>29,505<br>73,913 | $30.00<br>$29.85<br>$28.94<br>$28.17 |
| Liu | 2/22/2021 | 1,000<br>351<br>21<br>120<br>158<br>621<br>568<br>568<br>134<br>208<br>100 | $28.00<br>$28.05<br>$28.00<br>$27.63<br>$27.83<br>$28.05<br>$28.05<br>$28.05<br>$28.05<br>$28.05<br>$28.00 |

| Name | Date of Transaction | Amount | Price |
|---|---|---|---|
| Glazer | 2/23/2021 | 4,819 | $27.18 |
| | | 84,373 | $26.46 |
| | | 13,068 | $25.66 |
| | | 3,900 | $24.58 |
| Sankar | 2/23/2021 | 9,855 | $26.79 |
| | | 37,737 | $26.18 |
| | | 2,408 | $24.59 |
| Liu | 2/23/2021 | 28 | $26.47 |
| | | 680 | $25.57 |
| | | 40 | $25.73 |
| | | 97 | $25.75 |
| | | 3 | $25.74 |
| | | 5 | $25.40 |
| Cohen | 3/31/2021 | 38,309 | $23.54 |
| | | 45,875 | $23.12 |
| Karp | 3/31/2021 | 101,821 | $23.54 |
| | | 121,934 | $23.12 |
| Cohen | 4/6/2021 | 60,000 | $23.16 |
| Karp | 4/6/2021 | 1,308,465 | $23.15 |
| | 4/7/2021 | 638,629 | $23.08 |
| | 4/8/2021 | 638,629 | $23.19 |
| Liu | 4/9/2021 | 29 | $24.00 |
| | 4/13/2021 | 400 | $24.88 |
| Karp | 4/20/2021 | 65,436 | $22.36 |
| | | 573,193 | $21.68 |
| | 4/21/2021 | 244,636 | $22.54 |
| | | 393,993 | $22.26 |
| Liu | 4/26/2021 | 10 | $24.14 |
| Cohen | 6/2/2021 | 30,000 | $24.39 |
| Karp | 6/7/2021 | 638,629 | $24.42 |
| | 6/8/2021 | 26,483 | $25.05 |
| | | 612,146 | $24.45 |
| Liu | 6/8/2021 | 30 | $24.34 |
| Karp | 6/9/2021 | 638,629 | $24.49 |
| Liu | 6/9/2021 | 18 | $24.66 |
| | 6/10/2021 | 40 | $24.00 |
| | | 2 | $24.24 |

- 2 -

| Name | Date of Transaction | Amount | Price |
|---|---|---|---|
| Glazer | 6/28/2021 | 9,000 | $27.00 |
| Liu | 7/2/2021 | 400 | $24.45 |
| Karp | 8/2/2021 | 638,629 | $22.05 |
| Cohen | 8/3/2021 | 45,000 | $22.04 |
| Karp | 8/3/2021 | 638,629 | $21.96 |
| | 8/4/2021 | 638,629 | $22.27 |
| Liu | 8/6/2021 | 306 | $21.95 |
| Glazer | 8/12/2021 | 54,000 | $24.72 |
| Thiel | 8/13/2021 | 3,262 | $25.00 |
| Liu | 8/13/2021 | 2 | $24.89 |
| | | 2 | $24.98 |
| | | 1 | $25.18 |
| | | 1 | $25.18 |
| Glazer | 9/16/2021 | 9,000 | $27.90 |
| CalPERS | 9/17/2021 | 13,738 | $28.71 |
| | | 324,885 | $28.71 |
| | | 3,246,621 | $28.71 |
| Glazer | 9/20/2021 | 10,539 | $27.53 |
| | | 7,461 | $26.25 |
| Liu | 9/20/2021 | 3,088 | $26.52 |
| | | 3,087 | $26.56 |
| | | 1 | $26.56 |
| Cohen | 9/21/2021 | 6,000 | $27.02 |
| Glazer | 9/21/2021 | 314 | $27.11 |
| | | 71,686 | $26.62 |
| Liu | 9/21/2021 | 1,200 | $26.58 |
| | | 320 | $26.54 |
| | | 240 | $26.58 |
| Karp | 11/4/2021 | 638,629 | $26.39 |
| | 11/5/2021 | 638,629 | $26.06 |

4860-3470-9441.v1

| Name | Date of Transaction | Amount | Price |
|---|---|---|---|
| Liu | 11/10/2021 | 2,400 | $22.58 |
| | 11/11/2021 | 3,200 | $22.83 |
| | | 3,000 | $22.88 |
| | | 1,250 | $22.87 |
| | | 1,330 | $22.85 |
| | | 2 | $22.86 |
| | | 1,330 | $22.84 |
| | | 1,335 | $22.81 |
| Sankar | 7/22/2022 | 125,000 | $9.95 |
| Liu | 7/22/2022 | 1,800 | $10.35 |
| | 7/25/2022 | 5,720 | $9.85 |
| | | 4,442 | $9.85 |
| CalPERS | 7/28/2022 | 94,569 | $10.13 |
| Liu | 7/28/2022 | 200 | $10.06 |
| Glazer | 8/2/2022 | 105,553 | $11.02 |
| CalPERS | 8/4/2022 | 54,074 | $11.30 |

- 4 -

4860-3470-9441.v1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Lead Civil Action No. 1:22-cv-02384-GPG-SBP
*Consolidated with Civil Actions 1:22-cv-02805-GPG-SBP*
*and 1:22-cv-02893-GPG-SBP*

MINCHIE GALOT CUPAT, Individually      **IN-PERSON ORAL ARGUMENT**
and on Behalf of All Others Similarly Situated,      **REQUESTED**

      Plaintiff,

v.

PALANTIR TECHNOLOGIES INC.,
ALEXANDER C. KARP,
DAVID GLAZER, and
SHYAM SANKAR,

      Defendants.

---

## DEFENDANTS' COMBINED MOTION AND BRIEF
## TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

---

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................iii

TABLE OF DEFINITIONS ............................................................................... x

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ........................................................................................... 4

    A.    Palantir's Origins and Products.................................................... 4

    B.    Palantir Goes Public After 17 Promising Years as a Private Company. ..... 4

    C.    The Registration Statement ....................................................... 5

    D.    Palantir Warns of the Risks About Which Plaintiffs Complain. .................. 5

    E.    Palantir's Strategic Investment Program..................................... 7

    F.    The SPAC Market Declines. ..................................................... 8

    G.    This Litigation.......................................................................... 9

ARGUMENT................................................................................................ 9

I.    THE SECTION 11 CLAIM FAILS BECAUSE PLAINTIFFS CANNOT "TRACE" THEIR SHARES................................................................. 10

    A.    Plaintiffs Cannot Substitute Mere Possibility for Traceability.....................11

    B.    The Integrated Offering Doctrine Is Inapplicable....................................... 12

II.    LACK OF SCIENTER COMPELS DISMISSAL OF SECTION 10(b) CLAIMS. ............................................................................................. 13

    A.    The Complaint Fails Adequately to Allege Intent to Defraud.................... 14

    B.    The Complaint Fails Adequately to Allege Deliberate Recklessness. ...... 17

III.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED FOR FAILURE TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION. ........................... 21

    A.    Plaintiffs Fail to Plead Falsity as to the SPAC-Related Statements. ........ 22

**Page**

          1.    Section 11 Claims Not Adequately Pleaded ................................... 22

          2.    Section 10(b) Claims Not Adequately Pleaded ............................ 22

    B.    Plaintiffs Fail to Plead Falsity as to Non-SPAC Statements. .................... 28

          1.    Plaintiffs Plead No False Statement as to Financial Performance.................................................................................... 28

          2.    Plaintiffs Plead No False Statement Concerning Efficiencies........ 31

    C.    The Complaint Fails to Plead Falsity as to Any Remaining Statement in the FRS................................................................................ 33

IV.     FORWARD-LOOKING STATEMENTS ARE INACTIONABLE. ............................ 35

V.      MANY CHALLENGED STATEMENTS ARE INACTIONABLE OPINIONS OR CORPORATE OPTIMISM. ................................................................................... 37

VI.    PLAINTIFFS FAIL ADEQUATELY TO PLEAD SCHEME LIABILITY. .................. 39

VII.   PLAINTIFFS FAIL ADEQUATELY TO PLEAD LOSS CAUSATION. ................... 44

VIII.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20A. ....................... 45

CONCLUSION ........................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Abbey v. Comput. Memories, Inc.*,
   634 F.Supp. 870 (N.D. Cal. 1986)........................................................ 11,12

*Acme Propane, Inc. v. Tenexco, Inc.*,
   844 F.2d 1317 (7th Cir. 1988) ................................................................ 43

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999)................................................................... 39

*In re Airgate PCS, Inc. Sec. Litig.*,
   389 F.Supp.2d 1360 (N.D. Ga. 2005) ..................................................... 39

*Amr v. Sollitto*,
   08-cv-1686, 2009 WL 10673610 (D. Ariz. Sept. 30, 2009) ...................... 28

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
   827 F.3d 1229 (10th Cir. 2016)......................................................... *passim*

*In re Ariad Pharm., Inc. Sec. Litig.*,
   842 F.3d 744 (1st Cir. 2016) .................................................................. 11

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
   28 F.4th 343 (2d Cir. 2022).................................................................... 16

*Ashland Inc. v. Morgan Stanley & Co.*,
   652 F.3d 333 (2d Cir. 2011)................................................................... 31

*In re AST Rsch. Sec. Litig.*,
   887 F.Supp. 231 (C.D. Cal. 1995)........................................................... 45

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................ 9

*In re Centerline Holding Co. Sec. Litig.*,
   678 F.Supp.2d 150 (S.D.N.Y. 2009) ....................................................... 22

*Cent. Laborers' Pension Fund v. Karp*,
   2023-0864 (D. Ch. Aug. 22, 2023) ......................................................... 23

*Century Aluminum Co. Sec. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) ................................................................ 11

**Cases**                                                                                            **Page(s)**

*In re Citigroup Sec. Litig.*,
    20-cv-9132, 2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ....................................... 38

*Copland v. Grumet*,
    88 F.Supp.2d 326 (D.N.J. 1999) ............................................................................... 45

*In re Crocs, Inc. Sec. Litig.*,
    774 F.Supp.2d 1122 (D. Colo. Feb. 28, 2011) ........................................................ 30

*Croker v. Carrier Access Corp.*,
    05-cv-01011, 2006 WL 2035366 (D. Colo. July 18, 2006) ....................................... 45

*Curry v. Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017) ................................................................................. 45

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ................................................................................. 26

*Doherty v. Pivotal Software, Inc.*,
    19-cv-3589, 2019 WL 5864581 (N.D. Cal. Nov. 8, 2019).......................................... 11

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................... 44

*Ellis v. Spectranetics*,
    15-cv-01857, 2018 WL 1583837 (D. Colo. Apr. 2, 2018)......................................... 15

*Emps.' Ret. Sys. of R.I. v. Williams Cos.*,
    889 F.3d 1153 (10th Cir. 2018) ............................................................................... 17

*In re FoxHollow Techs., Inc., Sec. Litig.*,
    06-cv-04595, 2008 WL 2220600 (N.D. Cal. May 27, 2008) ..................................... 24

*In re Gold Res. Corp. Sec. Litig.*,
    776 F.3d 1103 (10th Cir. 2015) ............................................................................... 20

*In re Gold Res. Corp. Sec. Litig.*,
    957 F.Supp.2d 1284 (D. Colo. 2013) ............................................................... 36, 37

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ....................................................................... *passim*

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*,
    15-cv-07952, 2017 WL 114401 (C.D. Cal. Jan. 9, 2017) ......................................... 39

**Cases**                                                                                          **Page(s)**

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d. Cir. 2002) ................................................................................ 23

*Hampton v. Root9B Techs., Inc.*,
    15-cv-02152, 2016 WL 9735744 (D. Colo. Sept. 21, 2016) .................................... 33

*Hampton v. root9B Techs., Inc.*,
    897 F.3d 1291 (10th Cir. 2018) ........................................................................... 9, 38

*In re Hennessy Cap. Acquisition Corp. IV S'holder Litig.*,
    — A.3d —, 2024 WL 2799044 (Del. Ch. May 31, 2024) ..................................... 7, 21

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp.*,
    537 F.3d 527 (5th Cir. 2008) .................................................................................. 15

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) .............................................................................. 16

*In re Intrexon Corp. Sec. Litig.*,
    16-cv-02398, 2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ..................................... 27

*Ironworkers Local 580–Joint Funds v. Linn Energy, LLC*,
    29 F.Supp.3d 400 (S.D.N.Y. 2014) ........................................................................ 42

*Joseph v. Wiles*,
    223 F.3d 1155 (10th Cir. 2000) ............................................................................. 10

*Krim v. pcOrder.com, Inc.*,
    402 F.3d 489 (5th Cir. 2005) .................................................................................. 11

*Lanigan Grp., Inc. v. Li-Cycle Holdings. Corp.*,
    22-cv-0222, 2023 WL 6541884 (E.D.N.Y. Oct. 6, 2023) ........................................ 45

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
    667 F.3d 1331 (10th Cir. 2012) ........................................................ 16, 17, 19, 30

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ................................................................................. 44

*Lorenzo v. SEC*,
    587 U.S. 71 (2019) ................................................................................................ 40

*Lorusso v. Boulder Brands*,
    15-cv-00679, 2017 WL 4365180 (D. Colo. Mar. 1, 2017) ..................................... 37

**Cases**                                                                                      **Page(s)**

*In re Lottery.com, Inc. Sec. Litig.*,
   22-cv-07111, 2024 WL 454298 (S.D.N.Y. Feb. 6, 2024) ......................................... 15

*McDonald v. Kinder-Morgan, Inc.*,
   287 F.3d 992 (10th Cir. 2002) ...................................................................... 29, 30, 34

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems*
   *Holdings, Inc.*,
   79 F.4th 1209 (10th Cir. 2023) ...................................................................... 2, 18, 37

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ................................................................................ 16

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
   761 F.3d 1109 (10th Cir. 2014) ........................................................... 18, 19, 34, 38

*In re Molycorp, Inc. Sec. Litig.*,
   12-cv-00292, 2015 WL 1540523 (D. Colo. Mar. 31, 2015) ................................ 35, 45

*Noble Asset Mgmt. v. Allos Therapeutics, Inc.*,
   04-cv-1030, 2005 WL 4161977 (D. Colo. Oct. 20, 2005).......................................... 31

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
   423 F.Supp.2d 364 (S.D.N.Y. 2006) ....................................................................... 20

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
   300 F.Supp.3d 551 (S.D.N.Y. 2018) ....................................................................... 37

*Okla. Police Pension & Ret. Sys. v. Boulder Brands, Inc.*,
   15-cv-00679, 2017 WL 1148689 (D. Colo. Mar. 28, 2017) .......................... 29, 30, 37

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015).............................................................................................. 38

*In re Overstock Sec. Litig.*,
   19-cv-0709, 2021 WL 4267920 (D. Utah Sept. 20, 2021)........................................ 21

*Pirani v. Slack Techs., Inc.*,
   445 F.Supp.3d 367 (N.D. Cal. 2020)....................................................................... 10

*In re Pivotal Sec. Litig.*,
   19-cv-03589, 2020 WL 4193384 (N.D. Cal. July 21, 2020)...................................... 20

**Cases**                                                                               **Page(s)**

*Prissert v. EMCORE Corp.*,
    894 F.Supp.2d 1361 (D.N.M. 2012) ........................................................ 45

*Prodanova v. H.C. Wainwright & Co.*,
    993 F.3d 1097 (9th Cir. 2021) ................................................................ 17

*In re Quarterdeck Off. Sys., Inc. Sec. Litig.*,
    92-cv-0397, 1993 WL 623310 (C.D. Cal. Sept. 30, 1993)........................ 11

*In re Qwest Commc'n Int'l, Inc.*,
    396 F.Supp.2d 1178 (D. Colo. 2004) ...................................................... 26

*In re Refco, Inc. Sec. Litig.*,
    503 F.Supp.2d 611 (S.D.N.Y. 2007) ...................................................... 12

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,
    22-cv-04893, 2024 WL 3447524 (N.D. Cal. July 16, 2024)...................... 19

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012).......................................................... 24,  34

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .......................................................... 10, 39

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ................................................................ 17

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ....................................................... 10, 34

*In re Sanofi Sec. Litig.*,
    87 F.Supp.3d 510 (S.D.N.Y. 2015) ........................................................ 38

*Schaffer v. Evolving Sys., Inc.*,
    29 F.Supp.2d 1213 (D. Colo. 1998) ...................................................... 35

*SEC v. GPL Ventures LLC*,
    2022 WL 158885 (S.D.N.Y. 2022) ........................................................ 41

*SEC v. Kelly*,
    817 F.Supp.2d 340 (S.D.N.Y. 2011) ...................................................... 41

*SEC v. Murphy*,
    626 F.2d 633 (9th Cir. 1980)................................................................. 12

**Cases** Page(s)

*SEC v. Simpson Capital Mgmt., Inc.*,
  586 F.Supp.2d 196 (S.D.N.Y. 2008) ........................................................ 41

*SEC v. St. Anselm Expl. Co.*,
  936 F.Supp.2d 1281 (D. Colo. 2013) ........................................... 39, 40, 41

*Shafer v. Lightning eMotors, Inc.*,
  21-cv-02774, 2024 WL 691458 (D. Colo. Feb. 20, 2024) .................. 37, 40

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) .................................................................... 17

*Slack Techs., LLC v. Pirani*,
  598 U.S. 759 (2023) .......................................................................... *passim*

*Slater v. A.G. Edwards & Sons, Inc.*,
  719 F.3d 1190 (10th Cir. 2013) .................................................................. 4

*Smallen v. W. Union Co.*,
  17-cv-00474, 2019 WL 1382823 (D. Colo. Mar. 27, 2019) ............... 13, 18

*Smallen v. W. Union Co.*,
  950 F.3d 1297 (10th Cir. 2020) ........................................... 13, 14, 15, 17

*In re SolarCity Corp. Sec. Litig.*,
  274 F.Supp.3d 972 (N.D. Cal. 2017) ........................................................ 42

*Sorkin, LLC v. Fischer Imaging Corp.*,
  03-cv-00631, 2005 WL 1459735 (D. Colo. June 21, 2005) ...................... 19

*Steamfitters Loc. 449 Pension Plan v. Molina Healthcare, Inc.*,
  18-cv-3579,2018 WL 6787349 (C.D. Cal. Dec. 13, 2018) ........................ 37

*TDC Lending LLC v. Priv. Cap. Grp., Inc.*,
  340 F.Supp.3d 1218 (D. Utah 2018) ........................................................ 18

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) .............................................................. 17, 28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................................... 13, 14, 21

*Werner v. Werner*,
  267 F.3d 288 (3d Cir. 2001) ...................................................... 26, 27, 43

| Cases | Page(s) |
|---|---|

*In re Williams Sec. Litig.*,
  339 F.Supp.2d 1206 (N.D. Okla. 2003)...................................................... 35

*In re Williams Sec. Litig.*,
  558 F.3d 1130 (10th Cir. 2009) ................................................................ 44

*Wolfe v. Aspenbio Pharma, Inc.*,
  587 F. App'x 493 (10th Cir. 2014) ........................................................... 20

*In re Zagg, Inc. Sec. Litig.*,
  797 F.3d 1194 (10th Cir. 2015) ............................................................... 14

**Statutes**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4................................*passim*

15 U.S.C. § 78u-5 .......................................................................................... 35

**Other Authorities**

Civ. Practice Standard 7.1B(c) ........................................................................... 1

Initial Public Offerings: Lockup Agreements, SEC Answers (Sept. 6,
  2011), available at https://www.sec.gov/answers/lockup.htm .................................. 15

Fed. R. Civ. P. 8(a)................................................................................... 1, 34

Fed. R. Civ. P. 9(b)............................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) .................................................................................. 1

SEC Release, 86 Fed. Reg. 3496, 3499 (Jan. 14, 2021) ............................................. 12

## TABLE OF DEFINITIONS

| Term | Definition |
| --- | --- |
| ¶ | Paragraph of the Complaint (unless otherwise noted) |
| 1Q | The first quarter of a fiscal year (*e.g.*, 1Q22 is the first quarter of the 2022 fiscal year) |
| 2Q | The second quarter of a fiscal year (*e.g.*, 2Q22 is the second quarter of the 2022 fiscal year) |
| 3Q | The third quarter of a fiscal year (*e.g.*, 3Q22 is the third quarter of the 2022 fiscal year) |
| 4Q | The fourth quarter of a fiscal year (*e.g.*, 4Q22 is the fourth quarter of the 2022 fiscal year) |
| 10b5-1 Plans | Pre-determined trading plans entered into by insiders of a company that specify in advance the share price, amount and transaction date, pursuant to 17 C.F.R. § 240.10b5-1 *et seq.* |
| ACD | Average Contract Duration |
| Annex | Annex to Motion submitted at D.A.1432–1529 |
| Annual Shareholders Meeting | The transcript of Palantir's June 8, 2021 Annual Shareholders Meeting and Analyst Call, submitted as Ex.92 at D.A.1147–54 |
| April 26, 2023 Schedule 14A | Palantir's Schedule 14A Proxy Statement, filed with the SEC on April 26, 2023, submitted as Ex.96 at D.A.1186–99 |
| ARPC | Average Revenue per Customer |
| ASC 606 | Accounting Standards Codification 606, promulgated by the Financial Accounting Standards Board |
| Aug. 12, 2021 10-Q or 2Q21 Form 10-Q | Palantir's Form 10-Q for the quarter ended June 30, 2021, filed with the SEC on August 12, 2021, submitted as Ex.62 at D.A.263–335 |
| Aug. 12, 2021 PR or 2Q21 Press Release | Palantir's press release concerning its earnings for the quarter ended June 30, 2021, attached as Exhibit 99.1 to Palantir's Form 8-K, filed with the SEC on August 12, 2021, submitted as Ex.80 at D.A.720–28 |
| Aug. 12, 2021 Tr. or 2Q21 Earnings Call | Palantir's August 12, 2021 earnings call transcript, submitted as Ex.63 at D.A.336–353 |
| Aug. 8, 2022 10-Q or 2Q22 Form 10-Q | Palantir's Form 10-Q for the quarter ended June 30, 2022, filed with the SEC on August 8, 2022, submitted as Ex.87 at D.A.980–1037 |

| Term | Definition |
|---|---|
| Aug. 8, 2022 Tr. or 2Q22 Earnings Call | Palantir's August 8, 2022 earnings call transcript, submitted as Ex.68 at D.A.550–64 |
| BP | BP p.l.c. |
| CalPERS | Lead Plaintiff California Public Employees' Retirement System |
| CDC | The Centers for Disease Control and Prevention |
| CELU 10-Q | Celularity's Form 10-Q for the quarter ended March 31, 2023, filed with the SEC on May 22, 2023, submitted as Ex. 77 at D.A.688–93 |
| CELU S-1 | Celularity's Form S-1 Registration Statement, filed with the SEC on August 6, 2021, submitted as Ex.65 at D.A.452–60 |
| Celularity or CELU | Celularity Inc. |
| Celularity Investor Deck or ID | Celularity's Investor Presentation, attached as Ex. 99.3 to GX Acquisition Corp.'s Form 8-K, filed with the SEC on January 8, 2021, submitted as Ex.75 at D.A.669-75 |
| Challenged Statements | The allegedly false and/or misleading statements challenged in the Complaint |
| Class Period | Putative Class Period, September 30, 2020 through August 5, 2022, as defined at ¶ 1 |
| Complaint or Second Amended Complaint | Second Amended Consolidated Class Action Complaint dated May 24, 2024 (ECF 92) |
| Defendants | Exchange Act Defendants or Securities Act Defendants, as applicable |
| Defendants' Appendix or D.A. | The Appendix submitted with Defs' Mot. Dismiss, containing Annexes and Exhibits supporting this motion |
| Defs' Mot. Dismiss or Motion | Defendants' Combined Motion and Brief to Dismiss Plaintiffs' Second Amended Complaint |
| ECF | Electronic Case Filing number on the docket for Lead Civil Action No. 1:22-cv-02384-GPG-SBP |
| Ex. | Exhibit submitted in the D.A. and defined in the Livshiz Declaration |
| Exchange Act | The Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78a *et seq.* |
| Exchange Act Defendants | Together, Palantir, Alexander C. Karp ("Karp"), Stephen Cohen ("Cohen"), Peter Thiel ("Thiel"), David Glazer ("Glazer"), Shyam Sankar ("Sankar"), and Kevin Kawasaki ("Kawasaki") |

| Term | Definition |
|---|---|
| FDA | U.S. Food and Drug Administration |
| Feb. 16, 2021 PR or FY20 Press Release | Palantir's press release concerning its earnings for the fiscal year and quarter ended December 31, 2020, attached as Exhibit 99.1 to Palantir's Form 8-K, filed with the SEC on February 16, 2021, submitted as Ex.78 at D.A.694–702 |
| Feb. 16, 2021 Tr. or FY20 Earnings Call | Palantir's February 16, 2021 earnings call transcript, submitted as Ex.90 at D.A.1122–1138 |
| Feb. 26, 2021 10-K or FY20 Form 10-K | Palantir's Form 10-K for the year ended December 31, 2020, filed with the SEC on February 26, 2021, submitted as Ex.83 at D.A.813–87 |
| Feb. 17, 2022 PR or FY21 Press Release | Palantir's press release concerning its earnings for the fiscal year and quarter ended December 31, 2021, attached as Exhibit 99.1 to Palantir's Form 8-K, filed with the SEC on February 17, 2022, submitted as Ex.93 at D.A.1155-63 |
| Feb. 17, 2022 Tr. or FY21 Earnings Call | Palantir's February 17, 2022 earnings call transcript, submitted as Ex.94 at D.A.1164–78 |
| Feb. 24, 2022 10-K or FY21 Form 10-K | Palantir's Form 10-K for the year ended December 31, 2021, filed with the SEC on February 24, 2022, submitted as Ex.64 at D.A.354–451 |
| Feb. 13, 2023 Tr. or FY22 Earnings Call | Palantir's February 13, 2023 earnings call transcript, submitted as Ex.59 at D.A.164–78 |
| FedScoop Article | John Hewitt Jones, *Palantir COO Says Partnerships with Hardware Manufacturers Key to Growth of US Gov Business* (August 10, 2022), submitted as Ex.85 at D.A.960–969, https://tinyurl.com/3yc4cnah |
| Final Registration Statement, FRS, or Form S-1 Registration Statement | Palantir's Form S-1 Registration Statement, filed with the SEC on September 21, 2020, submitted as Ex.56 at D.A.1–132 |
| Form 3 | Form filed with the SEC disclosing ownership of company securities.  Compilations of Forms 3 and 4 have been submitted for each Defendant as Exs.97–101 at D.A.1200–1431 |
| Form 4 | Form filed with the SEC disclosing transactions in company securities.  Compilations of Forms 3 and 4 have been submitted for each Defendant as Exs.97–101 at D.A.1200–1431 |
| FY | Fiscal Year (*e.g.*, FY22 is the 2022 fiscal year) |
| GAAP | Generally Accepted Accounting Principles |
| H1 | First half of the year (*e.g.*, H122 is the first half of the 2022 fiscal year) |

| Term | Definition |
|---|---|
| H2 | Second half of the year (*e.g.*, H222 is the second half of the 2022 fiscal year) |
| IPO | Initial Public Offering |
| Initial Public Offerings: Lockup Agreements, SEC Answers | SEC description of lock up agreements in connection with initial public offerings, published September 6, 2011, available here: https://www.sec.gov/answers/lockup.htm |
| Investor Day Tr. or Investor Day Webcast | Palantir's September 9, 2020 Investor Day Webcast, transcript submitted as Ex.86 at D.A.970–979 and webcast available here: https://investors.palantir.com/news-details/2020/Palantir-Posts-Investor-Day-Webcast-and-Live-QA-Recordings-Including-Management-Presentation/ |
| Lilium | Lilium GmbH |
| Lilium Investor Deck or ID | Lilium's Analyst Presentation, filed with the SEC on Qell Acquisition Corp.'s Form 425 on June 15, 2021, submitted as Ex.72 at D.A.636–43 |
| Lilium 6-K | Lilium's Form 6-K Report of Foreign Private Issuer, filed with the SEC on November 15, 2021, submitted as Ex.70 at D.A.619–29 |
| Liu or Shijun Liu | Additional Plaintiff Shijun Liu, Individually and as Trustee of The Liu Family Trust 2019 |
| Livshiz Declaration | Declaration of David Y. Livshiz dated July 25, 2024, submitted with Defendants' Appendix |
| May 11, 2021 PR or 1Q21 Press Release | Palantir's press release concerning its earnings for the fiscal year and quarter ended March 31, 2021, attached as Exhibit 99.1 to Palantir's Form 8-K, filed with the SEC on May 11, 2021, submitted as Ex.91 at D.A.1139–46 |
| May 11, 2021 Tr. or 1Q21 Earnings Call | Palantir's May 11, 2021 earnings call transcript, submitted as Ex.60 at D.A.179–95 |
| May 12, 2021 10-Q or 1Q21 Form 10-Q | Palantir's Form 10-Q for the quarter ended March 31, 2021, filed with the SEC on May 12, 2021, submitted as Ex.61 at D.A.196–262 |
| May 9, 2022 10-Q or 1Q22 Form 10-Q | Palantir's Form 10-Q for the quarter ended March 31, 2022, filed with the SEC on May 9, 2022, submitted as Ex.67 at D.A.476–549 |

| Term | Definition |
|---|---|
| May 9, 2022 PR or 1Q22 Press Release | Palantir's press release concerning its earnings for the fiscal year and quarter ended March 31, 2022, attached as Exhibit 99.1 to Palantir's Form 8-K, filed with the SEC on May 9, 2022, submitted as Ex.95 at D.A.1179–85 |
| May 9, 2022 Tr. or 1Q22 Earnings Call | Palantir's May 9, 2022 earnings call transcript, submitted as Ex.58 at D.A.149–63 |
| MNPI | Material Non-Public Information |
| NNSA | U.S. National Nuclear Security Administration |
| Nov. 12, 2020 PR or 3Q20 Press Release | Palantir's press release concerning its earnings for the quarter ended September 30, 2020, attached as Exhibit 99.1 to Palantir's Form 8-K, filed with the SEC on November 12, 2020, submitted as Ex.88 at D.A.1038–47 |
| Nov. 12, 2020 Tr. or 3Q20 Earnings Call | Palantir's November 12, 2020 earnings call transcript, submitted as Ex.57 at D.A.133–48 |
| Nov. 13, 2020 10-Q or 3Q20 Form 10-Q | Palantir's Form 10-Q for the quarter ended September 30, 2020, filed with the SEC on November 13, 2020, submitted as Ex.82 at D.A.738–812 |
| Nov. 9, 2021 10-Q or 3Q21 Form 10-Q | Palantir's Form 10-Q for the quarter ended September 30, 2021, filed with the SEC on November 9, 2021, submitted as Ex.84 at D.A.888–959 |
| Nov. 9, 2021 PR or 3Q21 Press Release | Palantir's press release concerning its earnings for the quarter ended September 30, 2021, attached as Exhibit 99.1 to Palantir's Form 8-K, filed with the SEC on November 9, 2021, submitted as Ex.81 at D.A.729–37 |
| Nov. 9, 2021 Tr. or 3Q21 Earnings Call | Palantir's November 9, 2021 earnings call transcript, submitted as Ex. 79 at D.A.703–19 |
| Nov. 7, 2022 10-Q or 3Q22 Form 10-Q | Palantir's Form 10-Q for the quarter ended September 30, 2022, filed with the SEC on November 7, 2022, submitted as Ex.69 at D.A.565–618 |
| Opp'n to Mot. to Lift | Defendants' Opposition to Plaintiffs' Motion for a Partial Lift of the PSLRA Discovery Stay (ECF 94), dated July 25, 2024 |
| Palantir or the Company | Palantir Technologies Inc. |
| Plaintiffs | Collectively, CalPERS and Shijun Liu, Individually and as Trustee of The Liu Family Trust 2019 |
| Prospectus Supplement | Palantir's Form 424B3 Supplement to the Prospectus, filed with the SEC on November 13, 2020, submitted as Ex.89 at D.A.1048–1121 |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 77z-1 and 78u-4 *et seq.* |

| Term | Definition |
|---|---|
| RBC Report | November 9, 2021 report by RBC Capital Markets analysts, titled "Palantir Technologies Inc.: Cracks Emerging in the Story; Downgrading to Underperform," submitted as Ex.66 at D.A.461–75 |
| RJN | Request for Judicial Notice, submitted concurrently herewith |
| Roivant | Roivant Sciences Ltd. |
| Roivant Investor Deck or ID | Roivant's Investor Presentation, attached as Exhibit 99.1 to Montes Archimedes Acquisition Corp.'s Form 8-K, filed with the SEC on June 26, 2021, submitted as Ex.74 at D.A.657–68 |
| Rule 8(a) | Federal Rule of Civil Procedure 8(a) |
| Rule 9(b) | Federal Rule of Civil Procedure 9(b) |
| Rule 10b-5 | SEC Rule 10b-5 promulgated under Section 10 of the Exchange Act, 17 C.F.R. § 240.10b–5 |
| SaaS | Software as a Service |
| Sarcos | Sarcos Technology and Robotics Corporation |
| Sarcos 14A | Sarcos's Schedule 14A Proxy Statement, filed with the SEC on August 6, 2021 as Ex.76 at D.A.676-87 |
| Sarcos Investor Deck or ID | Sarcos's Investor Presentation, attached as Exhibit 99.2 to Rotor Acquisition Corp.'s Form 8-K, filed with the SEC on April 6, 2021, submitted as Ex.73 at D.A.644–56 |
| Sarcos PR | Sarcos's press release, attached as Exhibit 99.1 to Rotor Acquisition Corp.'s Form 8-K, filed with the SEC on April 6, 2021, submitted as Ex.71 at D.A.630–35 |
| SEC | U.S. Securities and Exchange Commission |
| Section 10 | Section 10 of the Exchange Act, 15 U.S.C. § 78j |
| Section 11 | Section 11 of the Securities Act, 15 U.S.C. § 77k |
| Section 15 | Section 15 of the Securities Act, 15 U.S.C. § 77o |
| Section 20(a) | Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) |
| Section 20A | Section 20A of the Exchange Act, 15 U.S.C. § 78t–1 |
| Securities Act | Securities Act of 1933, as amended, 15 U.S.C. § 77a *et seq.* |
| Securities Act Defendants | Together, Palantir, Karp, Cohen, Thiel, Glazer, Alexandra Schiff ("Schiff"), Alexander Moore ("Moore"), and Spencer Rascoff ("Rascoff") |
| SPAC | Special Purpose Acquisition Company |
| TAM | Total Addressable Market |
| TRDV | Total Remaining Deal Value |
| Tyson Foods | Tyson Foods, Inc. |

Defendants, by and through undersigned counsel, move to dismiss the Complaint pursuant to the PSLRA and Fed. R. Civ. P. 8(a), 9(b) and 12(b)(6).[1]

## PRELIMINARY STATEMENT

For two decades, Palantir has pioneered software vital to our safety and prosperity. Palantir's software supports counterterrorism missions, powers leading businesses, and enabled COVID-19 vaccine rollouts.  As Plaintiffs would have it, however, Palantir lied to the market about its well-documented successes and future prospects in its Final Registration Statement and in *every* SEC filing and earnings call since going public.

Fraud is a serious allegation.  Particularly when it is unsupported.  Despite having nearly two years and three attempts to do so, Plaintiffs' newest Complaint fails to muster a *single* hallmark of fraud—no SEC investigation, restated earnings, or documentary evidence of "undisclosed truth," and not one confidential witness.  Plaintiffs instead resort to fraud by hindsight innuendo: because some of Palantir's SPAC investments lost money, there must have been fraud.  That does not satisfy the PSLRA and Rule 9(b)'s heightened pleading standards, as courts in this Circuit have repeatedly held.

Plaintiffs' case fails as a matter of law for these and several other reasons.  *First*, Plaintiffs do not, and cannot, connect their shares to those registered for resale pursuant to the FRS.  As the Supreme Court recently held, to pursue a Section 11 claim, a plaintiff must "plead and prove" that it can "trace" its specific shares to those registered by the challenged registration statement.  *Slack Techs., LLC v. Pirani*, 598 U.S. 759 (2023).  This

---

[1]   On July 22, 2024, counsel for all parties conferred regarding the requested relief pursuant to Civ. Practice Standard 7.1B(b).  Plaintiffs do not consent to the Motion.

Court already told Plaintiffs that probabilistic allegations were unlikely to satisfy that burden.  ECF 91.  Ignoring that guidance, Plaintiffs rest on the same defective theories as before: arguing that it is "probable" that their shares were among those tied to the FRS and that, alternatively, all shares issued by Palantir are traceable to the FRS under an "integrated offering" theory.  These theories are as defective now as they were last time.

*Second*, the PSLRA requires Section 10 claims be pleaded with facts showing not simply that it is *plausible* that *each* defendant acted with fraudulent intent, but rather that such inference is so strong that it is *at least as compelling* as any other.  Despite years of investigating and multiple chances to amend, Plaintiffs' allegations still do not clear this hurdle.  Plaintiffs allege no facts—no specific document, whistleblower testimony, or government finding—that demonstrate intent to defraud by any Defendant or contradict any Challenged Statement.  Plaintiffs fall back on the refrain that Defendants had "strong visibility" into future performance through "access" to unspecified reports and "regular" meetings, which somehow made their statements fraudulent.  But court after court has rejected such theories.  As the Tenth Circuit recently confirmed: visibility allegations fail to plead scienter absent particularized facts showing what each report or meeting revealed and how that information rendered any statement contemporaneously false.  *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc*., 79 F.4th 1209, 1217 (10th Cir. 2023).  The Complaint is devoid of any such allegations.

*Third,* Plaintiffs' claims fail because the Challenged Statements are accurate statements of historical fact, inactionable opinions, corporate optimism, or immunized forward-looking projections.  Moreover, Palantir warned investors repeatedly and

extensively of the very risks about which Plaintiffs now complain.  The FRS overflowed with specific and detailed disclosures, warning that there were "no assurances" that Palantir's revenue "will continue to grow" "at current rates."  Palantir also warned investors that it invested in businesses with "unproven technologies" that may be "unable to generate . . . sufficient revenues" to pay Palantir, thus "negatively impact[ing]" Palantir's results.  It is blackletter law that disclosed risks cannot form the basis of a securities claim.

*Fourth*, Plaintiffs fail to plead loss causation.  To pursue a "corrective" disclosure theory, Plaintiffs must identify a disclosure that reveals and corrects prior falsehoods.  The only "reve[lations]" to which Plaintiffs point, however, are regularly scheduled earnings releases.  None of these corrected any earlier statement or revealed any prior fraud.

Unable to identify any misconduct, Plaintiffs invent several "scheme[s]."  For instance, they allege that Defendants schemed to take Palantir public solely to profit from a "massive insider selling spree."  The truth is: as is typical after a company goes public, and after being compensated in stock for nearly two decades, Palantir's insiders (including rank and file employees) elected to sell a portion of their stock.  Yet most Defendants *retained* over 75% of their Palantir holdings.  Equally deficient is Plaintiffs' fantasy "SPAC scheme," pursuant to which Palantir allegedly invested in SPACs to inflate financial metrics.  Plaintiffs cannot show that any revenue recognized from Palantir's SPAC transactions was fabricated, or that the SPAC investments were inherently deceptive.  Plaintiffs thus cannot satisfy the PSLRA and Rule 9(b)'s demanding standards.

The Complaint should be dismissed, this time with prejudice.

## BACKGROUND[2]

### A.    Palantir's Origins and Products

Founded in 2003, Palantir's products include Gotham and Foundry.  ¶ 26.  Gotham organizes and evaluates complex datasets and is used to design software.  *Id.*; D.A.9, 14 (FRS).  Foundry creates an operating system that permits organizations to better utilize data.  ¶ 26; D.A.9, 14 (FRS).  Palantir's products assist U.S. Special Forces, aid in distributing the COVID vaccine, and help Ukraine resist the Russian invasion.  *See* D.A.138 (Nov. 12, 2020 Tr.); D.A.152, 154 (May 9, 2022 Tr.).  Its government customers include the U.S. Army, the FDA, and the CDC.  D.A.112 (FRS).  Its commercial clients include BP, Tyson Foods, and the Cleveland Clinic.  D.A.121–22 (FRS); D.A.168–69 (Feb. 13, 2023 Tr.).

### B.    Palantir Goes Public After 17 Promising Years as a Private Company.

After 17 years operating privately, developing marquee products, and building relationships with over 125 customers but having limited liquidity for its shareholders, Palantir decided to go public.  Rather than use an IPO structure, where a company issues new shares which are sold via financial institutions who act as underwriters, Palantir used a direct listing in which it issued no new shares but registered certain shares of preexisting shareholders so that they could (and did) sell directly to the public together with

---

[2]  Defendants accept the Complaint's well-pleaded facts only for this Motion.  The Court may consider publicly available documents, annexes, and exhibits in Defendants' Appendix filed herewith, *see* Civ. Practice Standard 7.1B(c), without converting this Motion into one for summary judgment, because they are incorporated into or integral to the Complaint and/or are subject to judicial notice.  *See* RJN; *see also Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013).  Unless otherwise noted, all emphasis is added, and all internal quotations and citations are omitted.

unregistered shares.  *See* ¶ 29.  As a result, both registered and unregistered Palantir shares were available for purchase simultaneously, without brokers tracking which transacted shares were registered and which were not.  *See* Opp'n to Mot. to Lift.

### C.    The Registration Statement

To facilitate the Offering, Palantir filed the FRS on September 21.  ¶ 29 n.7.[3] Taking as true the Complaint's allegations, 489 million shares of Class A common stock were available for resale upon Palantir's direct listing, of which 257 million were registered under the FRS, leaving 232 million shares unregistered.  ¶ 234.  This immediately created a public market for registered and unregistered shares.

The FRS also described Palantir's capital structure, which has three share classes: Class A common stock, which was entitled to one vote per share; Class B common stock, with ten votes per share and that can be converted to Class A; and Class F common stock, which is held in a voting trust established by Palantir's founders.  D.A.16 (FRS).

### D.    Palantir Warns of the Risks About Which Plaintiffs Complain.

The FRS referenced Palantir's recent historical financial success, including Palantir's "accelerat[ing]" growth: generating a 25% increase in revenue in 2019 compared to 2018; and a 49% increase in H1 2020 revenue, compared to H1 2019. D.A.108 (FRS).  At the same time, Palantir cautioned that, while "revenue ha[d] increased," there could be "no assurances that revenue will continue to grow or do so at current rates." *Id*. at D.A.26.   Palantir specifically warned investors that "the revenue of any prior

---

3    On September 30, the first day of the Class Period, Palantir filed a final prospectus with the SEC.  ¶ 29 n.7.  A supplement was filed on November 13.  *Id*.

quarterly or annual period" is not a reliable indicator of future performance.  *Id*.  It further disclosed:

- "[Y]ou should not rely on the revenue of any prior [year] or quarter[] as an indication of" future performance.  **"Our revenue growth rate may decline."**  *Id*.

- "We have incurred losses each year since our inception" and "***may never achieve or maintain profitability***."  *Id*.

- "[D]ownturns in new sales may not be immediately reflected in our revenue because we generally recognize revenue over the term of our contracts."  *Id*. at D.A.28.

The FRS also noted recent government growth: as of June 30, 2020, government TRDV "was $1.2 billion, up 74% from December 31, 2018."  *Id*. at D.A.102.  It warned that these growth rates may not be sustained as "changes in the contracting or fiscal policies of the public sector could have a material adverse effect on our business."  *Id*. at D.A.42.

Palantir "believe[d]" that, over time, its "contribution margin" "[would] increase" as software efficiency improved.  *Id*. at D.A.100.  Palantir acknowledged, however, that its sales efforts "involve considerable time and expense" and the "sales cycle is often long and unpredictable," adding "there is no guarantee" that its customers would scale or that its contribution margin would increase.  *Id*. at D.A.26–29.  As for its products, Palantir stated that they have a "complex," "lengthy implementation process, and any failure of our platforms to satisfy" customers "could harm our business[.]"  *Id*. at D.A.30–31.

Further, while Palantir was optimistic about a $119 billion TAM, it warned that "[t]he estimates and assumptions that are used to calculate our market opportunity are subject to change," may prove "inaccurate," and "there is no guarantee" of "any particular level of revenue."  ¶ 226, D.A.57, 73 (FRS); *see also* D.A.46–47 (FRS) (warning that if Palantir is "not successful in executing our strategy," "our results of operations may suffer").

Palantir reiterated and updated these risk disclosures throughout the Class Period.

### E.     Palantir's Strategic Investment Program

Six months after going public, in March 2021, Palantir began a strategic investment program in which it invested in early- and growth-stage companies, including SPACs, and entered into multi-year commercial agreements with these same companies.   ¶¶ 63–64.

Palantir aimed to expand its commercial customer base from "established industry players" to "day 0" companies with "ambitious goals."   D.A.183 (May 11, 2021 Tr.). Palantir viewed these partnerships as a natural fit: its software would allow these clients to "accelerate production ramps and time to market."   *Id.*   Palantir would benefit from the opportunity to be at the forefront of innovation and growth in new markets.   *See id.*

Palantir's investment strategy was not unique.   SPACs were among the most popular transactions in 2021, the year Palantir began investing.   *See In re Hennessy Cap. Acquisition Corp. IV S'holder Litig.*, — A.3d —, 2024 WL 2799044, at *1 (Del. Ch. May 31, 2024) (describing 2020 and 2021 as a SPAC transaction "frenzy").   Nor was it a secret. Palantir disclosed the details of its SPAC investments, including investment dates and amounts; names or descriptions of the investee; number and type of shares acquired; maximum potential revenue; and recognized revenue.   ¶ 3; *see, e.g.*, D.A.202 (May 12, 2021 10-Q); D.A.266 (Aug. 12, 2021 10-Q).   It also disclosed the "high-risk, high-reward strategy" of investing in, and working with, Day 0 companies.   D.A.347 (Aug 12, 2021 Tr.). Palantir told the market that SPAC investments "may decline in value or be entirely lost," and SPACs "may be unable to perform their obligations" so Palantir "may not realize a return."   *See, e.g.*, D.A.232 (May 12, 2021 10-Q); D.A.288, 305–06 (Aug. 12, 2021 10-Q).

Palantir also disclosed that it recognized its revenue from SPAC contracts in compliance with ASC 606.  *See, e.g.*, D.A.438 (Feb. 24, 2022 10-K).  Moreover, because Palantir recognized SPAC revenue ratably, its commercial agreements with SPACs had a limited impact on its revenue.  *See, e.g.*, D.A.344, 347 (Aug 12, 2021 Tr.) (SPAC revenue made up less than 1% of Palantir's 2Q21 revenue).

Beyond Palantir's extensive disclosures, there was ample SPAC investment information available to the market.  The companies in which Palantir invested (including those the Complaint names) issued their own disclosures, detailing Palantir's investments and the risks associated with that company's business.  For example, Celularity warned that it already "incurred net losses," had "no cellular therapeutics approved for commercial sale," and "anticipate[d] that it will incur substantial net losses in the future." ¶ 64; D.A.456 (CELU S-1).  Celularity disclosed that its "historical operating results indicate[d] substantial doubt" as to its ability to continue as a going concern.  D.A.457 (CELU S-1).  Additionally, the SPACs in which Palantir invested were required to make regular public filings, providing yet more information to investors.  Analysts also monitored the public information regarding Palantir's SPAC investments.  RBC, for example, published a strategic investment tracker. ¶ 182; *see also* D.A.463 (Nov. 9, 2021 RBC Report).

## F.    The SPAC Market Declines.

In 2022, the popularity of SPAC investments began to wane.  Many SPACs, including those in which Palantir had invested, underperformed expectations.  During its earnings call on May 9, 2022, Palantir explained that revenue from its strategic investment program had "peaked" at about $39 million in 1Q22 and that it would no longer make

additional such investments.  D.A.160 (May 9, 2022 Tr.).

Despite the downturn in SPACs, Palantir's performance remained strong, with total revenue exceeding $446 million.  D.A.479 (May 9, 2022 10-Q).  At that time, Palantir announced that it had experienced "continued strength and growth in the U.S. business, ex SPACs," growing 65% year-over-year and 9% quarter-over-quarter.  D.A.160 (May 9, 2022 Tr.); D.A.558 (Aug 8, 2022 Tr.) (80% ex SPAC growth for year).  Ultimately, Palantir achieved its disclosed goal of long-term growth and profitability in 4Q22, two years earlier than expected.  *Compare* D.A.157–59 (May 9, 2022 Tr.), *with* D.A.167 (Feb. 13, 2023 Tr.).

### G.    This Litigation

Plaintiffs filed their original complaint in September 2022, which they amended in February 2023.  ECF 1, 47.  Over Plaintiffs' objections, Judge Sweeney stayed this action pending the decision in *Slack*.  ECF 54.  Plaintiffs amended again on June 29, 2023.  ECF 59.  Defendants moved to dismiss.  ECF 67.  On March 31, 2024, the Court dismissed that complaint without prejudice.  ECF 82.  This Complaint followed.  ECF 92.

**ARGUMENT**

To survive dismissal, a complaint must contain sufficient facts which, if true, show that a claim "is plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A Section 10(b) claim must also satisfy the heightened pleading standards of the PSLRA and Rule 9(b).  These require Plaintiffs to plead particularized facts showing why a statement was false when made and why each defendant acted with the requisite scienter.  *See Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1298 (10th Cir. 2018); *see also* 15 U.S.C. § 78u-4(b)(1)(B) (Plaintiffs must "specify each statement alleged to have been misleading" and

plead with particularized facts "the reasons why."). Where, as here, Plaintiffs' Section 11 claim is based on the same allegations as their Section 10(b) claims, it must also satisfy Rule 9(b), even if fraud is summarily disclaimed. *See, e.g.*, *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (Rule 9(b) applies to Section 11 claim "sound[ing] in fraud"); *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004) (same).

## I.     THE SECTION 11 CLAIM FAILS BECAUSE PLAINTIFFS CANNOT "TRACE" THEIR SHARES.

The Section 11 claim should be dismissed because Plaintiffs fail to plead, as required, that they purchased shares registered by (*i.e.*, "traceable" to) the "allegedly defective registration statement" as opposed to "unregistered shares unconnected to the registration statement." *Slack*, 598 U.S. at 765, 768–70 & n.2 (citing *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000)).

*Slack* directly parallels this case. Like Palantir, Slack went public via a direct listing in which registered and unregistered shares simultaneously entered the market. *Id*. This commingling of registered and unregistered shares renders tracing impossible, as the district court in *Slack* acknowledged. *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 379 (N.D. Cal. 2020) ("In a direct listing, the impossibility of tracing begins on the very first day of listing due to the simultaneous offering of unregistered and registered shares").

*Slack* compels dismissal of Plaintiffs' Section 11 claim. Plaintiffs' attempts to circumvent *Slack's* clear mandate through (1) probabilistic reasoning, ¶¶ 237–42, and (2) the "integrated offering" doctrine, ¶¶ 231–36, should be rejected.[4]

---

[4]   These allegations about CalPERS cannot show tracing as to Plaintiff Liu.

### A.  Plaintiffs Cannot Substitute Mere Possibility for Traceability.

Plaintiffs argue they satisfy the tracing requirement because "the probability that CalPERS purchased at least one registered share is so high as to constitute a legal certainty."   ¶ 237.   The leading circuit decision rejected this argument.   *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 492 (5th Cir. 2005).  In *Krim*, plaintiffs purchased stock when registered shares comprised *99.85%* of the market—far more than the 52.6% assumed here.  *Id.*, ¶ 238.  The *Krim* plaintiffs argued that tracing can be established "by proffering nothing more than statistics indicating a high mathematical probability" that they purchased traceable shares.   402 F.3d at 494 & n.6.   The Fifth Circuit rejected this assertion because "these general statistics say nothing about the shares that a *specific* person *actually owns* and have *no ability to separate* those shares upon which [statutory] standing can be based from those for which [statutory] standing is improper."  *Id.* at 501.[5]

Numerous lower courts have reached the same conclusion because "probabilistic" tracing is speculative.  *See, e.g.*, *Doherty v. Pivotal Software, Inc.*, 19-cv-3589, 2019 WL 5864581, at *10 (N.D. Cal. Nov. 8, 2019) ("a favorable percentage" insufficient to plead tracing); *In re Quarterdeck Off. Sys., Inc. Sec. Litig.*, 92-cv-0397, 1993 WL 623310, at *2–3 (C.D. Cal. Sept. 30, 1993) (tracing not pleaded even though *97%* of the shares were traceable); *Abbey v. Comput. Memories, Inc.*, 634 F. Supp. 870, 875 (N.D. Cal. 1986) ("high probability" of tracing is not enough).  Despite amici urging the Supreme Court to

---

[5]  *See also Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (allegation that plaintiffs' shares "could have" come from challenged offering insufficient); *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 755 (1st Cir. 2016) (allegation that plaintiff's shares "are traceable to the offering in question" insufficient).

adopt this probability-based methodology in *Slack*, the Court declined to do so.  *See* Br. for Evid. and Civ. Proc. Scholars, *Slack*, 22-200, 2023 WL 2439653 (U.S. Mar. 6, 2023).

### B.   The Integrated Offering Doctrine Is Inapplicable.

Alternatively, Plaintiffs argue that—notwithstanding *Slack*—they need not trace *at all*, because Palantir's direct listing was a "single integrated offering such that all shares sold . . . are deemed registered and are traceable to the Registration Statement."  ¶ 236. This argument fails for two independent reasons.

*First*, the integration doctrine has nothing to do with Section 11's tracing requirement.  Rather, it "determine[s] whether exemptions from the registration requirements [of the Securities Act] apply."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 627 (S.D.N.Y. 2007).  Its purpose is to prevent issuers from avoiding registration by artificially dividing a single offering that should be registered into multiple exempt offerings. *See* SEC Release, 86 Fed. Reg. 3496, 3499 (Jan. 14, 2021).  Plaintiffs do not claim that Palantir violated the Securities Act's registration provisions.  Nor is there any support, including from *Slack*, for using the integration doctrine as Plaintiffs seek to do here.

*Second*, even if the integration doctrine were applicable, Plaintiffs fail to satisfy its requirements.  Courts consider five factors when determining whether securities offerings should be integrated, the most important of which are "(a) whether the offerings are part of a single plan of financing . . . and (e) whether the offerings are made for the same general purposes."  *SEC v. Murphy*, 626 F.2d 633, 645 (9th Cir. 1980).  These factors typically apply when a company is raising money for a single purpose.

That is not the case here.  There was no "single plan of financing" in Palantir's

direct listing; hundreds of stockholders independently decided whether and when *they* wanted to sell their shares.  *See* D.A.130 (FRS) ("[W]e will have no input if and when any Registered Stockholder may, or may not, elect to sell their shares").  The proceeds from those sales went to *the stockholders*, not Palantir.  *Id.* ("We will not receive any proceeds from the sale of shares of Class A common stock by the Registered Stockholders.").  Nor were these sales "made for the same general purpose."  Plaintiffs attempt to circumvent this distinction by alleging all Palantir stockholders had the "same general purpose" of gaining "access to liquidity" (*i.e.*, raising money).  ¶ 233.  But that argument would render this factor superfluous because raising money is the purpose of *all* offerings.

Plaintiffs fail to allege facts establishing tracing, and they cannot skirt their pleading burden based on probabilities and an inapplicable doctrine.

## II.   LACK OF SCIENTER COMPELS DISMISSAL OF SECTION 10(b) CLAIMS.

Plaintiffs' Section 10(b) claims fail because the Complaint does not plead with particularity a "strong inference" of scienter—a mental state evidencing an "intent to deceive, manipulate, or defraud," or "recklessness" for the truth—for any Defendant.  *See Smallen v. W. Union Co.*, 950 F.3d 1297, 1304–05 (10th Cir. 2020); *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1236–37 (10th Cir. 2016); *Smallen v. W. Union Co.*, 17-cv-00474, 2019 WL 1382823, at *40 (D. Colo. Mar. 27, 2019) (scienter cannot be group-pled), *aff'd*, 950 F.3d 1297.  To survive dismissal, a complaint must contain enough well-pleaded facts to establish that the inference of scienter is not only "plausible" but that it is "at least as compelling as any opposing inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Allegations of fraudulent intent

through motive (*i.e.*, personal financial gain) and opportunity must be supported by particularized facts but even then "are typically not sufficient" "to establish a strong inference of scienter."  *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1206 (10th Cir. 2015). "[R]ecklessness" requires conduct that is both "an extreme departure from the standards of ordinary care" and "presents a danger of misleading [investors] that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Id*. at 1201.

Unable to point to an SEC investigation, financial restatement, confidential witness, or internal report demonstrating fraud, Plaintiffs speculate about Defendants' motives. Alternatively, they hypothesize about Defendants' collective and generalized access to information about Palantir's business.  Neither meets the PSLRA's high bar.  What remains is the claim that because the SPAC investments were not as successful as hoped, Defendants must have known they would fail when Palantir entered them.  It is black letter law that "Plaintiff[s] may not rely on a subsequent event triggering a decrease in stock price 'to say that the later, sobering revelations make the earlier, cheerier statement a falsehood.'"  *Smallen*, 950 F.3d at 1309 (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997)).  Rather, Plaintiffs "must provide particularized allegations showing the Individual Defendants" "knew of or recklessly disregarded the falsity of the challenged statements at the time they made the statements."  *Id*.  Plaintiffs fail to do so.

### A.    The Complaint Fails Adequately to Allege Intent to Defraud.

Plaintiffs allege that Defendants acted with scienter because they took Palantir public solely to engage in a "massive . . . selling spree" and "cash out" over $ 2.2 billion. ¶¶ 32, 187–92.  This argument fails.

***Liquidity & Profit.***  Plaintiffs ground their scienter claim in Defendants' desire for liquidity, but "[g]eneralized motives shared by all companies" do not suffice to plead scienter.  *Anderson*, 827 F.3d at 1239.  Companies routinely go public "to afford their shareholders" liquidity.  *Slack*, 598 U.S. at 764; *Ellis v. Spectranetics Corp.*, 15-cv-01857, 2018 WL 1583837, at *12 (D. Colo. Apr. 2, 2018) (motive to complete offering insufficient).  Thus, allegations of stock sales, even at substantial profit, are insufficient "to give rise to a strong inference of scienter."  *Smallen*, 950 F.3d at 1310.  That is especially true here where Defendants were, for years, primarily compensated with equity grants, such that their sales represent 17 years of deferred compensation.[6]  *See Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 543 (5th Cir. 2008) (post-public offering sales "overstated and innocuous").

Moreover, a supposed motive to take Palantir public fails to show scienter for any post-offering Challenged Statements in 2020 or in 2021 and 2022, when the "SPAC Scheme" allegedly occurred and most of those statements were made.  *See In re Lottery.com, Inc. Sec. Litig.*, 22-cv-07111, 2024 WL 454298, at *32 (S.D.N.Y. Feb. 6, 2024) (motive to take public "dissipate[s] once the [] transaction [is] complete").

***10b5-1 Plans & Tax Withholding Sales***.  Scienter is further lacking because a majority of the challenged trades were made automatically pursuant to 10b5-1 plans or

---

6   Plaintiffs allege that Defendants' stock sales during the Class Period were "out of line" with post-Class Period sales.  ¶ 192.  It makes sense for insiders to sell stock at a higher rate in the first few months (and even years) of the public listing due to newfound liquidity.  *See* Initial Public Offerings: Lockup Agreements, SEC Answers (Sept. 6, 2011) (extensive post-listing sales so typical "stock price may drop in anticipation").  The notion that Defendants "tempered their sales" later in the Class Period, ¶ 191, merely reflects high sales post-listing, and is not indicative of scienter.

to cover tax withholdings.[7]  Such automatic sales are routinely held to "rebut any inference of scienter."  *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1346–47 (10th Cir. 2012) (no scienter for automatic sales to cover tax withholding); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008) (same, for automatic sales pursuant to 10b5-1 plans); *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355–56 (2d Cir. 2022) (10b5-1 sales "could not be timed suspiciously").  In the Tenth Circuit, pleading scienter based on 10b5-1 sales requires particularized facts that defendants knew when their trades were scheduled and made false and misleading statements to take advantage of that schedule.  *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1266 (10th Cir. 2022).  The Complaint alleges nothing of the sort.

*2020 Awards.*  Plaintiffs allege the August 2020 stock awards made to Karp, Cohen, and Sankar influenced these Defendants to take Palantir public in September 2020.  ¶¶ 187–88.  But this does not plead scienter for several reasons:

- Palantir had already decided to go public before the awards.  *See* ¶¶ 28, 187 (proposing a public offering in July 2020 but granting awards in August 2020).

- Defendants could have exercised their options prior to expiration and sold the stock later, thus undermining any supposed urgency to take Palantir public.

- Defendants kept most of their equity, including from these awards.  *See* D.A.1517–25 (Annex F).

- Over 90% of Karp's options did not vest by the end of the Class Period and thus could not have been sold until after the "fraud" had been revealed.  *See* D.A.1201.

*Retained Holdings.*  Finally, Defendants retained substantial portions of their

---

[7]  All other sales occurred shortly after the direct listing when any MNPI had just been disclosed and SPAC investments were not yet under consideration.  Plaintiffs fail to allege which trades were not automatic and the statements these sales coincide with.

holdings, further undermining scienter. The allegation that Thiel retained 73% of his shares, ¶ 189, rebuts scienter. *Smallen*, 950 F.3d at 1310–11 (no scienter where sales are "only a fraction" of holdings). Similarly, the proportion of holdings retained by Karp, Cohen, Sankar, and Glazer (81%, 81%, 76%, and 45%, respectively) is contrary to an inference of scienter. *See* D.A.1517–25 (Annex F); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999) (no scienter where 24.7% of holdings retained); *Ronconi v. Larkin*, 253 F.3d 423, 435–37 (9th Cir. 2001) (same, for 31% and 2% retained holdings); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007) (18%, 8%, and 0% retained holdings not suspicious in light of vested stock options).[8]

### B.     The Complaint Fails Adequately to Allege Deliberate Recklessness.

Absent motive to defraud, Plaintiffs' burden to plead scienter grows "correspondingly greater" and is "more difficult to sustain." *Level 3*, 667 F.3d at 1347; *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1173 (10th Cir. 2018). Plaintiffs thus face the "substantial hurdle" of pleading "compelling and particularized facts showing" deliberate recklessness. *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1103, 1108 (9th Cir. 2021). Plaintiffs fail to meet this heavy burden.

Plaintiffs argue that "Defendants" collectively and generally had "strong visibility" and "access to [MNPI]," and thus must have had contemporaneous knowledge that their

---

[8]   The Complaint emphasizes the purported value of Class F shares to insiders, ¶ 194, but Plaintiffs omit Class F shares (and other equity) from their "% Sold" calculation, ¶ 189. *Ronconi*, 253 F.3d at 435–36 (considering stock options in calculations). Moreover, the claim that Class F allowed Karp, Thiel, and Cohen to sell stock but retain control, ¶¶ 193–95, fails, because if they were so motivated, they would not have retained multiple times the holdings required to retain control, foregoing billions.

statements were false.  *See, e.g.*, ¶¶ 25 ("Individual Defendants" sent and received "monthly email updates," "Karp, Cohen, or Sankar" attended "sales ops" meetings); 125–27 ("Karp, Glazer, and the other[s]" had "access to dashboards," "Defendants" had "strong visibility" into the business), 129 ("strong visibility into future revenue"), 230 (same).

 *First*, such group-pled allegations are impermissible.  *Smallen*, 2019 WL 1382823, at *40 (plaintiff "required to adequately allege scienter on the part of *each* Defendant"); *TDC Lending LLC v. Priv. Cap. Grp., Inc.*, 340 F.Supp.3d 1218, 1227 (D. Utah 2018) (By group pleading, a plaintiff attempts "to group defendants together without distinguishing the bases for each defendant's culpability.  This is incompatible with the [PSLRA's] purpose" of "eliminat[ing] complaints that do not clearly show scienter."); *see* § 78u-4(b)(2) & (d) (ultimate question is "*each such* defendant's state of mind").

 *Second*, in *Spirit*, the Tenth Circuit recently considered and squarely rejected this very theory.  *Spirit*, 79 F.4th at 1217.  The court held that while "top executives presumably had access to" information, mere access "d[id] [not] show knowledge of specific facts" required to plead scienter.  *Id.*  The court explained that "it's not enough" to allege knowledge of "underlying data," "access to internal reports," or "close involvement" in the business.  *Id.* at 1216, 1222.  Rather, plaintiffs *must* point to "particularized allegations about the contents" of those meetings or reports, like that the defendant "saw data that would have alerted him" that his statements were false.  *Id.* at 1220, 1222 n.4.  *Spirit* is consistent with other Tenth Circuit authority, as well as authority in this District.  *See MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1122 (10th Cir. 2014) ("[N]othing in the defendants' routine [meeting] attendance" "suggest[s] a

cogent and 'compelling' inference of scienter."); *Anderson*, 827 F.3d at 1245–46 (alleging defendants were "intimately involved" in or "personally monitored" the business insufficient to plead scienter); *Level 3*, 667 F.3d at 1344 (same, for "monitor[ing]" "through regular meetings and reports"); *Sorkin, LLC v. Fischer Imaging Corp.*, 03-cv-00631, 2005 WL 1459735, at *10 (D. Colo. June 21, 2005) (same, for "mere access to" information).[9]

The Complaint is devoid of the particularized showing the Tenth Circuit requires. It pleads no "specific" facts about what *each* Defendant *knew* and how that information rendered any statement contemporaneously false. There are no allegations about what the email updates discussed, what specific information the meetings covered, nor what the dashboards revealed. *Level 3*, 667 F.3d at 1344–45 (noting "fundamental weakness" in plaintiffs' scienter allegations, "[g]iven the difficulty" "in determining whether a conflict actually existed between the reports and defendants' statements"); *Sorkin*, 2005 WL 1459735, at *8 ("Without specific facts about . . . what information was presented" at meetings, "there is no way to determine whether the matters discussed" support a strong inference of scienter). Plaintiffs' allegations are thus insufficient to plead scienter.

Unable to point to specific facts that would support their theory, Plaintiffs default to group-pled speculation. This is of no help. For example, speculation that a "typical contract['s]" length permitted "Defendants" to predict quarterly revenue fails to account for new contracts Palantir hoped to sign or existing contracts that could be renewed or upsized during a particular period. *See, e.g.*, ¶ 129 ("aware from their 'strong visibility'

---

9   *Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 22-cv-04893, 2024 WL 3447524, at *7 (N.D. Cal. July 16, 2024) ("access to such data" insufficient).

[that] performance was set to peak" and "growth rates" "decline").  These allegations also rest entirely on Defendants' clairvoyance, which courts repeatedly reject.[10]  *Wolfe v. Aspenbio Pharma, Inc.*, 587 F. App'x 493, 497–98 (10th Cir. 2014) (rejecting "notion that knowledge may be imputed solely from an individual's position within a company"); *In re Pivotal Sec. Litig.*, 19-cv-03589, 2020 WL 4193384, at *16–17 (N.D. Cal. July 21, 2020) ("quite a bit of revenue visibility" insufficient); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F.Supp.2d 364, 406–07 (S.D.N.Y. 2006) ("exceptionally good visibility" insufficient).

Similarly, Plaintiffs suggest, without any supporting facts, that "Defendants" "knew" that Palantir would not receive a "substantial portion" of SPAC-related revenue because Palantir "had as much information about the SPAC as the SPAC themselves" and so knew the SPACs would fail.[11]  ¶ 59 (pointing to unspecified "due diligence" and alleging Foundry would "unlock" a "digital twin" of the SPAC's "entire enterprise" for the customer's use).  Plaintiffs' assertion that "Defendants" entered SPAC customers' digital twin environments, accessed customers' internal data and became aware of information that contradicted Palantir's disclosures is baseless.  *See* ¶ 81.  Indeed, Plaintiffs fail to allege

---

[10]  To the extent Plaintiffs seek to plead scienter through a core operations theory—that SPACs were so key to Palantir that Defendants must have knowledge of the alleged "Scheme"—this theory has repeatedly been rejected.  *Anderson,* 827 F.3d at 1246; *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1116 (10th Cir. 2015) (rejecting allegations that defendants working at a small, single-product company "must have known" the misleading nature of their statements, as "insufficient under the heightened pleading requirements to establish" scienter).

[11]  The conclusory argument that scienter may be inferred from "front-loaded" or "upfront" payment, ¶¶ 82, 87, 93, also fails because "[g]eneralized motives shared by all companies" do not suffice to plead scienter.  *Anderson*, 827 F.3d at 1239.  Negotiating favorable contract terms and insulating against risk is not indicative of fraud.

any facts—well pleaded or otherwise—to show that "Defendants" had access to or entered any SPAC customer's digital twin environment. Plaintiffs fail to allege what information "Defendants" allegedly obtained that informed their individual knowledge of SPAC customers' operations. This outlandish and unsupported speculation does not suffice to plead scienter. *In re Overstock Sec. Litig.*, 19-cv-0709, 2021 WL 4267920, at *13 (D. Utah Sept. 20, 2021) ("[S]peculation does not support an allegation of scienter.").

Plaintiffs have not alleged a *cogent* inference of fraud *at least as compelling* as all opposing inferences. *Tellabs*, 551 U.S. at 324. The alternative non-fraudulent inference is that Palantir experienced, as every company does, routine business setbacks. Palantir went public after years of operating privately, which is not motive to defraud. Nor is the fact that Palantir invested in SPACs, like many other sophisticated investors at the time, evidence of fraud. *See Hennessy*, 2024 WL 2799044, at *1 ("Experienced investors . . . sponsored SPACs with the promise of huge returns."). Defendants saw SPACs as strategic investments, symbiotic with Palantir's business model and disclosed the Company's SPAC-related strategy and risks. As the market discovered in 2022, SPACs were not the investment opportunities that they appeared to be. Investors, including Palantir, were affected. That suggests, at most, a business decision that did not pan out.

## III.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED FOR FAILURE TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION.

The Challenged Statements comprise three categories: (i) Palantir's SPAC investments; (ii) Palantir's financial performance, and (iii) Palantir's efficiencies. Plaintiffs fail to plead with particularity the reasons "why [each] statement was misleading," and "all facts" that contradict them.

### A.   Plaintiffs Fail to Plead Falsity as to the SPAC-Related Statements.

#### 1.   Section 11 Claims Not Adequately Pleaded

There can be no SPAC-related Section 11 claim because no SPAC investments had yet been made at the time of the direct listing.  Plaintiffs' sole attempt to link SPACs to the FRS is to point to a generic reference to "strategic transactions."  ¶¶ 62, 223-24. This fails.  "[S]trategic transactions" is a generic term that did not refer exclusively to SPACs.  In fact, Palantir continued to use that term even after it stopped making SPAC investments.  *Compare* D.A.305 (Aug. 12, 2021 10-Q) (Palantir "expects" to "engage[] in strategic transactions" "in the future."), *with* D.A.585 (Nov. 7, 2022 10-Q) (same).  When Palantir discussed SPACs, it did so explicitly.  *See, e.g.*, D.A.306 (Aug. 12, 2021 10-Q) (Palantir entered into agreements with "special purpose acquisition companies.").

Plaintiffs' challenge in ¶ 224 also fails because Palantir had no duty to disclose future business strategies not yet "consummated."  *See In re Centerline Holding Co. Sec. Litig.*, 678 F.Supp.2d 150, 161 n.74 (S.D.N.Y. 2009), *aff'd*, 380 F.App'x 91, 94 (2d Cir. 2010).  Moreover, Plaintiffs' attempt to create Section 11 liability runs into their own allegation that it took 3 or 4 months to negotiate SPAC investments.  ¶ 62.  Taking that allegation as true means that Palantir was not working on SPAC transactions until December 2020, months after the Final Registration Statement was filed.  Plaintiffs' attempt to conjure Section 11 liability for SPAC-related statements fails.

#### 2.   Section 10(b) Claims Not Adequately Pleaded

Plaintiffs' critiques of Palantir's SPAC investment strategy do not come within the ambit of Section 10(b).  Plaintiffs allege fraud existed because the investments were not

as successful as expected.  But a business strategy that does not pan out is not actionable under federal securities laws.  *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d. Cir. 2002) (no redress through fraud claim where "investment did not turn out" as hoped).  Plaintiffs' actual complaint concerning SPACs concerns an alleged breach of fiduciary duties; that claim will be decided by the Delaware Chancery Court.  *See Cent. Laborers' Pension Fund v. Karp*, 2023-0864 (D. Ch. Aug. 22, 2023).

Plaintiffs allege SPAC-related disclosure and accounting claims.  Both fail.

***Disclosure.***  Plaintiffs allege that the SPAC investments were not adequately disclosed.  ¶ 61.  Yet, the very documents on which Plaintiffs rely rebut that theory.  In fact, Palantir disclosed the material details of each of its SPAC investments.  *See supra* pp. 7–8; D.A.266 (Aug. 12, 2021 10-Q).  Moreover, Palantir warned investors about the riskiness of these investments, which Plaintiffs themselves concede.  *See, e.g.*, ¶¶ 61, 63.[12]  These disclosures were specific and cautioned, for example, that:

- "***If [SPACs are] unable to generate sufficient revenues or profitability or to access financing or funding . . . [our results] would also be negatively impacted***."  D.A.232 (May 12, 2021 10-Q).

- "[W]e make strategic investments. . . including, [in SPACs] in connection with . . . transactions with growth-stage companies. . . ***our investments may decline in value or be entirely lost***."  *Id.*

- The SPAC companies with which we contract "may be engaged in businesses that involve novel and unproven technologies, products, and services and ***such companies may be unable to perform their obligations under any commercial agreements . . ., in a timely manner or at all***."  *Id.*

It is black letter law that no securities fraud claim can lie where the very risks about which

---

[12]  These risks were also noted early in the Class Period in analyst reports that suggested SPAC revenue was "unsustainable" and that the "SPAC story" had "cracks."  ¶ 176.

plaintiffs complain were disclosed.  *See Novell*, 120 F.3d at 1119.

Plaintiffs also claim Palantir did not disclose the rationale for its SPAC investment strategy.  *See* ¶¶ 61–62.  That is incorrect.  Though Palantir had no duty to disclose such information, it, in fact, did so.  *See, e.g.*, D.A.183 (May 11, 2021 Tr.) ("we are investing in innovation. . .companies with ambitious goals"); *In re FoxHollow Techs., Inc., Sec. Litig.*, 06-cv-04595, 2008 WL 2220600, at *23 (N.D. Cal. May 27, 2008) (no duty to disclose every detail of business strategy), *aff'd*, 359 F. App'x 802 (9th Cir. 2009).[13]

Plaintiffs also allege that SPACs were not "legitimate" investments, not "long-term customers," and could not "afford" Palantir's software, thereby rendering Palantir's statements that SPACs would be "long term" "growth" partners false.  ¶¶ 60, 79, 83, 90, 97, 115, 117, 224.  The sole basis for Plaintiffs' conclusion is that SPACs eventually became "[nearly] insolvent," "bankrupt," or did not achieve commercialization.[14]  ¶¶ 60, 69, 70, 79, 82, 86, 98, 115.  This, however, is the very essence of impermissible fraud by hindsight.  *Novell*, 120 F.3d at 1124.  Tellingly, Plaintiffs fail to identify a single fact, statement or document to support their conclusion that "Defendants" did not believe that SPACs would become "legitimate," long-term customers when they made those

---

[13]  The claim that Palantir delayed disclosing its SPAC investments from March to May 2021 is unavailing.  ¶ 63.  Palantir was not required to disclose the investments before it reported quarterly results, which it did in May.  The notion that Palantir did not timely disclose the names of two SPACs (although it described them) also falls flat, ¶ 76 n.16.  *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012) (no duty to disclose every fact "even if investors" "consider the omitted information significant").  Plaintiffs' omission allegations relating to the 1Q21 and 3Q21 earnings calls fail for the same reason.  ¶¶ 73, 92, 100; *see id.*

[14]  Investors like Blackrock and Honeywell believed SPACs were legitimate and invested in the same SPACs as Palantir.  *See* D.A.628 (Lilium 6-K); D.A.632 (Sarcos PR).

statements.  Their contrary speculation does not suffice to carry their burden.[15]  Plaintiffs'

contention that the SPACs could not "afford" Palantir services is belied by the fact that

each of the SPACs received cash infusions of hundreds of millions of dollars.[16] ¶ 68.

Plaintiffs also take aim at statements concerning the SPACs' use of Palantir's

software.  ¶¶ 65–66, 74, 88, 95, 96.  They argue the SPACs were too "nascent" to need

Palantir's software and received an "out of the box" version of Foundry as a "pretext."

*See, e.g.*, ¶¶ 58, 68, 78, 97.  Not only do Plaintiffs fail to allege contemporaneous falsity,

but the SPACs' public disclosures themselves refute this.  For example, Lilium disclosed

that: "by leveraging Palantir's . . . Foundry" it could "develop powerful . . . data analytics

to gain insights and optimize processes."  D.A.625 (Lilium 6-K); D.A.686 (Sarcos 14A).

Plaintiffs make much of Celularity's disclosure that it "ceased using Palantir software."  ¶¶

80, 89.  But, the fact that Celularity "ceased" using the software, implies that until then,

Celularity *was* using it.  Further, a single customer complaint—made almost two years

*after* the contract was signed and *after* the Class Period—does not suggest fraud.  *See*

D.A.691 (CELU 10-Q).  It also undermines Plaintiffs' argument that Palantir was engaged

in sham transactions.  Were that the case, Celularity would not care about the efficacy of

---

[15]  The unsubstantiated contention "Defendants" had "close relationships" with SPAC directors meant that they had information about the SPACs' future lack of success is baseless.  ¶ 98 n.21.

[16]  Lilium, Sarcos, Roivant, and Celularity were expected to raise $830 million, $496 million, $631 million, and $375 million, respectively.  *See* D.A.641 (Lilium ID); D.A.649 (Sarcos ID); D.A.662, 666 (Roivant ID); D.A.672 (Celularity ID).  Further, five-year projections for Lilium and Sarcos predicted $3.3 billion and $2.7 billion in annual revenue, well in excess of the fees owed Palantir.  *See* D.A.640 (Lilium ID); D.A.652 (Sarcos ID).  The same was true for Roivant's ($7.3 billion) and Celularity's ($1.3 billion) post-transaction valuations.  *See* D.A.666 (Roivant ID); D.A.673 (Celularity ID).

Palantir's software once it received Palantir's cash.   Regardless of Plaintiffs' view on whether the software was needed, the SPACs' intent to use the software and actual use of the software are the critical inquiry.   And there is no doubt that the SPACs so intended and did use Palantir's products.   *See* D.A.625 (Lilium 6-K); D.A.686 (Sarcos 14A).

*Accounting.*   Unable to plead a traditional disclosure claim, Plaintiffs imply that Palantir improperly accounted for the SPAC transactions.   To establish an accounting-based securities fraud claim, Plaintiffs must plead "widespread and significant inflation of revenue" and particularized facts, including the amount overstated, products involved, dates of such transactions, and customers or employees involved.   *In re Daou Sys., Inc.*, 411 F.3d 1006, 1017 (9th Cir. 2005), *abrogated on other grounds by Tellabs*, 551 U.S. 308.   Plaintiffs fail to do so, thereby dooming this theory.   *See In re Qwest Commc'n Int'l, Inc.*, 396 F.Supp.2d 1178, 1191 (D. Colo. 2004) (generalized allegations critiquing revenue recognition and sources of revenue do not suffice).

Plaintiffs allege that many statements regarding financial metrics were false or misleading because they included SPAC revenue, which purportedly was not sustainable in the long term.   None is alleged to be false with the requisite degree of particularity.

Plaintiffs contend that SPAC revenue artificially "inflated" adjusted operating margins, contribution margins, revenue and revenue growth, number of customers, and TRDV.   ¶¶ 104, 106-07, 110, 112, 114, 120, 121, 146.   But Palantir disclosed all information (SPAC revenue and TRDV, number of SPAC customers, etc.) necessary to calculate these metrics ex SPAC.   *Werner v. Werner*, 267 F.3d 288, 299 (3d Cir. 2001) (affirming dismissal where shareholders could calculate allegedly omitted information).

Furthermore, missing from the Complaint are any particularized facts that the SPAC related revenue was overstated, inaccurate, or nonexistent. *See, e.g.*, ¶¶ 147, 122. Plaintiffs cannot escape the facts: the agreements existed, the customers paid, and the revenue recognized met the appropriate revenue recognition criteria. Indeed, Palantir disclosed that it recognized revenue consistent with ASC 606, and Plaintiffs do not argue that this accounting treatment was improper. D.A.266 (Aug. 12, 2021 10-Q); *In re Intrexon Corp. Sec. Litig.*, 16-cv-02398, 2017 WL 732952, at *5 (N.D. Cal. Feb. 24, 2017) (financials not misleading where revenue recognition policy disclosed).

The assertion that Palantir's commercial contribution margin was "inflated" is baseless. It is premised on Plaintiffs' assumption—drawn from thin air—of SPAC contracts having a 90% contribution margin. ¶ 105. Having invented a 90% contribution margin for SPACs, Plaintiffs claim that Palantir overstated its commercial contribution margin by as much as 17.7% in 2021 and 2022. *Id.* But Plaintiffs cannot invent alternative metrics from whole cloth to argue that the properly reported metrics are false.[17]

Finally, Plaintiffs allege that Palantir's agreements with SPACs were "roundtrip" or "quid pro quo" exchanges made to "mask[] the timing and extent of the stagnation" of its business. *See, e.g.*, ¶¶ 3, 32, 64, 84, 100, 103, 104. This too is wrong. A "round tripping" scheme involves parties entering into off-setting contracts exchanging similar amounts of money. Such transactions are improper because parties book revenues even though the transactions "wash out" without any economic substance. That did not happen here.

---

[17] Plaintiffs similarly estimate—without any basis—a 90% profit margin from the SPAC contracts, ¶ 108, which the Court should reject for the same reasons.

Palantir's SPAC investments did not "wash out" the value of each subscription agreement. *See, e.g.*, ¶¶ 64 (Lilium: $41M investment and 5-year $50M contract); 76 (AdTheorent: $15M investment and 5-year $20M contract); *Amr v. Sollitto*, 08-cv-1686, 2009 WL 10673610, at *4 (D. Ariz. Sept. 30, 2009) (dismissing complaint; "[i]f Plaintiffs wish to pursue their round-tripping theory, they must plead more specific facts establishing that these transactions lacked economic substance" because transactions that do not "match up" cannot conceivably be construed as "washing each other out" as required to show round tripping); *Hunter*, 477 F.3d at 178 (affirming dismissal because "[t]he mere existence of reciprocal dealing does not suggest 'round-tripping'").   Moreover, in exchange for its investment, Palantir received shares at market value in the SPAC.  *See, e.g.*, D.A.202 (May 12, 2021 10-Q) ("3.0 million shares" in Roivant).  Plaintiffs therefore fail to adequately establish falsity as to the SPAC-related statements.

## B.  Plaintiffs Fail to Plead Falsity as to Non-SPAC Statements.

### 1.  Plaintiffs Plead No False Statement as to Financial Performance.

Plaintiffs challenge statements about Palantir's financial performance metrics, including statements about (i) reported revenue, TRDV and customer count, (ii) revenue growth, and (iii) projected long-term revenue growth.  None of Plaintiffs' allegations suffice to make out a securities fraud claim.

***Reported Revenue, TRDV, and Customers.***   Plaintiffs challenge statements concerning Palantir's reported revenue, TRDV, and customer count.  ¶¶ 112, 113–16. They argue, *inter alia*, that because the SPAC customers did not have a "legitimate" need for Foundry, the revenue recognized, TRDV, and customer counts relating to these

customers were false.  *See id.*  However, Plaintiffs do not allege—because they cannot—that the revenue recognized was incorrect or that the SPAC customers and related agreements did not exist.  As such, these are "accurate recitations of historical successes" and "not actionable."  *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002); *see also Okla. Police Pension & Ret. Sys. v. Boulder Brands, Inc.*, 15-cv-00679, 2017 WL 1148689, at \*7 (D. Colo. Mar. 28, 2017) ("accurate reporting of historical successes" are "non-actionable").

**Revenue Growth**.  Plaintiffs also contend that Palantir "inflated" revenue, TRDV and customer growth.  *See* ¶¶ 110-17.  This is untrue.  Plaintiffs acknowledge that revenue growth occurred and instead take issue with the *source* of revenue (*i.e.*, derived from SPAC contracts).  *See* ¶¶ 129, 133 ("modest single-digit YoY" ex-SPAC growth). The fact is, however, Palantir's revenue, deal value, and customer count *increased* to the extent disclosed, both prior to and during the Class Period.  *See, e.g.*, D.A.96 (FRS) (15.5% growth from 2017 to 2018; 24.9% growth from 2018 to 2019; 49% growth from H1 2019 to H1 2020); D.A.694 (Feb. 16, 2021 PR) (47% Y/Y revenue growth for FY20; 40% Y/Y revenue growth for 4Q20); *compare* D.A.206 (May 12, 2021 10-Q) (149 customers) *with* D.A.275 (Aug. 12, 2021 10-Q) (169 customers); D.A.1526 (Annex G).  Plaintiffs do not show that any of these figures were false.

Plaintiffs argue that statements about the performance of the government sector were false.  *See, e.g.*, ¶¶ 136–37 ("enduring problems;" "tip of the iceberg"), 143–44, 146–47, 150 ("pipeline . . . is big and building"), 152–53, 155.  But Palantir's US government revenue and pipeline grew at all times that Plaintiffs contest.  *See, e.g.*, D.A.1527–29

(Annex H); D.A.342 (Aug. 12, 2021 Tr.) (new deals with U.S. Army, Air Force); D.A.715–16 (Nov. 9, 2021 Tr.) (reporting deals with U.S., U.K., and Australian Navies, and more); D.A.183 (May 11, 2021 Tr.) (new contract with NNSA); D.A.156 (May 9, 2022 Tr.) (new order with Bavarian police; CDC expansion).   Plaintiffs offer no particularized facts demonstrating contemporaneous falsity of these historical facts, so their claim fails. *McDonald*, 287 F.3d at 998; *In re Crocs, Inc. Sec. Litig.*, 774 F.Supp.2d 1122, 1151 (D. Colo. 2011), *aff'd sub nom. Sanchez v. Crocs, Inc*, 667 F. App'x 710 (10th Cir. 2016); *Boulder Brands*, 2017 WL 1148689, at *7.

Plaintiffs also allege that statements about commercial sector performance were false.  *E.g.*, ¶¶ 131 ("significant momentum"), 135 ("pipeline is substantial and growing"), 140-41 ("commercial tailwind"), 142 ("sales cycle is [h]eating up"), 146 ("revenue growth accelerated"), 149 ("accelerating commercial business").  Again, there is no dispute that Palantir saw its commercial pipeline grow and its commercial revenue and customers *increase* during the relevant period.   *See* D.A.720 (Aug. 12, 2021 PR) (commercial revenue up 90% Y/Y in 2Q21; commercial customer count up 32%); D.A.729 (Nov. 9, 2021 PR) (commercial revenue up 103% Y/Y in 3Q21); D.A.154, 160 (May 9, 2022 Tr.) (commercial revenue accelerated in the previous five quarters, reaching 54% growth rate in 1Q22; US commercial revenue ex SPACs up 65% Y/Y and 9% sequentially Q/Q); D.A.1527–29 (Annex H).  These "accurate recitations of historical successes" are "not actionable."  *McDonald*, 287 F.3d at 998; *see also In re Crocs*, 774 F.Supp.2d at 1151 (that company had "achieved significant growth" was inactionable historical fact).

**_Projected Long-term Revenue Growth._**   Meanwhile, Plaintiffs' allegations

concerning the rate of Palantir's growth fail because the risks associated with Palantir's projected long-term revenue guidance was repeatedly and emphatically disclosed. *See, e.g.*, D.A.752 (Nov. 13, 2020 10-Q) ("***there can be no assurances that revenue will continue to grow or do so at current rates***, and you should not rely on the revenue of any prior quarterly or annual period as an indication of our future performance"; "***revenue growth rate may decline in future periods***"); D.A.821 (Feb. 26, 2021 10-K) (same); D.A.366 (Feb. 24, 2022 10-K) (same); D.A.214 (May 12, 2021 Form 10-Q) ("if our relationships with our largest customers are impaired or terminated, our revenue could decline"); D.A.289 (Aug. 12, 2021 Form 10-Q) (same); D.A.914 (Nov. 9, 2021 Form 10-Q); *see also* D.A.1527–29 (Annex H).  Disclosed risks cannot ground a securities fraud claim. *See Noble Asset Mgmt. v. Allos Therapeutics, Inc*., 04-cv-1030, 2005 WL 4161977, at *12 (D. Colo. Oct. 20, 2005) (positive statements not misleading because company disclosed relevant risks and uncertainties).[18]  As such, Plaintiffs' allegations fail.

### 2.      Plaintiffs Plead No False Statement Concerning Efficiencies.

The Complaint next takes aim at several statements about Palantir's efficiencies. ¶¶ 34, 36, 37, 38-39, 47, 49, 50-52.  None is adequately pleaded to be false.

Plaintiffs challenge accurate statements about the rise in Palantir's operating results, including contribution margins.  ¶¶ 36–39.  Plaintiffs claim these statements were false or misleading because they do not reflect the time and resources required to

---

[18]    *Accord Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 336–38 (2d Cir. 2011) (rejecting misrepresentation claim concerning liquidity risks when defendants "explicitly disclosed" that a successful auction "does not mean that an investment" "involves no significant liquidity or credit risk").

onboard new clients, including the use of pilots.  ¶¶ 35, 40–44.  As a threshold matter, Plaintiffs do not dispute that Palantir's contribution margin, a measure of efficiency in selling and delivering software, improved from 15% to 55% over the four quarters preceding these statements.  D.A.97–98 (FRS).  Unable to challenge the truth of these metrics, Plaintiffs claim they were misleading because Defendants knew that they were unsustainable.  *See, e.g.*, ¶¶ 40, 44.  Yet, Plaintiffs identify no contemporaneous facts to support their view that Palantir did not believe that it could sustain improved contribution margins.  Rather, their argument is based on alleged lower margins after the direct listing. ¶¶ 40, 44.  That is impermissible fraud by hindsight.  ¶ 58; *Novell*, 120 F.3d at 1124.

Plaintiffs next challenge Palantir's statements that its platform Apollo gave it "SaaS like economics."  ¶ 34.  Plaintiffs point to "a lengthy, expensive, and highly-customized process to secure client contracts and build out software solutions" for Gotham and Foundry. ¶ 35.  Plaintiffs conflate two separate things.  Palantir's SaaS-related statement described its Apollo platform, which permitted Palantir to deploy its other products in various environments—a Humvee, a submarine, or a drone—and which had SaaS like economics.  *See* D.A.970–979 (Investor Day Tr.).  The statement did not purport to address Gotham and Foundry, which Palantir did customize for customers, as Palantir disclosed.   D.A.111 (FRS) ("[Gotham and Foundry are] comprised of user-facing applications that are targeted to the specific industries and sectors in which they are used."); *see also* ¶ 35 (citing D.A.960–969 (FedScoop Article)).

Plaintiffs also challenge the statements that Palantir did not do "custom development work" or "buil[d] bespoke applications," because Foundry was "a set of

digital infrastructure tools which engineers use to build a bespoke product."  ¶ 34.  Again, Palantir disclosed all of this.  D.A.38–39, 111 (FRS).  It thus could not have been surprising to a reasonable investor that business-to-business sales involved some user-facing modulation of Palantir's applications.

Finally, Plaintiffs challenge Palantir's statement that its software can be "ready in days" or "within hours," or can be deployed with a "few clicks."  *See* ¶¶ 47, 49, 50-52. Plaintiffs claim these statements were false because Palantir's process was "lengthy, time-consuming, and costly."  ¶ 47.  But Plaintiffs advance no well pleaded facts to support these *ipse dixit* assertions, which cannot support a securities fraud claim.  *Hampton v. Root9B Techs., Inc.*, 15-cv-02152, 2016 WL 9735744, at *3 (D. Colo. Sept. 21, 2016) (falsity must be pleaded with particularity), *aff'd*, 897 F.3d 1291 (10th Cir. 2018). Moreover, that Palantir's products could be "ready in days" did not mean that some clients would not demand substantial customization.  This was precisely why Palantir disclosed both its intensive sales and deployment process to investors.  *Supra* p. 6.

### C.    The Complaint Fails to Plead Falsity as to Any Remaining Statement in the FRS.

Plaintiffs' remaining challenges under Section 11 are equally meritless.  To start, Plaintiffs predicate their Securities Act claims on the same "scheme" as their Exchange Act claims.  Specifically, Plaintiffs allege: (i) Defendants "planned" the "SPAC Scheme" "at the time of the Offering, as demonstrated by the Registration Statement," and "fail[ed] to disclose" the investments' "true nature"; (ii) the FRS "sought to portray Palantir as a highly-efficient company even though Defendants "had no good faith basis to believe, and did not actually believe" the statements in the FRS; and (iii) the statements in the FRS

"were all made in connection with (and to solicit interest in) the Offering," so Defendants could "unlock [their] awards."  ¶¶ 38, 44, 46, 61-62, 188.  None suffices.

The Securities Act section challenges four of the same statements as the Exchange Act section, and even expressly alleges fraud.  ¶¶ 219, 221, 223, 225; *see* ¶¶ 222 ("Defendants were aware" of falsity and "did not believe" their statements); 224 ("artificially inflating" metrics); 230 (Defendants "aware of" contradictory facts).  Because Plaintiffs' theory of falsity is the same under both statutes, they must satisfy Rule 9(b)'s heightened pleading requirement.  *Rubke*, 551 F.3d at 1161.  Plaintiffs cannot avoid doing so by disclaiming fraud.  ¶¶ 246, 256; *Rigel*, 697 F.3d at 885.

Plaintiffs cannot satisfy the exacting requirements of Rule 9(b) (or even Rule 8(a)) and thus fail to plead falsity of any statement in the FRS.  The Challenged Statements in ¶¶ 219, 221, 223, and 225 fail for the same reasons as their counterparts in ¶¶ 38, 39, 61, and 128.  *Supra* III.A, B.  As to the rest, Plaintiffs fail to show that they are actionable:

- The "estimate" of then-current TAM in ¶ 226 is a statement of opinion and corporate optimism, and thus cannot be rendered false by future deceleration, as alleged, ¶ 230.  *See MHC Mut. Conversion Fund*, 761 F.3d at 1119–21 (statements about prospects are inactionable opinions); *Novell*, 120 F.3d at 1121 ("compelling set of opportunities" is inactionable corporate optimism).  Palantir also warned TAM was not a guarantee and may change.  *Supra* p.6.

- The statements in ¶¶ 220, 227–28 are forward-looking, and cannot be rendered false by future events.  *See* ¶ 230 (alleging statements false because revenue growth rates "set to decelerate" in next quarter).  Plaintiffs omit from ¶ 227 the words "We are working towards becoming," which also appear in ¶ 228 and which confirm that they are forward-looking.  They also omit from ¶¶ 220 and 228 the lead-in: "We are pursuing a number of strategies . . .," which confirms the same.

- The statement in ¶ 229 about Palantir's 3Q20 revenue growth is an inactionable recitation of historical success.  *See McDonald*, 287 F.3d at 998.

Finally, the Complaint's challenge to Palantir's plan to increase its reach with

- 34 -

existing customers and "design[ing]" its platform to easily accommodate new users, workflows, and use cases, fails. ¶ 220. Plaintiffs proffer nothing that shows Palantir was not planning to increase its reach or that its platforms were not "designed" as stated. ¶122. Thus, Plaintiffs' allegations should be dismissed.

## IV.    FORWARD-LOOKING STATEMENTS ARE INACTIONABLE.

Forward-looking statements, such as "projections of revenues, expenditures, and income; statements of management's plans and objectives for future operations; statements of future economic performance," are insulated from liability under the PSLRA's safe harbor (15 U.S.C. § 78u-5). *In re Molycorp, Inc. Sec. Litig.*, 12-cv-00292, 2015 WL 1540523, at *25 (D. Colo. Mar. 31, 2015). They are separately protected by the judicially created "bespeaks caution doctrine." *Novell*, 120 F.3d at 1120; *Schaffer v. Evolving Sys., Inc.*, 29 F.Supp.2d 1213, 1221 (D. Colo. 1998). Such statements are inactionable if they are "accompanied by meaningful cautionary statements" or the plaintiff fails to prove that the statement was made with "actual knowledge" that it was false and misleading. § 78u-5I(1)(A)(i); *In re Williams Sec. Litig.*, 339 F.Supp.2d 1206, 1220 (N.D. Okla. 2003). Many Challenged Statements, including those about Palantir's long-term revenue guidance, are textbook inactionable forward-looking statements.[19] For example:

- **Revenue Projections and Long-Term Guidance**: ¶¶ 157–59 (expecting "30%" "revenue growth"); 96 (expecting "40% revenue growth" for 2021).

- **Customer Pipeline:** ¶¶ 37, 39, 221 (predicting customers will move into Scale phase and increased margins); 120, 141, 150, 152 (predicting revenue growth).

- **Strategy**: ¶¶ 65 (Sarcos "will leverage Foundry"); 66 (Lilium and Sarcos are "going"

---

[19]  A list of inactionable forward-looking Challenged Statements is at D.A.1432–43 (Annex A).

to build around Foundry from "day 0").

- **Operational Efficiencies**: ¶¶ 36 (contribution margin increase due to "getting much more efficient"); 52 (predicting Palantir will reach a "broad set of customers").

Here, the forward-looking statements are inactionable for both reasons. *First*, they were accompanied by meaningful cautionary language warning of the precise risks that Plaintiffs claim occurred. Palantir's warnings were "highly specific, very factual, and directly address[ed] the predictive statements [at issue]," so as to "nullify any potentially misleading effect."[20] *Novell*, 120 F.3d at 1120–21; *In re Gold Res. Corp. Sec. Litig.*, 957 F.Supp.2d 1284, 1297 (D. Colo. 2013) ("[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment"), *aff'd*, 776 F.3d 1103 (10th Cir. 2015).

Indeed, Palantir's disclosures cautioned about the uncertainty of its revenue growth and earnings guidance. *See, e.g.*, D.A.1476–1516 (Annex E) ("no assurances that revenue will continue to grow"; "downturns in sales . . . may not be immediately reflected"; results "may fluctuate" due to "intensive nature of our sales efforts"). Similarly, Palantir disclosed the nature of its strategic investment program and its attendant risks. *See, e.g.*, D.A.305 (Aug. 12, 2021 10-Q) (investments could lead to "a partial or complete loss of invested capital"); D.A.388 (Feb. 24, 2022 10-K) ("companies may be engaged in businesses that involve novel and unproven technologies, products, and services" and "may be unable to perform their obligations under any commercial contracts"). Palantir further disclosed the complexities associated with its software sales, customer base, and

---

[20]  A non-exhaustive list of Palantir's cautionary statements, which accompanied the Challenged Statements, is at D.A.1476–1516 (Annex E).

operational efficiencies.  *See supra* pp.31–33; *see also, e.g.*, D.A.819 (Feb. 26, 2021 10-K) ("sales cycle is often long and unpredictable"); *Lorusso v. Boulder Brands*, 15-cv-00679, 2017 WL 4365180, at *11 (D. Colo. Mar. 1, 2017) (defendants sufficiently disclosed risks related to company's ability to implement growth strategy and adverse developments with respect to sale of product), *R&R adopted*, 2017 WL 1148689, at *3.[21]

*Second*, Plaintiffs rely on conclusory allegations that Defendants knew, when the SPAC transactions were entered, that SPACs would fail and Palantir would not receive a "substantial" portion of SPAC-related revenue.  ¶¶ 84, 98, 115.  But Plaintiffs fail to plead any facts showing that any Defendants actually had this "knowledge;" and their speculation to the contrary does not suffice.  ¶¶ 59, 68, § 78u-5l(1)(B); *Spirit*, 79 F.4th at 1217; *Shafer v. Lightning eMotors, Inc.*, 21-cv-02774, 2024 WL 691458, at *1, (D. Colo. Feb. 20, 2024), *R&R adopted*, 2024 WL 1509166 (D. Colo. Mar. 26, 2024); *Gold Res.*, 957 F.Supp.2d at 1298 ("conclusory allegations" insufficient to plead "actual knowledge"). Accordingly, these allegations fail.

## V.   MANY CHALLENGED STATEMENTS ARE INACTIONABLE OPINIONS OR CORPORATE OPTIMISM.

Several Challenged Statements are inactionable opinion.  *See, e.g.*, ¶¶ 39 ("We

---

[21]  *See Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F.Supp.3d 551, 574 (S.D.N.Y. 2018) (statements concerning a new venture and how it "would benefit the company in the future" shielded by safe harbor because disclosures warned of potential "cost challenges" and difficulties in implementing new systems), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019); *Steamfitters Loc. 449 Pension Plan v. Molina Healthcare, Inc.*, 18-cv-3579, 2018 WL 6787349, at *2 (C.D. Cal. Dec. 13, 2018) (statements concerning "scalability" of company's infrastructure, expected "administrative cost leverage" from new acquisitions, and associated investments shielded by safe harbor because disclosures warned of risks that company faced "as it moved into" a new market).

*believe* that all of our customers will move into the Scale phase over the long term"), 83 ("These are companies that we *think* we will be working with for a very long time."); 152 ("I *believe* we will double it again this year.").[22]  Courts routinely hold such statements to be non-actionable.  *See MHC Mut. Conversion Fund*, 761 F.3d at 1119–21 (statements about prospects of company's investments were inactionable opinions) (Gorsuch, J.).

To plead falsity based on opinion statements, it is insufficient to show that defendants' "belief turned out to be wrong." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).  Rather, a plaintiff must plead particularized facts establishing that defendants "inaccurately represent[ed]" their subjective "beliefs concerning then-present factual conditions." *Hampton*, 897 F.3d at 1299; *In re Sanofi Sec. Litig.*, 87 F.Supp.3d 510, 534 (S.D.N.Y. 2015) (for opinion statements, "the falsity and scienter requirements are essentially identical").  Plaintiffs make no such showing.  Indeed, Plaintiffs fail to plausibly allege that "(i) the speaker did not hold the belief []he professed, (ii) any supporting fact[s] []he supplied with h[is] opinion were untrue, or (iii) the speaker omitted facts whose omission makes the statement misleading to a reasonable investor." *In re Citigroup Sec. Litig.*, 20-cv-9132, 2023 WL 2632258, at *12 (S.D.N.Y. Mar. 24, 2023) (citing *Omnicare*, 575 U.S. at 186).

Moreover, many of the Challenged Statements are inactionable statements of corporate optimism. *See, e.g.*, ¶¶ 36 ("much more efficient"); 131 (continuing "momentum"); 132 ("rapid growth"); 140 ("tailwind"); 141 ("bigger and bigger"); 149

---

[22]  A list of Challenged Statements that are inactionable opinion is at D.A.1444–59 (Annex B).

("cutting-edge" product "innovation" driving "exceptional results").[23]  As the Tenth Circuit explained: "[v]ague, optimistic statements" are "not actionable because reasonable investors do not rely on them in making investment decisions."[24]  *Novell*, 120 F.3d at 1119. Defendants are "not required to take a gloomy, fearful, or defeatist view" of their business model.  *Rombach*, 355 F.3d at 174.  Therefore, Plaintiffs' allegations fall flat.

## VI.   PLAINTIFFS FAIL ADEQUATELY TO PLEAD SCHEME LIABILITY.

Unable to make a disclosure claim, Plaintiffs try for "scheme" liability.  To do so, Plaintiffs must plead that Defendants participated "in an illegitimate, sham or inherently deceptive transaction" with "the purpose and effect of creating a false appearance."  *SEC v. St. Anselm Expl. Co.*, 936 F.Supp.2d 1281, 1299 (D. Colo. 2013).  The conduct "must be inherently deceptive" and undertaken with scienter.  *Id.* at 1298–99.  Thus, to the extent that Plaintiffs fail to plead scienter, *supra* pp. 13–21, their scheme claim also fails.

Plaintiffs suggest that Defendants engaged in a scheme by making the SPAC investments and/or changing the way Palantir disclosed certain non-GAAP metrics.  They fail, however, to allege that either was an "illegitimate" or an "inherently deceptive" act

---

[23]  A list of Challenged Statements with inactionable corporate optimism is at D.A.1460–70 (Annex C).

[24]  Examples of inactionable statements of corporate optimism include: *Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, 15-cv-07952, 2017 WL 114401, at *9 (C.D. Cal. Jan. 9, 2017) ("more efficient"); *Anderson*, 105 F.Supp.3d at 1256–57 ("growing tailwinds"), *aff'd*, 827 F.3d 1229 (10th Cir. 2016); *In re Airgate PCS, Inc. Sec. Litig.*, 389 F.Supp.2d 1360, 1378–79 (N.D. Ga. 2005) ("additional operating efficiencies"; "growth potential"); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 529 (3d Cir. 1999) ("maintain[ing] growth and "accelerat[ing]" expansion); *Novell*, 120 F.3d at 1121 ("compelling set of opportunities"; "moving rapidly").

undertaken with the "purpose and effect" of defrauding investors.[25]

*First,* Plaintiffs suggest that Defendants initiated "sham transactions" and signed "multiyear, multimillion-dollar contracts" with SPACs to "foster an illusion of improved revenue and margin growth." ¶ 58. This claim fails because it is based on the Challenged Statements. ¶¶ 34 n.8; 56–122. As the Supreme Court made clear, claims of scheme liability cannot be premised on misstatements alone. *Lorenzo v. SEC*, 587 U.S. 71, 78 (2019). Otherwise, there would be no difference between Rule 10b-5(b) misstatement liability and Rule 10b-5(a) and (c) scheme liability. *Id.* at 82–84; *accord Shafer*, 2024 WL 1509166, *1. Moreover, "bolster[ing] the allegedly false impression created by defendants' misrepresentations . . . that form the basis of the 10b-5(b)" claim is impermissible "legal double dipping." *St. Anselm*, 936 F.Supp.2d at 1298–99 ("liability does not arise" by "repackaging a fraudulent misrepresentation a 'scheme to defraud'").

Plaintiffs suggest that SPAC investments were inherently deceptive because they "create[d] the appearance of continued robust high-margin growth." ¶ 32. That allegation fails for several reasons. Labeling an investment that does not pan out as deceptive is merely fraud by hindsight. *Novell*, 120 F.3d at 1124. That these investments were not as successful as expected does not mean that the transactions were entered into for an inherently deceptive purpose. *Compare St. Anselm*, 936 F. Supp. 2d at 1298–99

---

[25] Plaintiffs challenge the direct listing under scheme liability but going public via this SEC-approved method is hardly "inherently deceptive." ¶¶ 29, 32. Plaintiffs also do not allege how taking Palantir public in 2020 motivated Defendants to mislead investors in 2021 and 2022, which is when the SPAC investments and metric changes occurred. Plaintiffs need to allege—with particularity—facts that show Palantir planned the "scheme" prior to going public. The Complaint is devoid of any such allegations.

("nothing inherently deceptive" about investing in "promising opportunities that seemed likely to yield enormous returns" that failed to do so); *with SEC v. GPL Ventures LLC*, 21-cv-6814, 2022 WL 158885, *10 (S.D.N.Y. 2022) (scheme liability adequately pleaded where defendants "were the puppet masters of a scheme to launder their investments for profit"); *and SEC v. Simpson Capital Mgmt., Inc.*, 586 F. Supp. 2d 196, 205 (S.D.N.Y. 2008) (allowing scheme claim where the alleged scheme was to "late trade" mutual funds, which is "itself illegal").   Plaintiffs' allegations that Palantir engaged in roundtrip transactions, likewise, do not satisfy the requisite pleading standard.  *See SEC v. Kelly*, 817 F.Supp.2d 340, 344 (S.D.N.Y. 2011) ("nothing inherently deceptive" with defendant paying money to a counterparty and structuring the transaction so that the "counterparty purchases advertising").   Plaintiffs must plead facts showing that Palantir's SPAC investments were inherently deceptive when made.  They have not.

*Second,* Plaintiffs allege that Defendants failed to report negative trends by "altering Palantir's reporting of key metrics" and that this practice demonstrates efforts "in furtherance of their scheme."  ¶¶ 3, 161.  However, to survive dismissal, plaintiffs must allege "conduct beyond" misstatements.  The full extent of Plaintiffs' argument is that these "disclosures were critical" for "investors [to] gauge" the Company's performance and Defendants misrepresented performance by "conceal[ing] this information from the market." ¶¶ 166–67.  As such, Plaintiffs do not allege fraudulent conduct *beyond* the statements themselves and so this claim also fails.  *See supra* pp. 23–33, 35–39.

Moreover, Plaintiffs plead no facts that plausibly allege changes to these non-GAAP metrics were motivated by fraud.  Nor can they—the changes at issue are a result

of Palantir's evolving business needs, and so, entirely appropriate.[26]  *See In re SolarCity Corp. Sec. Litig.*, 274 F.Supp.3d 972, 1002 (N.D. Cal. 2017) ("[t]here are many potential reasons" to "cease to report a metric" that may "have no relation to the prior falsity of that metric"); *Ironworkers Local 580–Joint Funds v. Linn Energy, LLC*, 29 F.Supp.3d 400, 426 (S.D.N.Y. 2014) ("Plaintiff's effort to transform [a] business decision [to change the way defendant calculated certain metrics] into some sort of admission that statements made in prior reporting periods were false and materially misleading is entirely misguided.").

*Finally*, Plaintiffs' metrics allegations mischaracterize Palantir's disclosures:

- **Customers.**  Plaintiffs allege that Palantir changed their definition of customer to "artificially inflate[]" the customer count.  ¶ 162.  But the Company explained this change to the market when it was made, shortly after they went public—"[w]e have updated our definition of a customer to be an organization from which we have recognized revenue during the trailing twelve month period to provide more meaningful period over period comparisons"—and maintained this definition of "customer" ever since.  D.A.206 (May 12, 2021 10-Q); *Compare* D.A.745 (Nov. 13, 2020 10-Q) ("We define a customer as an organization from which we have recognized revenue in a reporting period.") *with* D.A.275 (Aug. 12, 2021 10-Q); D.A.897 (Nov. 9, 2021 10-Q); D.A.425 (Feb. 24, 2022 10-K); D.A.493 (May 9, 2022 10-Q); D.A.983 (Aug. 8, 2022 10-Q).

- **ACD.**  Plaintiffs allege that Defendants "failed to disclose [ACD] with 3Q21, 1Q22, or 2Q22 earnings" to "obscure the deterioration in Palantir's prospects."  ¶ 163.  But Plaintiffs overlook that Palantir regularly disclosed ACD in its annual reports.  *Compare* D.A.881 (Feb. 26, 2021 10-K), *and* D.A.426 (Feb. 24, 2022 10-K), *with* D.A.206 (May 2021 10-Q).  Thus, the FY21 10-K provided ACD directly between the only two challenged announcements in the Class Period, and in so doing disclosed the 0.1-year drop that Plaintiffs allege was "obscure[d]."  ¶ 163.  The

---

[26]  Palantir included certain metrics in the FRS because it was an emerging-growth company, but figures that had initially been meaningful were no longer relevant in later quarters as the Company grew.  For example, once Palantir was growing by 10+ new customers in a quarter, ARPC was less meaningful.  *Compare* D.A.745 (Nov. 13, 2020 10-Q) (132 customers), *and* D.A.880 (Feb. 26, 2021 10-K) (139), *with* D.A.493 (May 9, 2022 10-Q) (277); D.A.983 (Aug. 8, 2022 10-Q) (304).   Regardless, Palantir continued to report Top 20 revenue.  *E.g.*, D.A.745 (Nov. 13, 2020 10-Q); D.A.359, 425 (Feb. 24, 2022 10-K); D.A.493 (May 9, 2022 10-Q); D.A.983 (Aug. 8, 2022 10-Q).

2Q22 earnings occurred after the Class Period concluded.

- ***Acquire, Scale, and Expand.***   Palantir reported these metrics until 1Q22. Plaintiffs allege that by not providing the FY22 metric, Palantir "obscure[d]" its prospects with non-SPAC customers.  ¶¶ 167–68.  That change cannot be part of any supposed "scheme," because Palantir implemented it in the same quarter that the supposed "SPAC scheme" ended.  ¶ 167.  As such, the lack of these metrics could not obscure the performance of either SPAC or non-SPAC customers.  Nor do Plaintiffs explain how "revenue or contribution margins associated with [the Acquire, Expand, or Scale] cohort[s] of new customers acquired in 2021" showed "diminishing business prospects" for non-SPAC customers."  ¶ 168.  In fact, Plaintiffs are wrong that the metric would not include SPAC customers. This metric defines cohorts of specific customers and then tracks each cohort's progress for two years.  *See, e.g.*, D.A.427 (Feb. 24, 2022 10-K) (comparing metrics for a set of contracts defined in 2020 to the same set in 2021).

- ***TRDV.***   Plaintiffs allege that "the 1Q21, 2Q21, and 3Q21 Forms 10-Q each concealed current quarterly TRDV information" and Defendants "concealed the split between government and commercial [TRDV] in both 1Q21 and 1Q22."  ¶¶ 115, 170.  This misconstrues Palantir's reporting.  Palantir disclosed the TRDV reported in the previous 10-K in its Form 10-Qs, beginning with its first 10-K in 2021.[27]  Palantir additionally disclosed quarterly TRDV in all 1Q, 2Q, and 3Q earnings calls.[28]  That Palantir did not disclose the TRDV split the way Plaintiffs would have preferred is not actionable.

- ***ARPC.***   Plaintiffs allege that Defendants moved from reporting ARPC to average revenue of Palantir's top twenty customers in 1Q22 to "conceal" that "Palantir's newest customers were not scaling up in size or profitability."  ¶ 171.  But Plaintiffs admit that Palantir acknowledged and disclosed the reasons for changes in the reported ARPC metric.  *Id.*  Palantir also continued to report both revenue and their total numbers of customers—making ARPC a straightforward equation.  *See*, D.A.488–89, 493 (May 9, 2022 10-Q); D.A.983, 986 (Aug. 8, 2022 10-Q).[29]

Thus, Plaintiffs fail to allege particularized facts to ground a scheme liability claim.

---

[27]  *See, e.g.*, D.A.823, 883 (Feb. 26, 2021 10-K); D.A.215 (May 12, 2021 10-Q); D.A.207 (Aug. 12, 2021 10-Q); D.A.913 (Nov. 9, 2021 10-Q).

[28]  D.A.185 (May 11, 2021 Tr.); D.A.344 (Aug. 12, 2021 Tr.); D.A.711 (Nov. 9, 2021 Tr.).

[29]  *See also Werner*, 267 F.3d at 299; *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1323 (7th Cir. 1988) (no fraud where defendant disclosed the relevant numbers and the necessary calculation for the ratio at issue).

## VII.    PLAINTIFFS FAIL ADEQUATELY TO PLEAD LOSS CAUSATION.

Because Plaintiffs attempt to plead loss causation through a "corrective" disclosure theory, they must show that "the truth" about the allegedly false statements "became known" upon issuance of those disclosures.  ¶¶ 173–74; *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  That Palantir's earnings disappointed is not sufficient.  *Loos v. Immersion Corp.*, 762 F.3d 880, 887–88 (9th Cir. 2014).  Rather, Plaintiffs must show that the "corrective" disclosures revealed "the wrongfully concealed information."  *In re Williams Sec. Litig.*, 558 F.3d 1130, 1138 (10th Cir. 2009).  Plaintiffs fail to do so.

The Complaint alleges four "loss events"—*each* a regularly scheduled earnings release through which Palantir reported quarterly or annual results.  Plaintiffs do not and cannot show that any Challenged Statement was revealed to be false in these releases:

- On November 9, 2021, Palantir's 3Q21 earnings allegedly "revealed a significant deceleration" in revenue growth and declining government metrics.  ¶ 175.
- On February 17, 2022, Palantir's FY21 release allegedly "revealed" that the government sector continued to decelerate along with declining contribution margins, flat TRDV, and certain guidance below consensus.  ¶ 178.
- On May 9, 2022, Palantir's 1Q22 earnings allegedly "revealed" that Palantir achieved "only" 25% growth, "substantially below" the 30% long-term revenue target, certain guidance below expectations, a decline in $300 million in total deal value, and that it had "wound" the SPAC investment program down.  ¶ 181.
- On August 8, 2022, Palantir's 2Q22 earnings allegedly revealed that it had terminated several SPAC contracts, that its deal value remained "flat," and that it anticipated "only" 23% annual revenue growth, "well below" the 30% target.  ¶ 184.

Each fails to plead loss causation for several reasons.  *First*, the releases did not correct any prior untruth or reveal any fraud.  They did not reveal, for example, that reported revenue was inaccurate, that Palantir no longer aimed for 30% growth, or that it did not believe that SPAC investments represented opportunities when they were made.

*Second*, "loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud." *Prissert v. EMCORE Corp.*, 894 F.Supp.2d 1361, 1376 (D.N.M. 2012).  Therefore, Plaintiffs' allegations do not suffice.  *See Lanigan Grp., Inc. v. Li-Cycle Holdings Corp.*, 22-cv-0222, 2023 WL 6541884, at *9 (E.D.N.Y. Oct. 6, 2023).

Finally, Plaintiffs point to analyst reports issued after these earnings releases, as is typical for public companies, but they do not show how anything in the reports rendered any prior statement false.  ¶¶ 176, 179, 182, 185; *see Curry v. Yelp Inc.*, 875 F.3d 1219, 1228 (9th Cir. 2017) (affirming dismissal of claim that pointed to "analyst reports" as basis for loss causation "without providing additional facts that demonstrate fraud").

Accordingly, Plaintiffs fail to plead facts sufficient to show loss causation.

## VIII.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20A.

Because no separate violation of the securities laws was adequately pleaded, the Section 20A insider trading claim (like the Section 20(a) and 15 control person claims) fails.  *Molycorp*, 2015 WL 1540523, at *30 (requiring "separate violation").[30]

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Respectfully submitted,

Sam D. Starritt

---

[30] The 20A claim also fails as Plaintiffs do not allege what MNPI Defendants possessed and when, and for lack of contemporaneity.  *See Croker v. Carrier Access Corp.*, 05-cv-01011, 2006 WL 2035366, at *13 (D. Colo. July 18, 2006); *In re AST Rsch. Sec. Litig.*, 887 F.Supp.231, 234 (C.D. Cal. 1995) (same-day trades required); *Copland v. Grumet*, 88 F.Supp.2d 326, 338 (D.N.J. 1999) (two days insufficient); D.A.1471–75 (Annex D).

Starritt Legal, LLC
222 North 7th Street, Suite A-1
Grand Junction, Colorado 81501
Telephone: (970) 335-8831
email:  sam@starrittlegal.com

*/s/ David Y. Livshiz*
David Y. Livshiz
Nicholas A. Caselli
FRESHFIELDS BRUCKHAUS DERINGER
US LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 277-4000
david.livshiz@freshfields.com
nicholas.caselli@freshfields.com

Boris Feldman
FRESHFIELDS BRUCKHAUS DERINGER
US LLP
855 Main Street
Redwood City, CA 94063
(650) 618-9250
boris.feldman@freshfields.com

*Attorneys for Defendants Palantir Technologies Inc., Alexander C. Karp, David Glazer, Shyam Sankar, Kevin Kawasaki, Peter Thiel, Stephen Cohen, Alexandra Schiff, Alexander Moore, and Spencer Rascoff*